# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                                  **No. CR 15-4275 JB**

CHRISTOPHER GARCIA,

     Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) the Defendant's Motion to Compel Disclosure of Discoverable Materials, filed February 25, 2017 (Doc. 163)("Motion to Compel"); and (ii) the Defendant's Motion for Discovery and Inspection Concerning Government's Use of Informants and Cooperating Individual; Disclosure and Notice of Exculpatory Evidence Requested Concerning Government's Use of Informants and Cooperating Individuals, filed February 28, 2017 (Doc. 181)("CI Motion"). The Court held a hearing on April 13, 2017, which continued onto April 14, 2017. The primary issues are: (i) whether the Court should compel Plaintiff United States of America to disclose certain materials and documents that Defendant Christopher Garcia asserts are in its possession, custody, and control, in accordance with rule 16 of the Federal Rules of Criminal Procedure, and all other federal laws regulating discovery in criminal cases; and (ii) whether the Court should order disclosure of the identities of, and other information regarding, certain confidential informants ("CIs") assisting the United States in this prosecution. At the hearing, the Court addressed each specific discovery and disclosure request, and made specific rulings with respect to the requests that the parties did not resolve before or

during the hearing. Accordingly, the Court will grant in part and deny in part the Motion to Compel and the CI Motion.

**FACTUAL BACKGROUND**

The Court takes its recitation of the facts regarding Garcia's standalone drug case from the Redacted Superseding Indictment, filed March 16, 2016 (Doc. 49)("Redacted Superseding Indictment"). The Court recognizes that the facts are largely the United States' version, and that Garcia is presumed innocent. First, however, the Court will provide the facts from the cases related to Garcia's drug case, so the reader has the fuller context of all of the relevant background information.

1.  **United States v. DeLeon.**

The Court first, then, takes its facts from the first Superseding Indictment in United States v. DeLeon, 2016 WL 7242579 (D.N.M. 2016)(Browning, J.). See also United States of America v. Angel DeLeon, 2016 WL 3124632 (D.N.M. 2016)(Browning, J.). The Court does not set forth these facts as findings or the truth. The Court recognizes that the factual background is largely the United States' version of events and that the Defendants are all presumed innocent.

This case deals with crimes that the Syndicato de Nuevo Mexico (Spanish for Syndicate of New Mexico)("SNM") allegedly committed through its members. See Superseding Indictment at 2. SNM, through its members, operated in the District of New Mexico at all relevant times, and its members engaged in acts of violence and other criminal activities, "including murder, kidnapping, attempted murder, conspiracy to manufacture/distribute narcotics, and firearms trafficking." Superseding Indictment at 2. SNM constitutes an enterprise "as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals

associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce." Superseding Indictment at 3.

SNM is a violent prison gang formed in the early 1980s at the Penitentiary of New Mexico ("PNM") after a violent prison riot at PNM during which inmates seriously assaulted and raped twelve correctional officers after taking them hostage. See Superseding Indictment at 3. During the riot, thirty-three inmates were killed, and over 200 were injured. See Superseding Indictment at 3. After the PNM riot, SNM expanded throughout the state's prison system and has had as many as 500 members. See Superseding Indictment at 3. SNM has approximately 250 members, comprised of "a 'panel' or 'mesa' (Spanish for table) of leaders who issued orders to subordinate gang members." Superseding Indictment at 3. SNM controls drug distribution and other illegal activities within the New Mexico penal system, but it also conveys orders outside the prison system. See Superseding Indictment at 3. Members who rejoin their communities after completing their sentences are expected to further the gang's goals, the main one being the control of and profit from narcotics trafficking. See Superseding Indictment at 4. Members who fail "to show continued loyalty to the gang [are] disciplined in various ways, [] includ[ing] murder and assaults." Superseding Indictment at 4. SNM also intimidates and influences smaller New Mexico Hispanic gangs to expand its illegal activities. See Superseding Indictment at 4. If another gang does not abide by SNM's demands, SNM manages to assault or kill one of the other gang's members to show its power. See Superseding Indictment at 4. SNM's rivalry with other gangs also manifests itself in beatings and stabbings within the prison system. See Superseding Indictment at 4. SNM further engages in violence "to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, [and] to gain notoriety and show it superiority over others."

Superseding Indictment at 4-5.  To show its strength and influence, SNM expects its members to confront and attack any suspected law enforcement informants, cooperating witnesses, homosexuals, or sex offenders.  <u>See</u> Superseding Indictment at 5.  To achieve its purpose of preserving its power, SNM uses intimidation, violence, threats of violence, assaults, and murder. <u>See</u> Superseding Indictment at 7.  SNM as an enterprise generates income by having its members and associates traffic controlled substances and extort narcotic traffickers.  <u>See</u> Superseding Indictment at 7.  SNM's recent activities in a conspiracy to murder high-ranking New Mexico Corrections Department Officials inspired the present investigation.  <u>See</u> <u>United States v. Garcia</u>, No. 15-4275 JB, Memorandum Opinion and Order at 2, filed November 16, 2016 (Doc. 133)(citing United States' Response to Defendant's Motion to Designate Complex (Doc. 56) at 1, filed May 3, 2016 (Doc. 70)("United States' Garcia Response")).  Some other relevant facts giving rise to the federal prosecution of this case are as follows.

In March of 2014, a Doña Ana County, New Mexico, grand jury indicted Defendants Jerry Montoya and Jerry Armenta on charges of first-degree murder and four other felonies related to the death of Javier Enrique Molina, Montoya and Armenta's fellow inmate during their incarceration at the Southern New Mexico state prison.  <u>See</u> <u>United States v. DeLeon</u>, 2016 WL 7242579, at *3.  The New Mexico Third Judicial District Attorney's Office accused Montoya and Armenta of fatally stabbing Molina with a shank in a gang-related attack.  <u>See</u> <u>United States v. DeLeon</u>, 2016 WL 7242579, at *3.  That grand-jury indictment charged Montoya and Armenta with: (i) Molina's murder; (ii) possessing a deadly weapon; (iii) tampering with evidence; and (iv) two counts of conspiracy.  <u>See</u> <u>United States v. DeLeon</u>, 2016 WL 7242579, at *3.  The Doña Ana County District Attorney then dismissed the charges against Montoya and Armenta -- as well as separate charges against alleged accomplice and Defendant Mario

Rodriguez, who had been charged with possession of a deadly weapon by a prisoner, tampering, and conspiracy -- in November of 2015. See United States v. DeLeon, 2016 WL 7242579, at *3. "A spokesperson for the District Attorney's Office indicated the charges were dismissed because the cases were going to be prosecuted at the federal court level." See United States v. DeLeon, 2016 WL 7242579, at *3.

     **2.**     **United States v. Baca.**

Next, the Court discusses the facts of another related SNM case. The Court, here, takes its recitation of facts from the Redacted Grand Jury Indictment in United States v. Baca, No. CR 16-1613 JB, filed Apr. 23, 2016 (Doc. 2)("Indictment"), and notes that some of the facts are virtually identical to those giving rise to United States v. DeLeon. Again, the Court does not adopt the facts as findings or truth. SNM is a prison gang that controls drug distribution and other illegal activities within the New Mexico prison system, and is similarly involved in narcotics trafficking occurring outside of the prison system. See Indictment ¶ 3, at 2. It is alleged that SNM's leaders, members, prospects, and associates constitute an enterprise as is defined under 18 U.S.C. §§ 1959(b)(2) and 1961(4), which provide that an enterprise constitutes a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce. See Indictment ¶ 2, at 2. The Indictment thus provides that SNM constitutes "an ongoing organization whose members/prospects/associates function[] as a continuing unit for the common purpose of achieving the objectives of the enterprise." Indictment ¶ 2, at 2. Accordingly, the Indictment alleges that Defendants Anthony Ray Baca, Christopher Garcia, Manuel Jacob Armijo, Frederico Munoz, Sergio Loya Rodriguez, Manuel Benito, Vincent Garduño, Mandel Lon Parker, Daniel Archuleta, Daniel Sanchez, Anthony Cordova, and Richard Gallegos, committed: (i) Racketeering Conspiracy under 18 U.S.C. §

1962(d); (ii) Violent Crimes in Aid of Racketeering (Murder) under 18 U.S.C. § 1959(a)(1); (iii) Aiding and Abetting under 18 U.S.C. § 2; and (iv) Violent Crimes in Aid of Racketeering (Conspiracy to Murder) under 18 U.S.C. § 1959(a)(5). <u>See</u> Indictment at 1.

SNM was formed after the February, 1980, prison riots at the New Mexico Penitentiary in Santa Fe, New Mexico. <u>See</u> Indictment ¶ 3, at 2. During the prison riot, thirty-three inmates were killed; more than 200 inmates were injured; and certain inmates held hostage, assaulted, and raped twelve correctional officers. <u>See</u> Indictment ¶ 3, at 2. Since the prison riot, SNM has expanded throughout the New Mexican prison system and has an estimated 250 members. <u>See</u> Indictment ¶ 4, at 2-3. SNM's main goals include controlling and profiting from narcotics trafficking. <u>See</u> Indictment ¶ 5, at 3. SNM members are often expected to confront and attack suspected informants, cooperating witnesses, homosexuals, and sex offenders. <u>See</u> Indictment ¶ 8, at 4.

Despite prison officials' close scrutiny, SNM leaders communicate orders to members and associates throughout and outside of the prison system by a variety of means, including secret notes, coded letters, and messages that complicit visitors deliver. <u>See</u> Indictment ¶ 5, at 3. SNM members are expected to remain loyal to the gang when they are released from prison. <u>See</u> Indictment ¶ 5, at 3. SNM disciplines members who fail to show continued loyalty in a variety of ways, including assault and murder. <u>See</u> Indictment ¶ 5, at 3. SNM members might display affiliation and loyalty with the Zia symbol,[1] the letters "SNM", the letter "S," and the numbers "19" and "505"[2] in tattoos, graffiti, drawings, and on clothing. Indictment ¶ 9, at 4-5.

---

[1]The Zia sun symbol, originating as the sun symbol of the Zia Pueblo, now serves as the centerpiece of the New Mexico state flag. <u>See</u> The Zia Sun Symbol, New Mexico History, <u>available at</u> http://newmexicohistory.org/multimedia/videos/the-zia-sun-symbol (last accessed October 13, 2016).

[2]Until October 7, 2007, the "505" area code covered the entire state of New Mexico, and

SNM also operates outside of the prison system in the streets of New Mexico, influencing and intimidating smaller New Mexico gangs to establish a larger network for its illegal activities. See Indictment  6, at 3. Accordingly, SNM does not always have to use violence to assert its control outside of prison, because the smaller gangs often fear that SNM members will assault or kill their compatriots should they be incarcerated. See Indictment  6, at 3. SNM thus retains a large membership and powerful reputation which subdues rival gangs and prevents victims and witnesses from assisting authorities. See Indictment ¶ 8, at 4.

The Indictment alleges that SNM engages in violence

> to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, to gain notoriety and show its superiority over others, and to send a message to others that it is strong, powerful, and not to be provoked.

Indictment ¶ 8, at 4. SNM "members and associates commit, conspire, attempt, and threaten to commit acts of violence, including murders and assaults to protect and expand the enterprise's criminal operations." Indictment ¶ 13(a), at 6. If the gang had a weak reputation, it would lose its membership and dissolve. See Indictment ¶ 8, at 4.

### 3. United States v. Garcia.

Turning, now, to the relevant facts of the case at hand, the Redacted Superseding Indictment, Garcia, on August 7, 2015, in the County of Bernalillo, State of New Mexico, charges that Garcia distributed a detectable amount of heroin. See Redacted Superseding Indictment at 1. On that same day, in the County of Bernalillo, State of New Mexico, it is alleged that Garcia also distributed a detectable amount of cocaine. See Redacted Superseding Indictment at 1-2. Then, on August 11, 2015, in the County of Bernalillo, State of New Mexico,

---

currently serves the Albuquerque, Santa Fe, and Farmington metropolitan areas. See Area Code 505, available at *https://en.wikipedia.org/wiki/Area_code_505* (last accessed October 13, 2016).

Garcia distributed a detectable amount of heroin.  See Redacted Superseding Indictment at 2.  On September 10, 2015, in the County of Bernalillo, State of New Mexico, Garcia distributed 100 grams and more of a detectable amount of heroin.  See Redacted Superseding Indictment at 2.  On December 3, 2015, in the County of Bernalillo, State of New Mexico, Garcia possessed with intent to distribute 100 grams and more of a detectable amount of heroin, and possessed with intent to distribute marijuana.  See Redacted Superseding Indictment at 2.

The Court has already, on multiple occasions, provided a detailed explanation of the charges and the history of the investigations giving rise to this case.  See United States v. Christopher Garcia, No. CR 15-4275 JB, 2016 WL 7257190 (D.N.M. November 16, 2016); United States of America v. Angel DeLeon, et al., No. CR. 15-4268 JB, 2016 WL 724579 (D.N.M. Oct. 28, 2016)(Browning, J.).  Essentially, in March, 2015, the Federal Bureau of Investigations ("FBI") renewed investigation of the SNM prison gang.  United States v. Garcia, 2016 WL 7257190, at *1.  "SNM's recent activities in a conspiracy to murder high-ranking New Mexico Corrections Department Officials inspired the investigation, which included both old murders and new murder conspiracies, in addition to the racketeering activities of current gang members that were out of custody."  2016 WL 7257190, at *1.

## PROCEDURAL HISTORY

In response to the renewed SNM investigation, Garcia has been indicted in three cases. In this case -- what the Court calls the drug case -- the grand jury originally charged Garcia with four counts for charges of: (i) Distribution of Heroin, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); (ii) Distribution of Cocaine Base, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); and (iii) Distribution of 100 Grams and More of Heroin, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B).  See Redacted Indictment at 1-2, filed December 1, 2015 (Doc. 2)("Garcia

Indictment").  On March 17, 2016, a federal grand jury returned a superseding indictment in this case against Garcia, alleging six charges of: (i) Distribution of Heroin, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); (ii) Distribution of Cocaine Base, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); (iii) Distribution of 100 Grams and More of Heroin, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B); (iv) Possession with Intent to Distribute 100 Grams and More of Heroin, and Aiding and Abetting, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and 18 U.S.C. § 2; and (v) Possession with Intent to Distribute Marijuana, and Aiding and Abetting, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(D), and 18 U.S.C. § 2.  See Redacted Superseding Indictment at 1-2.

In the related case -- United States v. DeLeon -- which the Honorable Ken Gonzales, United States District Judge for the United States District of New Mexico, declared complex on January 11, 2016, Garcia is a Defendant, and has been indicted and charged with: (i) Violent Crimes in Aid of Racketeering ("VICAR")(Conspiracy to Murder), in violation of 18 U.S.C. §§ 1959(a)(5); (ii) Felon in Possession of a Firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); and (iii) Using and Carrying a Firearm During and in Relation to a Crime of Violence Conspiracy to Commit Assault Resulting in Serious Bodily Injury, in violation of 18 U.S.C. § 924(c).  See United States v. DeLeon, No. CR. 15-4268 JB, Superseding Indictment passim, filed April 21, 2016 (Doc. 367).  Judge Gonzales initially presided over these cases until they were reassigned to the Court on March 30, 2016.  See Judge Update, filed December 1, 2015, and Notice of Case Reassignment, filed March 30, 2016 (Doc. 351).  Given the large number of Defendants and the safety concerns at issue in these cases, the Court has entered a Protective Order regulating discovery in those cases, and the Defendants receive their discovery on tablets

that a coordinated discovery management firm maintains.[3]  See Protective Order, filed June 16, 2016 (Doc. 589)("Protective Order").  That case names thirty Defendants, all alleged SNM members or associates, who have allegedly engaged in Violent Crimes in Aid of Racketeering activity, under 18 U.S.C. § 1959 -- making it the "VICAR" case -- whereas, again, the present case solely makes allegations related to Garcia's involvement in drug trafficking.  Some of the Defendants in that case were death-penalty eligible and have had learned counsel appointed.  See United States v. DeLeon, No. CR. 15-4268 JB, The United States' Notice of Intent Not To Seek a Sentence of Death, filed June 6, 2016 (Doc. 567)(stating that it would not seek a death sentence against twenty-one death-penalty eligible Defendants).

Garcia has also been indicted in United States v. Baca, No. CR 16-1613 JB (D.N.M.)(Browning, J.), which names twelve Defendants, all SNM members or associates, who have allegedly engaged in a racketeering conspiracy, under 18 U.S.C. § 1962(d) -- making it the "racketeering case."  United States v. Baca, No. CR 16-1613, Sealed Indictment, filed April 21, 2016 (Doc. 1).  The indictment in United States v. Baca also makes allegations of Violent Crimes in Aid of Racketeering activity; Garcia is charged with: (i) Racketeering Conspiracy, in violation of 18 U.S.C. § 1962(d); and (ii) Violent Crimes in Aid of Racketeering (Murder), in violation of 18 U.S.C. § 1959(a)(1).  See United States v. Baca, No. CR 16-1613, Sealed Indictment, filed April 21, 2016 (Doc. 1).  Garcia, along with two other Defendants named in

---

[3]On January 2, 2016, Judge Gonzales granted the Defendants' Joint Ex Parte Motion for Order Appointing Coordinating Discovery Attorney, Russell M. Aoki, for the Benefit of All Court-Appointed Counsel.  See United States v. DeLeon, Order Appointing Coordinating Discovery Attorney, filed January 22, 2016 (Doc. 231)("Discovery Coordinator Appointment Order").  Judge Gonzales held a hearing on January 20, 2016, with all parties present.  See Discovery Coordinator Appointment Order at 1.  The Court concluded that appointing Mr. Aoki is justified given the complexity of United States v. DeLeon and the thousands of pages of discovery documents.  See Discovery Coordinator Appointment Order at 2.

United States v. Baca, were originally death-penalty eligible, and the Court appointed learned counsel for them. See United States v. Baca, No. CR 16-1613, The United States' Notice of Intent Not To Seek a Sentence of Death, filed September 13, 2016 (Doc. 210)(stating that it would not seek a death sentence against the three Defendants). The Court has declared that case complex. See United States v. Baca, No. CR 16-1613, 2016 WL 6404772, at *1 (D.N.M. October 20, 2016)(Browning, J.).

Unlike the related cases in United States v. DeLeon and United States v. Baca, the Court has declined -- on two occasions -- to similarly declare this standalone drug case against Garcia complex. See United States v. Garcia, 2016 WL 7257190, at *1; Memorandum Opinion and Order at 1, filed December 19, 2016 (Doc. 144)("MOO"). The Court concluded in those opinions that complexity inherent to the SNM racketeering allegations was not similarly applicable in this standalone drug prosecution. See United States v. Garcia, 2016 WL 7257190, at *1; MOO at 1.

1.    **The Motion to Compel.**

The Motion to Compel begins by explaining that Garcia sent written notice to the United States on November 20, 2016, "requesting copies of the documents and materials that are listed below." Motion to Compel at 1. According to Garcia, "[s]ince sending that request, the Government has not provided all the documents at issue, nor has the Government indicated to counsel whether they intend to produce most these documents." Motion to Compel at 1. The Motion to Compel then argues that, under rule 16, Garcia is entitled to disclosure of, or access to, certain items which the United States is yet to disclose that, Garcia argues, are material to his case and, on good-faith belief, will assist him in preparing his defense. See Motion to Compel at 1. The requested items roughly fall into eleven general categories, with the first category

seeking "items relating to specific incident dates," with those items from each incident entailing, for the most part, "incident reports, search warrants, affidavits, records, reports, video/audio recordings, witness statements, photographs, evidence inventories and chain of custody reports, laboratory or forensic reports [and] any other investigative materials, documents, or data." Motion to Compel at 3, 9. Those specific incidents are: (i) a May 6, 2014 -- or 2015 -- incident; (ii) a July 13, 2015, incident; (iii) an August 7, 2015, incident (distribution of heroin and cocaine, Count 1 and 2, see Redacted Superseding Indictment at 1-2); (iv) an August 11, 2015, incident (distribution of heroin, Count 3, see Redacted Superseding Indictment at 2); (v) a September 10, 2015, incident (distribution of heroin, Count 4, see Redacted Superseding Indictment at 2); a November 18, 2015, incident; (vi) a December 3, 2015, incident (intent to distribute heroin and possession of marijuana, Count 5 and 6, see Redacted Superseding Indictment at 2-3); and (vii) thirty other dates which generally relate to certain overt acts alleged in United States v. DeLeon and United States v. Baca. See Motion to Compel at 3-11.

The second category of items that Garcia requests is "scientific reports and related items," Motion to Compel at 12, and the third category is "telephone records used by all confidential human sources," Motion to Compel at 13. Garcia's fourth category is "witness information and miscellaneous items," such as "a list of lay and expert witnesses that the Government intends to call at trial in each case," and "any and all law enforcement agency Reports of Investigation . . . regarding allegations in the indictments. Motion to Compel at 13-19. The fifth category the Motion to Compel provides is a request to view "drug evidence, and all laboratories that conducted the drug testing, and independent testing of all the drug evidence." Motion to Compel at 19-20.

Garcia's sixth category is a request "to view NM D[epartment of Corrections] Level VI cell where Eric Duran allegedly made phone calls to Mr. Garcia." Motion to Compel at 20. For Garcia's seventh category, he requests "redacted pages of all discovery and immediate identification of all C[onfidential human sources], cooperating informants, [and] cooperating defendants." Motion to Compel at 20. Garcia's eighth category seeks "NM D[epartment of Corrections ('NM DOC')] policies, procedures and documentation in effect at the time Mr. Garcia was housed at NM DOC." Motion to Compel at 21. The ninth category's request is for "Syndicato De Nuevo Mexico[] alleged enterprise evidence," Motion to Compel at 21, and Garcia's tenth category is "prior law enforcement contacts with Christopher Garcia," Motion to Compel at 21. Garcia's eleventh and final category is "transcripts of audio recordings" of confidential human source ("CHS") conversations. Motion to Compel at 22.

### 2.    The Motion to Compel Response.

The United States responded to the Motion to Compel with the United States' Response in Opposition to Defendant's Supplemental Motion to Compel Discovery (Doc. 163)("Response"). The Response begins by explaining that the United States responded to Garcia's November 20, 2016, letter making these discovery requests on December 23, 2016, and that it then "requested items from the labs and investigating agencies, and disclosed those items to the defense in subsequent discovery disclosures." Response at 2. Regarding the Motion to Compel, the United States takes the stance that

> much, if not most [of the requests are] wholly irrelevant to Defendant's instant case and will not lead to discovery of admissible evidence. The simple truth is that Defendant's overly broad demand for minutiae is nothing more than a cudgel, a weapon, to burden and harass the government and its witnesses during their pretrial preparation, and to delay the proceedings. Defendant's present demands are not the product of reasoned analysis of possible evidence by counsel and Defendant's retained experts. Rather, Defendant simply laid out a laundry list of boilerplate requests. Indeed, to underscore how overly broad and untargeted these

requests are, the United States provided the responsive information before it received these requests. What is most readily apparent in Defendant's discovery demand is that while seeking some material related to Garcia's drug dealings, the Motion is largely a broad demand for general discovery related to offenses charged in other cases.

Response at 2. Ultimately, the United States argues, the "Defendant has either (1) already been provided with the information sought, or (2) is not entitled to the information." Response at 3. The United States also incorporates its response to Garcia's CI Motion, because "Defendant's boilerplate laundry lists of requests in [the Motion to Compel] resemble and overlap with the boilerplate, overbroad requests presented in the [CI Motion]." Response at 3.

Regarding Garcia's requests in his first category, which regards items relating to specific incident dates, the United States provides that

[c]opies of all items (including uncharged incidents) which reasonably can be reproduced already have been provided to the defendant in this case (or are in the process of continually being provided as to material related to case numbers CR 15-4268 JB and CR 16-1613 JB). Those which could not be copied are available for review by making an appointment.

Response at 4. According to the United States, "[f]ourteen letters have been sent to defense counsel, detailing and disclosing all the documents in counsel's possession concerning this case, except, of course, certain witness interviews." Response at 4. Regarding information requested related to CHS disclosure, "the United States will provide *Brady* and *Giglio*[4] information for any CHS that the United States will call to testify." Response at 4. The United States also provides that it has "requested and disclosed the reports relating to a May 2014 incident with the

---

[4]In <u>Brady v. Maryland</u>, the Supreme Court explained that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87 ("<u>Brady</u>"). In <u>Giglio v. United States</u>, the Supreme Court extended the prosecution's disclosure obligation to evidence that is useful to the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory. <u>See</u> 405 U.S. at 153 ("<u>Giglio</u>").

Defendant.  It is important to note that the Defendant has not been charged with offenses from that arrest as he agreed to cooperate with law enforcement at that time."  Response at 4.  The United States also contends that "[d]iscovery is also complete as to the undercover drug sales that involved the Defendant in 2015, as well as the search warrants that were served in 2015," but that "[t]he United States will not return electronic items that were seized pursuant to the search warrant."  Response at 4-5.  Further, the United States "will provide to defense counsel the Court orders that were obtained on cellular telephones that were used by CHSs in contact with the Defendant[, and] . . . a copy of the written *Miranda*[5] waiver executed by the Defendant in this case."  Response at 5.  The United States, for Garcia's first category of requested discovery, then concludes that Garcia's request for information related to the other indictments is not relevant to this case, but that it has "provided discovery on the Overt Acts listed in the Indictment in CR 16-1613."  Response at 5.

Turning to the second category of requests -- scientific reports and related items -- the United States maintains that Garcia already has many of the requested items, and that it "will provide *Giglio* for testifying witnesses in advance of trial and the United States is, and has been, aware of its obligations under *Brady* and will continue to discharge those duties as appropriate."  Response at 5-6.  Regarding the third category -- CHS telephone records -- the United States "has provided information on the cellular telephones used by the CHSs involved in the charged incidents in this case, and will provide Court orders pertaining to those telephones to the Defense."  Response at 6.  Regarding witness information -- the fourth category of Garcia's requested discovery -- the United States indicates that it has already filed its witness list in this

---

[5]*Miranda v. Arizona*, 384 U.S. 436 (1966).

case and that it will continue to supplement that list according to the Court's schedule. <u>See</u> Response at 6.

The United States argues that Garcia's fifth category of requests, to view drug evidence and all laboratories, can be fulfilled, in part, by making an appointment to view the drug evidence with the Assistant United States Attorneys. <u>See</u> Response at 6-7. Regarding viewing the laboratories, however, the United States explains that the Drug Enforcement Administration and the New Mexico State Police oppose Garcia's request. <u>See</u> Response at 7. The United States also does not object to Garcia's sixth category of requests -- viewing Duran's "NM Doc Level VI cell" -- and provides that Garcia's counsel need only go through the normal process to visit the Penitentiary of New Mexico ("PNM"). Response at 7. The United States objects to Garcia's seventh category of requests, arguing that providing unredacted sets of discovery at this time is an attempt to receive Jencks Act material early, which is not allowable under rule 15. <u>See</u> Response at 7.

The United States also objects to Garcia's eighth and ninth categories of requests -- "NM DOC policies and procedures," and "SNM evidence" -- because such requests are irrelevant to this drug trafficking prosecution. Response at 8. The United States argues that Garcia's tenth category of requests for production of prior law enforcement contacts with Garcia is "overbroad and burdensome," but that, where the United States has information regarding Garcia's contacts with law enforcement in this case, it has already provided those discovery materials. Response at 8. Last, regarding Garcia's eleventh category of requests, for transcripts of CHS conversations, the United States maintains it has already disclosed those materials. <u>See</u> Response at 8.

### 3.    **The CI Motion.**

Garcia filed his CI Motion on February 28, 2016, requesting

that pursuant to Rule 16 of the Federal Rules of Criminal Procedure, and in accordance with the decisions in *Roviaro v. United States*, 353 U.S. 53 (1957), *Brady v. Maryland*, 373 U.S. 83 (1963), and *United States v. Bagley*, 87 L.Ed.2d 481, 490 (1985), . . . the Court for an order directing the United States to furnish counsel for the accused with the following information concerning the use of informants, confidential informants, witnesses, informers, confidential sources, sources of information, infiltrators, cooperating individuals, security informers or intelligence assets who participated in any way or who are material witnesses to any of the events charged in the indictment.

CI Motion at 1.  According to Garcia, the individuals about whom he seeks information are:

(A) Any person or entity furnishing information to the government on a confidential basis, where such information has been obtained as a result of legitimate employment or access to records and is provided consistent with applicable law;

(B) Any other person or entity furnishing information to the government on a confidential basis;

(C) Any other person or entity providing information or substantial operation assistance with some degree of regularity, which may be as infrequent as a few times per year, or as frequent as several times per week.

(D) It is further requested that the information requested be provided specifically as it may relate or pertain to the following individuals:

(1) All confidential sources as described in any affidavits which have been filed in support of requests for electronic surveillance whether such have been revealed or not;

(2) Any individual who has or is expected to furnish information, cooperation, testimony at the grand jury or at trial, or assistance to the government;

(3) All confidential sources referred to in the affidavits in support of the various search warrants which have been or will be provided in discovery;

(4) Individuals whose names were redacted in discovery referencing individuals believed to be inmates or cooperating defendants and co-defendants; and,

(5) Any other person identified in any document which has been or will be provided in this case.

CI Motion at 1-2. For those persons, Garcia then makes thirty-nine requests, with sub-parts, for specific information to which, he argues, he is entitled. CI Motion at 2-10. The specific information that Garcia requests ranges from "[i]nformation tending to show bias/prejudice on the part of any informant," to "[i]nformation tending to show that any informant . . . suffers from any material defect in perception, memory, veracity, or articulation." CI Motion at 4. Garcia's requests also include "[a] full and complete statement of all promises, considerations, rewards or inducements made by the government," CI Motion at 6, and "[a]ll approvals for payment for services and/or expenses to an informant utilized in the investigation of this case," CI Motion at 8.

In support of his requests, Garcia argues that, "[i]n *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that due process forbids a prosecutor from suppressing 'evidence favorable to an accused upon request where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" CI Motion at 10 (quoting Brady v. Maryland, 373 U.S. at 87 ("Brady"))(citing Giglio v. United States, 405 U.S. 150 (1972)("Giglio"); United States v. McCrane, 527 F.2d 906 (3d Cir. 1975), aff'd after remand, 547 F.2d 205 (1976); Douglas v. Workman, 560 F.3d 1156, 1172 (10th Cir. 2009)). Garcia reiterates that "the prosecution also has a duty to disclose any favorable evidence that could be used 'in obtaining further evidence.'" CI Motion at 10-11 (quoting Giles v. Maryland, 386 U.S. 66, 74 (1967)). Garcia also provides that, although the Supreme Court of the United States "has never precisely pinpointed the time at which the disclosure under *Brady* must be made," "[i]t is abundantly clear . . . that delayed disclosure by the government[] may

meaningfully alter a defendant's choices or prevent the defense from effectively using the disclosed information." CI Motion at 11 (internal quotation marks omitted)(citing United States v. Burke, 571 F.3d 1048, 1053-56 (10th Cir. 2009)). Last, even if the United States "is not aware of the existence of the requested information," Garcia requests a response indicating that fact so counsel may make independent investigation. CI Motion at 11-12.

### 4. **CI Motion Response.**

The United States responded to the CI Motion with The United States' Sealed Response to Defendant's Motion for Discovery and Inspection Concerning the Government's Use of Informants and Cooperating Individuals; Disclosure and Notice of Exculpatory Evidence Requested Concerning Government's Use of Informants and Cooperating Individuals, filed March 28, 2017 (Doc. 181)("CI Motion Response"). In the CI Motion Response, the United States explains that Garcia

> asks for a laundry list of information about supposed government informants or cooperating individuals. But the Federal Rules of Criminal Procedure don't entitle criminal defendants to the broad discovery that he requests. Moreover, while Garcia cites to *Roviaro v. United States*, 353 U.S. 53 (1957) as the basis for his requests, he doesn't cite any specific circumstances or facts that support that *Roviaro* entitles him to even the identity of any such confidential informants, let alone the additional information.

CI Motion Response at 1. The United States concedes in the CI Motion Response, however, that Garcia is "entitled to the identity of two of the confidential sources who participated in purchasing drugs from Garcia and will disclose those sources to him." CI Motion Response at 1-2.

The United States first explains:

> Counts 1 and 2 of the superseding indictment . . . charge Defendant with one count of distribution of heroin and one count of distribution of cocaine base . . . for offenses that occurred on or about August 7, 2015. At trial, the United States intends to prove that Confidential Source ("CS") 1 spoke to Garcia on the

telephone [and] arranged to buy narcotics from Garcia. Garcia then obtained the drugs from a relative's residence, packaged them at his residence, and provided them to CS1 in exchange for $2,860 ($1,700 for heroin and $1,160 for the crack cocaine). No one else played a crucial role in the transaction.

CI Motion Response at 2. Count 3, the United States further explains,

charges Defendant with one count of distribution of heroin . . . for an offense that occurred on or about August 11, 2015. At trial, the United States intends to prove that Garcia informed CS1 that he had heroin to sell and that CS1 should come to his house to do the deal. Garcia retrieved the drugs from his relative's house again and ultimately provided CS1 with 3 ounces of heroin in exchange for $2,400. No one else played a crucial role in the transaction.

CI Motion Response at 2. Then, according to the United States, Count 4

charges Defendant with one count of distribution of 100 grams or more of heroin . . . on or about September 10, 2015. At trial the United States intends to prove that Garcia sold 148.8 grams of heroin to an undercover government employee in exchange for $4300. Garcia and the undercover employee were introduced to each other through CS 2.

CI Response at 2-3.

The United States then concedes, for those two aforementioned CIs, that "they are witnesses to these transactions: they set up the drug deals and were material participants in the drug sales. So *Roviaro* entitles Garcia to their identities." CI Motion Response at 3. The United States also argues, however, that "Garcia's laundry list of requests for additional information about these witnesses should be denied, however, as the requests lack a sound basis in the law." CI Motion Response at 4. Regarding those requests sounding in <u>Brady</u> and <u>Giglio</u> obligations, the United States maintains that it will provide that information, in accordance with law, before trial. <u>See</u> CI Motion Response at 4-5. The United States concludes by asking the Court to deny the CI Motion, because the United States will already be disclosing the information it must disclose. <u>See</u> CI Motion Response at 4-5.

### 5.    **The April 13-14, 2017, Hearing**.

The Court held a hearing on April 13-14, 2017.  See Transcript of Hearing, taken April 13, 2017 ("Tr.")[6]; Transcript of Hearing, taken April 13, 2017 ("2 Tr.")[7]; Transcript of Hearing, taken April 14, 2017 ("3 Tr.").  The Court heard a variety of different motions at the hearing, and, regarding the Motion to Compel and the CI Motion, it heard argument on the CI Motion first.  See Tr. at 19:3-6 (Adams).  Garcia first provided that, "Judge, basically this is a rather broad discovery motion based on Rule 16 and on Brady about what we believe we're entitled to related to informants."  Tr. at 19:16-17 (Adams).  Given the CI Motion's admittedly broad nature, then, Garcia specified and narrowed for the Court and the United States precisely what information he wants, beginning with the CI that the FBI had used to buy drugs from Garcia as alleged in Counts 1-4.  See Tr. at 19:18-20:3 (Adams).  Garcia reiterated his need for this CI by hypothesizing that, should the CI have declined to record a statement about his role, Garcia would want to investigate information like that to perhaps impeach the CI's veracity at trial.  See Tr. at 20:5-17 (Adams).

Regarding the thirty-nine specific requests for the CIs to whom Garcia argues he is entitled, Garcia maintained that each requested information about potential CIs in this case that must be disclosed under Brady.  In support, Garcia explained:

> I'll say I've been [in a position] where, again, representing cooperators there has been extensive negotiation back and forth where I've engaged as the lawyer for an individual trying to work out different sort of side benefits to include in the deal. Even information that the defendant through counsel is asking for that ultimately doesn't get included in a final deal, we believe must be disclosed as part of Brady.

---

[6]The Court's citations to the transcripts of the hearings refer to the court reporters original, unedited versions.  Any final transcripts may contain slightly different page and/or line numbers.

[7]At the April 13, 2017, hearing, the court reporter's system crashed midway through the proceeding, resulting in two transcript volumes from that day instead of just one.

Tr. at 22:8-16 (Adams).  Under the law, Garcia maintained,

> we believe we're entitled to everything even if, even if it's not directly admissible, but may lead to something that's directly admissible as we try to . . . investigate the case for our client and as we try to figure out if we can impeach the confidential human sources that the Government relied on to make this case.

Tr. at 22:19-25 (Adams).

The United States then argued that "we intend to present one CI to testify at trial," and that this CI was indeed the person whom Garcia suspected, and that it was generally only objecting to what information it needed to disclose about that CI at this time.  Tr. at 23:7-17 (Beck, Adams, Court).  In that regard, the United States provided:

> I think much of this information will be provided as <u>Giglio</u> materials.  This CI was not charged.  He . . . doesn't have a lawyer.  So there is a difference between sort of a CI who I guess actively no, an investigation, purchases drugs and in a buy-bust operation or undercover . . . and sort of a historical debrief with a defendant who has decided to plead guilty and come on board.

Tr. at 23:19-24:1 (Beck).  The Court then queried the United States "[w]hat is it . . . if you're going to produce this person, you're going to produce <u>Giglio</u> material, what is it in Mr. Adams' long list that you're not wanting to give him or not wanting to track down."  Tr. at 24:2-6 (Court).  The United States responded that

> I think we're not wanting to give him information that we don't have and to which he's not entitled.  So for instance, we don't have I may be corrected and I may be wrong, but I don't believe we have records of whether this person has taken polygraph test and failed polygraph tests . . . .

Tr. at 24:7-13 (Beck).  The Court then reiterated that it had held that "the Department of Justice, U.S. Attorney's office can pretty much get w[hat it] wants given [the Secretary of the Department of Corrections] being an alleged target of [SNM,] they pretty much can pick up the phone and get this information [from the state Department of Corrections]."  Tr. at 25:15-20 (Court).  To this reality, the United States explained that it did not object to disclosing -- as

Giglio information -- "everything that's in the Government's possession," Tr. at 25:25-26:1 (Beck), which includes the information it can get from the New Mexico Department of Corrections, and "if . . . for example he's had contact with the FBI or DEA or somebody related to the federal Government, [it] would also give everything in the [federal] corrections department files," Tr. at 26:1-4 (Court).

The Court then attempted to get to the heart of the dispute about the CIs, and posited: "So what you're saying you're not going to do is folks, go search state police, local, county, local DA's that sort of stuff for his criminal history. Is that basically the dividing line[?]" Tr. at 26:13-17 (Court). The United States responded that the Court was correct and that, absent those entities such as the New Mexico Department of Corrections which were part of the joint investigation of SNM, the United States did not have all of the information that unrelated entities might have regarding its CIs. See Tr. at 26:18-25 (Beck). The United States conceded that, "if [the United States] know[s] about it or [has it] the[n it will] produce it but [it is] not going to go out and start doing an investigation trying to find out whether there is something there." Tr. at 27:1-5 (Court, Beck).

At this point, the Court said to Garcia: "It seems to me we've gotten pretty close to what I think you're entitled to[,] Mr. Adams. Where do you see the remaining issues[?]" Tr. at 30:15-17 (Court). Garcia was appeased with the representations that the United States made regarding the information it was going to be able to amass and deliver, stating: "Judge, if they're prepared to produce it ASAP then I think that's right. I mean, this is apparently material separate from Jencks [Act materials]." Tr. at 30:18-20 (Adams). It needed to be disclosed as soon as possible, Garcia argued, because his counsel has "a duty to investigate it." Tr. at 31:4 (Adams). Garcia further maintained that the United States needs to run a search of state files for the names of

persons whom Garcia suspects are "cooperators whose names are not confirmed." Tr. at 31:12-17 (Adams). The United States agreed to run and disclose summaries of the reports for names of persons that Garcia suspects and, obviously, for the CIs it needed to disclose information regarding. See Tr. at 33:23-34:4 (Beck). The Court then inquired whether the United States' agreements and intentions to disclose much of the requested <u>Giglio</u> information pertaining to the CIs involved in the standalone drug case -- as soon as possible -- satisfies Garcia's requests in the CI Motion, and Garcia agreed. See Tr. at 34:5-9 (Court, Adams). The Court, accordingly, concluded argument on the CI Motion. See Tr. at 34:8-9 (Court).

The Court heard argument regarding the Motion to Compel later in the hearing. See 3 Tr. at 19:8-11 (Sirignano). Garcia explained that he would go through the Motion to Compel line-by-line, to the extent necessary, to try to "resolve what has been produced and what has not been produced." 3 Tr. at 21:9-11 (Sirignano). Where the issues were not resolved, the Court made rulings. See 3 Tr. at 21:12 (Court). Garcia first argued regarding "requested items [that] relate . . . to the August 7, 2015 incident . . . but what I was asking for was reports by deputy Matt Chance, which I don't believe we have received. And he was one of the key investigative officers that day." 3 Tr. at 22:10-18 (Sirignano). The United States responded that "if she hasn't received a report from [Matt Chance] then there isn't a report." 3 Tr. at 23 6-8 (Armijo). The United States explained that it had "asked for the complete file from [Bernalillo County Sheriff's Office ('BCSO')] and if there is not one in the discovery, then there is not one, if she says she has not received one." 3 Tr. at 23:11-14 (Armijo). Apparently, however, Garcia had a report -- or outside knowledge that there was a report -- from Chance, and was now looking for the whole file related to his report, causing the Court to order the United States to "talk to [BCSO Deputy Chance and] find out what report or reports he did, and then let's track those down, I think I'd

feel more comfortable if the Government produced any report or reports rather than relying upon whatever sources the defendant is getting, has to get it." 3 Tr. at 25:7-12 (Court).

Garcia next addressed his request for full laboratory reports from BCSO, "chains of custody we have received a number of the chains of custody and we did review the evidence here in Court which had partial chains of custody but I know for sure I don't have all the chains of custody I need." 3 Tr. at 25:15-19 (Sirignano). Garcia further clarified that he had the chains of custody from everything going into the BCSO lab, but not everything "coming out of the lab," and that he was thus looking whether "there is anybody else other than FBI and BCSO hospital involved in chain of custody." 3 Tr. at 26:6-15 (Sirignano, Court). The United States then indicated that it had

> contacted each of the labs because we have three labs . . . [W]e have southern state lab[,] we have the APD lab[,] and we have the DEA lab. I contacted all of the analysts and I asked them for all of the . . . data that they had, all their notes, extensive stems and we received those items and we [dis]closed those items. I also asked for the chain of custodies from the FBI, from BCSO. [T]here is not a lot of chain of custody on the stuff from BCSO because it hasn't really gone . . . anywhere.

3 Tr. at 27:9-16 (Armijo). Further,

> I personally was dealing with all the chemists in this case and getting all of their notes and all of the evidence logs, and they sent us and we made a big, can I go and get the dates of when we disclosed all of that stuff. It was earlier this year.

3 Tr. at 28:2-7 (Armijo). Garcia reiterated that the "discovery was coming in large batches and that some regarded the indictments in United States v. DeLeon and United States v. Baca, and that he did not think that the United States' repeated inability to specifically state what it had disclosed violated Rule 16, and . . . Brady . . . and . . . unfortunately, the Government really hasn't made an effort to know what it has disclosed and what it hasn't disclosed." 3 Tr. at 28:15-19 (Sirignano).

At this point, the Court pressed the United States to indicate what it has produced to Garcia. <u>See</u> 3 Tr. at 28:23-29:2 (Court). The United States responded that it has "produced everything that they are telling us that they have on the items," meaning that it "contacted the labs and I said . . . I need all the chains of custody." 3 Tr. at 29:12-23 (Armijo). Accordingly, the Court asked the United States if it could "represent that BCSO and every law enforcement that's touched these drugs has produced every chain of custody," 3 Tr. at 20:11-13 (Court), to which the United States responded "I believe so, but I will go back and check," 3 Tr. at 30:14-15 (Armijo). The Court then ordered the United States to disclose all of the chain-of-custody information that Garcia sought. <u>See</u> 3 Tr. at 16-17 (Court).

Next, Garcia argued about his requested investigative reports, providing that

I've got one surveillance report, which was Bates number 6 on this incident. I don't have any other investigative report, and I don't know if it's because the FBI has failed to abide by their 5 day policy or rule to write reports, if reports were written or wasn't written, but when I was in the FBI everybody wrote reports within the five days for the most part. Not every single time and I can't imagine on an undercover drug purchase that all I have is one surveillance FBI report. I don't have any photographs . . . I don't have any photographs or . . . investigative reports on that.

3 Tr. at 20:21-31:8 (Sirignano). Regarding these FBI investigative reports, the United States stated that it had produced all existing reports, but that it would sit with the FBI and ensure that it had indeed made those disclosures. <u>See</u> 3 Tr. at 31:13-18 (Armijo). The Court provided: "All right I'm going to take that as a representation that complete FBI investigative reports on this incident have been produced. If you find that it [has not been] you need to produce it immediately. But I'm going to take that as a representation in case something shows up." 3 Tr. at 31:19-25 (Court).

Garcia then addressed the Court:

> Your Honor, this incident is the alleged purchase of drugs by Sammy Griego and
> I don't have any reports or information on him. . . . I don't have any of his
> statements to law enforcement regarding Mr. Garcia, and anything involving these
> paid snitches, Your Honor, and that might be a Jencks request. But I've been
> asking for this . . . and I have not had one response from the Government
> regarding this letter that I wrote over Thanksgiving . . . other than their response
> filed March the 27 and so that's why I continue to ask for it.

3 Tr. at 32:2-15 (Sirignano). Garcia at this point clarified that there were two CIs who were
participating actively in the drug deals that Garcia made, and two CIs who were on telephones
making the introductions necessary for the drug deals to proceed. See 3 Tr. at 33:14-17
(Sirignano). The parties and the Court then confirmed whom the CIs were, because "everybody
in the room knows who these people are except" the Court. 3 Tr. at 37:10-11 (Court). The Court
had the parties confer and write out the theory of the case -- with respect to the role of CIs or
CHSs -- on a large piece of paper, so as to ensure the identities were kept private. See 3 Tr. at
37:10-11 (Court). The Court then solidified that there were four CIs involved in this standalone
drug case, and one undercover agent, with the United States intending to call only one of the CIs
-- a CI whose identity it had confirmed and disclosed to Garcia earlier in the hearing. See 3 Tr.
at 43:6-7 (Beck). Once the Court had clarified whom the players were, it asked the United States
if it had "produced all law enforcement reports on" the four CIs and on the undercover agent
from the August 7, 2015, incident. 3 Tr. at 43:10-23 (Court). The United States represented to
the Court that it had produced all law enforcement reports for all five of the players, and that, for
the one CI it intended to call, it had immediately produced the Giglio information for that CI at
the Court's request earlier in the hearing. See 3 Tr. at 43:24-44:11 (Armijo). The Court
reiterated:

> Okay. So if I understand you correctly you will make certain that all law
> enforcement reports written by or on these five [CI]s will be produced either as
> Jencks material, Giglio material, or if it's Brady [it] will be produced
> immediately, but all of it will be produced by Wednesday before trial?

3 Tr. at 44:17-23 (Court). The United States responded that the Court was mistaken, "because we're not calling all those other people. So I think that's where the Roviaro[ v. United States] is going to come in. Is the Court going to require us to provide" that information, even though they are not to be testifying witnesses? 3 Tr. at 44:23-45:1 (Armijo). The United States stated that it has provided all of the requested law enforcement reports for the CI whom it is calling to testify and for the undercover agent, but the remaining three CIs are non-testifying witnesses for the United States' case, so the analysis has to be different regarding Garcia's requests pertaining to them. See 3 Tr. at 47:17-24 (Armijo, Court). Regarding the three non-testifying CIs, however, the United States indicated that it believed that, "given the Court's previous[] ruling in the DeLeon case," Garcia was entitled to the identity of the three CIs, and that it was thus in the process of helping Garcia by providing him "the identities of the reports for those CHSs to whose identity they're entitled. So now I hope I've confused you enough to tell you that we're going to disclose these people's identity to them, and also disclose which reports they have from these people." 3 Tr. at 48:25-49:5 (Beck). That ended the discussion regarding that incident, as Garcia then indicated that "at the moment it seems like [he was] getting everything [to which he is] entitled." 3 Tr. at 49:17-19 (Court).

Garcia next addressed his request for transcripts of the recordings from the August 7, 2015, incident, regarding which the United States agreed to "produce all time transcripts all recordings from August 7 that you have, and if there is a doubt about the date, you'll go ahead and just produce it." 3 Tr. at 51:18-21 (Court, Armijo). More specifically, the Court ordered that the United States will give Garcia its "exhibit list [and the relevant transcripts] . . . but they're giving you a little bit more, probably some transcripts they're not going to use," too. 3 Tr. at 52:16-19 (Court). For the transcript's substance, the Court ordered that, "when you maybe

send a letter over, could you just tell her that this transcript has CHS-1, CHS 2, CHS 3 and then we use the also chart Mr. Beck made," which depicts the relevant CIs and their roles. 3 Tr. at 54:1-4 (Court). The Court summed up the discussion that it and the parties had just had, suggesting: "Well I think that unless you tell me otherwise . . . we've probably gone through everything and with the law enforcement reports . . . the CHSs, so you're probably not entitled to all [other] law enforcement reports unless it falls into <u>Brady</u>, <u>Giglio</u>, [or the] Rule 16 standard." 3 Tr. at 55:23-56:4 (Court, Sirignano).

Garcia then turned to his discovery requests related to the August, 11, 2015, incident, to which the Court applied its previous rulings for the August 5, 2015, incident. <u>See</u> 3 Tr. at 58:9-61:2 (Court). Garcia subsequently argued about his request regarding the home surveillance equipment which was at his home during the arrest for these drug charges. <u>See</u> 3 Tr. at 61:7-8 (Sirignano). According to Garcia,

> we believe that it contains <u>Brady</u> material or impeachment [material] and this equipment was taken, I believe by the Government during the search warrant. And we'd like to -- I'm asking if a copy or an original to be returned to the defense of that as it's relevant to these alleged drug transactions.

3 Tr. at 61:9-14 (Sirignano). The United States, however, indicated that it did not take any home surveillance equipment, so the Court ordered -- to be sure -- that the United States talk to the FBI agent who executed the search and arrest warrants to "confirm whether it's on the list or not that there was no surveillance equipment attention and if there is not let Ms. Sirignano know send her an email or letter and tell her you've talked to the agent it's not on the [log] doesn't look like it's in FBI possession." 3 Tr. at 64:8-13 (Court). The Court further ordered the United States to ask the FBI agent about the other items from his home for which Garcia wants an account, specifically cellular telephones, tablets, and computers. <u>See</u> 3 Tr. at 19-21 (Court). Garcia,

however, indicated that he wanted the original cellular telephones, tablets, and computers, because

> in my experience, when a search warrant happens, a computer search warrant also is part of that. The evidence is taken to the FBI CART team or a local forensic computer laboratory. The evidence is downloaded if it's relevant to their investigation. Some kind of a report is done of the cellphone evidence. And in other cases . . . I've done with the AUSA is we've discussed either returning an original or a mirror images of the evidence that was seized, the computer evidence or the cellphone evidence, the tablet evidence so the defense isn't being deprived of that evidence. And I'd like to have the FBI CART report or the New Mexico regional forensic . . . report . . . regarding all this technology evidence.

3 Tr. at 66:2-16 (Sirignano). Garcia continued that "I need the original. [T]here is no evidentiary value to the Government on the original, or a mirror image of the data from those devices, and also the CART or the New Mexico regional forensic science center report regarding what was found on those devices." 3 Tr. at 66:21-67:2 (Sirignano). The United States ultimately agreed that Garcia's counsel could come view the cellular telephones, tablets, and computers if the data mirror images would not accomplish Garcia's same goals. See 3 Tr. at 67:25-68:1 (Armijo).

Garcia then turned to his discovery requests regarding the September 10, 2015, incident, for which the United States indicated: "Your Honor we will make the same request that we did on the other ones for BCSO, FBI, we will actually this will be like triple checking again and we will certainly do that, Your Honor." 3 Tr. at 70:3-7 (Armijo). Garcia then argued that one problem he was having was that the BCSO reports and their numbering made it hard to determine what the reports address, so the Court obtained

> a representation from the Government they're going to double checks make sure you have all the BCSO reports for this incident as well as the other two that we've talked about, but assuming you have all these, if you have a question about whether one relates to this incident, then shoot an email over to Ms. Armijo and they'll either confirm it does or say it does not.

3 Tr. at 72:4-10 (Sirignano, Armijo, Court). Garcia was not entirely amenable to that solution, arguing that the numbering was still so bad on some of the BCSO documents that it really made his job difficult, and that he was not convinced that the poor numbering and record keeping would make the reports appropriate or admissible at trial. See 3 Tr. at 76:8-77:7 (Sirignano)("Because I have multiple documents from different investigators with different years on it, so I believe these documents to have been backdated or written after the fact."). The Court, however, struck a compromise regarding the BCSO documents, ordering the United States:

> When you do this triple review, if there [are] any signed copies, produce those, if there are any unsigned copies, produce those, if there is a stray page, produce those. I know you can't be sponges [of] what occurred over at BCSO. But just give her everything and then Ms. Sirignano, you can have fun on cross-examination making your point. But I don't think that probably I can do much more than that. Do you agree with that Ms. Sirignano?

3 Tr. at 77:23-78:7 (Court). Garcia agreed with the solution. See Tr. at 78:8 (Sirignano). Garcia also reiterated that, if the United States finds any FBI reports on this incident, he would expect to receive that in supplemental discovery, which the United States had already agreed to do if the FBI report exists. See 3 Tr. at 78:22-79:9 (Sirignano, Court, Armijo).

Garcia next stated that, regarding Giglio information for the undercover officer who is going to be called to testify, he had worked out a timetable with the United States to get that information, mooting that request. See 3 Tr. at 79:17-19 (Sirignano). The Court reiterated its request that the United States promptly disclose Giglio information. See 3 Tr. at 80:10-13 (Court)("If you get anything on Giglio [or] Brady or Rule 16 materials, let's get that over to Ms. Sirignano and the Mr. Adams as soon as possible on that."). Garcia then addressed his laboratory evidence requests, which Garcia believed were covered by the Court's rulings that the United States needs "go back and produce all the chain of custody materials," which the Court confirmed. 3 Tr. at 80:22-81:2 (Court, Sirignano). Regarding law enforcement reports

pertaining to the September 10, 2015, incident, Garcia maintained his request "for all records or payments made by and benefits from law enforcement including but not limited to all payments made to this CHS," 3 Tr. at 81:16-19 (Sirignano), and the Court initially agreed that a CIs' payment is something that should be in Garcia's hands, see 3 Tr. at 82:5-7 (Court). The United States indicated, however, that it was not going to be calling a CI for this incident -- it was only calling an undercover officer, meaning it did not need to disclose any payments for the CI with whom the undercover officer worked. See 3 Tr. at 82:8-17 (Armijo). Garcia objected to the United States' indication, arguing:

> I'm kind of astounded that the Government thinks that they're going to come in and prove their case without the beginning or how this case commenced and the cellphone records and the paid snitch with the cellphone in the jail . . . You know, obviously they're just going to try and say, oh, on September 10th, you know an alleged drug deal occurred between this undercover officer and my client. Well, the story doesn't start there, Your Honor the story starts in the Department of Corrections.

3 Tr. at 83:9-24 (Sirignano). The Court pressed Garcia to explain why payments that the testifying undercover officer may have made leading to his purchase of drugs from Garcia would help him and his defense, to which Garcia explained:

> Well, this is something that I really don't think that we need to disclose to the Government or the Court at this time. You know, this is Kyles v. Whitley. This impeaches the integrity of their investigation. Your Honor, it starts from the beginning[] their investigation was tainted from the very beginning, and they want to start in the middle because they know that there was some dirty nonsense going on in the beginning of this case. And they don't want these snitches to testify.

3 Tr. at 84:7-19 (Sirignano). The United States maintained its refusal to disclose payment information for the three CIs that it was not calling, but whom instead Garcia was calling, arguing:

> I think that they're just planning on calling them [to im]peach them I don't think that's allowed to call a witness just to impeach a witness unless it provides something. They won't have anything really exculpatory as far as this case goes.

It's just like I keep saying this is a simple drug case. You have a search warrant and a lot of times we have intros or a search warrants we start the case from on this date we served a search warrant. We don't go into the background of it. Or a lot of times we have in[tros] from CIs, for instance this count we're not getting into the int[r]o. We're trying to keep it clean Your Honor and exactly like she said she may be astounded but that's how we do dr[ug] cases, which is . . . on this date, this person bought th[ese] drugs from this person[] and the that's what we're doing. As to these CHSs, again I think they're using this case to try and get information ahead of time that they're not entitled to for the other cases. And so as to the witnesses that we call, we have no problem providing.

3 Tr. at 86:22-87:17 (Armijo). The Court was inclined to agree with the United States, in that Garcia was not entitled to information regarding payments that the testifying undercover officer may have made to persons in the lead up to the September 10, 2015, drug buy from Garcia without making a showing that "these witnesses you're calling are going to provide some . . . evidence, and if you're calling them and then you're wanting to impeach your own witness that's fine, but I guess I'm wondering if you need to make a showing before you get that evidence from the Government that it [is not just a] fishing expedition and that in fact it's going to be <u>Giglio</u> or <u>Brady</u> information." 3 Tr. at 87:18-88:4 (Court). Garcia responded:

I don't think anyone would dispute that would be an area that we could [impeach] law enforcement[]'s lack of efforts to provide the best evidence in Court. I don't think anybody would dispute that we could ask about that. I think we are allowed to go further under <u>Kyles v. Whitley</u> and that was a 1995 Supreme Court case it's a <u>Brady</u> case and I've always thought it was really interesting because it was right [around the time of the] O.J. [trial], so and a lot of [people] where I lived were up[set] that O.J. got [aquitt]ed and . . . they thought it was unfair and right around that same time <u>Kyles</u> came out[. The] Supreme Court . . . said you know attacking the credibility of the police investigation is a time honored and legitimate defense strategy. . . . [W]e're allowed to talk about all the other things in their investigation that they did not do and the choices that they did do to try to develop a case against Chris Garcia and I think part of that is going to be the bank rol[l] that they put into . . . custody [and to the] person with the telephone and to other people. I mean we get, if they're going to put . . . agents on the stand we . . . attack the lack of full investigation as we see it to the extent the Court finds it [permissible] at this point we want discovery on it so we can make those tactical choices. But we certainly anticipate challenging them on what . . . choices they did make in the investigation and choices they did not make in the investigation. And I think this falls squarely under <u>Kyles v. Whitley</u>,

whether or not the Government chooses to call the witness and in <u>Kyles v. Whitley</u> the key witness was a guy named Bingaman [and] he was never called as a witness in the case but there was whole bunch of information that was never turned over to the defense that the defense could have used to further investigate and that could have led to admissible lines questioning of the law enforcement officer.

3 Tr. at 88:10-90:22 (Adams).  The Court posited that,

well, I guess my problem here is that these are witnesses . . . you're calling, [and] the Government is not calling.  It seems to me that once that occurs I've got to run it through . . . <u>Brady</u> and <u>Giglio</u>, and it's getting pretty attenuated to get out there and start talking about payments to CIs they're not calling in this case.  I'm not restricting your ability to question them on the stand about that.

3 Tr. at 90:22-91:4 (Court).  The Court then concluded that it would:

just warn the Government that if they've made payments and I'm going to allow these questions to be asked, which I am, you better have the material somewhat ready or have the officers ready to [speak about it] because I do think that I'll allow the question, but I'm not necessarily going to order the Government to produce all of it right at the moment.  Because I'm not seeing the <u>Brady</u>, <u>Giglio</u> or other, it seems, it's a fact, and assuming that the Government's witnesses say accurately what occurred, . . . but have it ready.  If you don't want to produce it now [fine,] but it may all of a sudden become relevant because the Government doesn't want to be in a position where its got witnesses up here that are not being accurate.  So have it ready to go but I won't order its production now[,] I think probably we know what happened so it's probably not a secret.

3 Tr. at 91:11-92:3 (Court).  Next, the United States explained that it was going to disclose the information Garcia requests regarding the "cellular phone information" relating to Duran's use of a cell phone in custody at PNM.  3 Tr. at 92:7-18 (Armijo).  At this point, Garcia withdrew the rest of the Motion to Compel's requests regarding the September 10, 2015, incident.  3 Tr. at 93:12-15; 93:19-21 (Sirignano).

Garcia then jumped to the Motion to Compel's category of requests regarding scientific reports and related items.  <u>See</u> 3 Tr. at 94:5-95:2 (Sirignano).  Garcia placed Janine Arvizu on the stand for inter vivos testimony.  Arvizu is a "chemist who works as a laboratory auditor," who works

for clients who use laboratory test results to make very important decisions and . . . need to understand whether or not a given result or given set of results was generated in accordance with the laboratory's own pro[cedures] and then whether those procedures meet national and international standards for that type of work.

3 Tr. at 95:16-17; 96:9-15 (Arvizu). Garcia, ultimately, elicited testimony from Arvizu regarding what she still needs from the United States to "generate a proper report." 3 Tr. at 97:20-21; 99:1-5 (Sirignano). Arvizu stated:

The records that have been received to date from the Albuquerque police department laboratory and from the New Mexico Department of Public Safety laboratory appear to both be good faith effort to provide all the available items of discovery that were listed in your request. I can't obviously ask the[m to] produce a record that doesn't exist. But it appears that they have made a good faith effort to produce all the requested materials. The records that have been provided to date from the DEA laboratory are wholly insufficient for this kind of an independent assessment. They are very, very limited. And the, I believe the only records to date []received from the FBI laboratory relate to their written procedures for doing latent print testing. So I don't actually have any case specific records just their latent print procedure.

3 Tr. at 99:6-22 (Arvizu). Arvizu stated that she needs the FBI laboratory data "to make an assessment as to whether or not the reported results can be considered scientifically reliable for an important forensic use in court." 3 Tr. at 99:24-100:2 (Arvizu). Arvizu clarified that "fingerprint work" was a component of the FBI data. See 3 Tr. at 100:8 (Arvizu).

On cross examination, the United States indicated that it had made a request from the FBI laboratory for the data that Arvizu may need and that the DEA has denied further requests for information. See 3 Tr. at 100:10-25; 110:2-4 (Castellano). The United States also presented Arvizu with documents disclosed as discovery in this case, of which "a number of them are from the FBI laboratory's and it includes chain of custody records for evidence, communication logs, some information a report produced by the FBI lab and statement of qualification for analysts. . . . In this case it's latent print case notes." 3 Tr. at 112:13-22 (Arvizu). After concluding Arvizu's testimony, the United States reiterated that it had given Arvizu what it had regarding

the FBI laboratory data, and that it had even given data to Garcia already which Arvizu had not

yet incorporated into her analysis, and that

> if there is a specific request then DEA is going to take issue with that, and . . .
> because DEA's position is as Mr. Castellano indicated . . . is that the criminal
> discovery rules do not require it; . . . she argues that the [DEA] denied several
> requests made by this, Ms. Arvizu, saying that what the defense wanted was civil
> discovery.

3 Tr. at 124:6-16 (Armijo). The Court indicated that it was

> not inclined to grant the motion. It seems to me that unless the defendant can
> point to some problem that it's a fishing expedition and it goes beyond what
> <u>Brady</u> and <u>Giglio</u> and Rule 16 require. So I'm not inclined to order anything
> further. I do think that if your expert, Ms. Arvizu, wants to look at the new [data
> she had not seen in the United States' disclosures] and make a more refined
> request, Ms. Armijo is not shutting the door of sending that to the DEA. But my
> reaction or initial impression is that most of this is just fishing to see if they can
> find a problem rather than there being something that gives the Court some
> concern that we need to go that direction.

3 Tr. at 129:20-130:7 (Court). The Court then concluded argument on the Motion to Compel,

with Garcia asking the Court to address that Motion to Compel immediately after the parties left

the hearing on April 14, 2017. <u>See</u> 3 Tr. at 135:8-9 (Sirignano).

## LAW REGARDING THE UNITED STATES' DUTY TO DISCLOSE IN CRIMINAL CASES

In <u>Brady v. Maryland</u>, the Supreme Court explained that "the suppression by the

prosecution of evidence favorable to an accused upon request violates due process where the

evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of

the prosecution." 373 U.S. at 87 ("<u>Brady</u>"). In <u>Giglio v. United States</u>, the Supreme Court

extended the prosecution's disclosure obligation to evidence that is useful to the defense in

impeaching government witnesses, even if the evidence is not inherently exculpatory. <u>See</u> 405

U.S. at 153 ("<u>Giglio</u>"); <u>Douglas v. Workman</u>, 560 F.3d 1156, 1172-73 (10th Cir. 2009)("[N]o

distinction is recognized between evidence that exculpates a defendant and 'evidence that the

defense might have used to impeach the [State's] witnesses by showing bias and interest.'")(quoting United States v. Bagley, 473 U.S. 667, 676 (1985)).  Finally, the Supreme Court has refined Brady and clarified that it is not necessary that a defendant request exculpatory evidence; "regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Kyles v. Whitley, 514 U.S. at 433 (quoting United States v. Bagley, 473 U.S. at 682).  See Douglas v. Workman, 560 F.3d at 1172 ("The government's obligation to disclose exculpatory evidence does not turn on an accused's request.");  United States v. Summers, 414 F.3d 1287, 1304 (10th Cir. 2005)("[T]he prosecution has an affirmative duty to disclose exculpatory evidence clearly supporting a claim of innocence even without request.").  On the other hand, "[i]t is well settled that there is no affirmative duty upon the government to take action to discover information which it does not possess."  United States v. Badonie, 2005 WL 2312480, at *2 (D.N.M. 2005)(Browning, J.)(internal quotation marks omitted).  "A prosecutor does not have a duty . . . to obtain evidence from third parties."  United States v. Badonie, 2005 WL 2312480, at *2.

During a criminal prosecution, the Federal Rules of Criminal Procedure and the Constitution of the United States of America require the United States to disclose certain evidence to a criminal defendant.  Rule 16 of the Federal Rules of Criminal Procedure is one source that imposes such a duty on the United States.  The Due Process Clause of the Constitution is another source imposing a duty to disclose on the United States.

## LAW REGARDING RULE 16

Rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure provides:

**(E) Documents and Objects.** Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:

    **(i)**       the item is material to preparing the defense;

    **(ii)**      the government intends to use the item in its case-in-chief at trial; or

    **(iii)**    the item was obtained from or belongs to the defendant.

Fed. R. Crim. P. 16(a)(1)(E). Although rule 16's language is permissive, it does not authorize "a blanket request to see the prosecution's file," and a defendant may not use the rule to engage in a "fishing expedition." United States v. Maranzino, 860 F.2d 981, 985-86 (10th Cir. 1988)(citing Jencks v. United States, 353 U.S. 657, 667 (1957)). Rule 16 also does not obligate the United States to "take action to discover information which it does not possess." United States v. Badonie, 2005 WL 2312480, at *2 (quoting United States v. Tierney, 947 F.2d 854, 864 (8th Cir. 1991))(internal quotation marks omitted). Nor is the United States required to secure information from third parties. See United States v. Gatto, 763 F.2d 1040, 1048 (9th Cir. 1985)(holding that rule 16 does not contain a due diligence element requiring a prosecutor to search for evidence not within the United States' possession, custody, or control).

Evidence is "material" under rule 16 if "there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, . . . or assisting impeachment or rebuttal." United States v. Graham, 83 F.3d 1466, 1474 (D.C. Cir. 1996)(internal quotation marks omitted)(quoting United States v. Lloyd, 992 F.2d 348, 351 (D.C. Cir. 1993))(internal quotation marks omitted). "Although the materiality standard is not a heavy burden, the Government need disclose rule 16 material only if it enables the defendant

significantly to alter the quantum of proof in his favor." United States v. Graham, 83 F.3d at 1474 (alterations, citations, and internal quotation marks omitted).

Rule 16(d)(1) provides guidelines for courts to regulate discovery by issuing or modifying protective orders:

> At any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief. The court may permit a party to show good cause by a written statement that the court will inspect ex parte. If relief is granted, the court must preserve the entire text of the party's statement under seal.

Fed. R. Crim. P. 16(d)(1). In In re Terrorist Bombings of United States Embassies in East Africa, 552 F.3d 93 (2d Cir. 2008), the United States Court of Appeals for the Second Circuit held that rule 16(d) gives district courts the discretion to determine the circumstances "under which the defense may obtain access to discoverable information." In re Terrorist Bombings of United States Embassies in East Africa, 552 F.3d at 122. In United States v. Delia, 944 F.2d 1010 (2d Cir. 1991), the Second Circuit noted that rule 16(d)(1) is "permissive," and gives district courts the ability to "limit or otherwise regulate discovery pursuant to Rule [16(d)(1)]." United States v. Delia, 944 F.2d at 1018.

Rule 16(d)(2) "gives the district court broad discretion in imposing sanctions on a party who fails to comply with" rule 16. United States v. Wicker, 848 F.2d 1059, 1060 (10th Cir. 1988).

> **(2) Failure to Comply.** If a party fails to comply with this rule, the court may:
>
> **(A)** order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms and conditions;
>
> **(B)** grant a continuance;
>
> **(C)** prohibit that party from introducing the undisclosed evidence; or

**(D)** enter any other order that is just under the circumstances.

Fed. R. Crim. P. 16(d)(2).

> In selecting a proper sanction, a court should typically consider: (1) the reasons the government delayed producing requested materials, including whether the government acted in bad faith; (2) the extent of prejudice to defendant as a result of the delay; and (3) the feasibility of curing the prejudice with a continuance.

United States v. Charley, 189 F.3d 1251, 1262 (10th Cir. 1999)(internal quotation marks omitted)(quoting United States v. Gonzales, 164 F.3d 1285, 1292 (10th Cir. 1999)).  In United States v. Martinez, 455 F.3d 1127 (10th Cir. 2006), the Tenth Circuit held that "a court should impose the least severe sanction."  455 F.3d at 1131 (quoting United States v. Wicker, 848 F.2d 1059, 1061 (10th Cir. 1988)).  The Tenth Circuit noted: "Rule 16 and our cases specifically mention continuance or exclusion of the evidence as preferred remedies."  455 F.3d at 1131.

## LAW REGARDING THE UNITED STATES' DUTY TO DISCLOSE UNDER THE DUE PROCESS CLAUSE OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA

The Due Process Clause of the Constitution requires that the United States disclose to the defendant any evidence that "is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Brady, 373 U.S. at 87.  The Supreme Court has extended the prosecution's disclosure obligation to include evidence that is useful to the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory.  See Giglio, 405 U.S. 153; Douglas v. Workman, 560 F.3d 1156, 1172-73 (10th Cir. 2009)("[N]o distinction is recognized between evidence that exculpates a defendant and 'evidence that the defense might have used to impeach the [United States'] witnesses by showing bias and interest.'" (quoting United States v. Bagley, 473 U.S. 667, 676 (1985)); United States v. Abello-Silva, 948 F.2d 1168, 1179 (10th Cir. 1991)("Impeachment evidence merits the same

constitutional treatment as exculpatory evidence.").  Finally, the Supreme Court has refined Brady and clarified that it is not necessary that a defendant request exculpatory evidence: "Regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government."  Kyles v. Whitley, 514 U.S. 419, 433 (1995)(quoting United States v. Bagley, 473 U.S. at 682).  See Douglas v. Workman, 560 F.3d at 1172 ("The government's obligation to disclose exculpatory evidence does not turn on an accused's request."); United States v. Summers, 414 F.3d 1287, 1304 (10th Cir. 2005)("[T]he prosecution has an affirmative duty to disclose exculpatory evidence clearly supporting a claim of innocence even without request.").

### 1.     Material Exculpatory Evidence Under Brady.

"The Constitution, as interpreted in Brady, does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant."  Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d 801, 823 (10th Cir. 1995).  Brady requires disclosure only of evidence that is both favorable to the accused, and "material either to guilt or to punishment." Brady, 373 U.S. at 87.  "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  United States v. Bagley, 473 U.S. at 682.  See United States v. Allen, 603 F.3d 1202, 1215 (10th Cir. 2010).  A "reasonable probability," in turn, is a "probability sufficient to undermine confidence in the outcome."  United States v. Bagley, 473 U.S. at 682 (internal quotation marks omitted).  The Tenth Circuit has noted that "[t]he mere possibility that evidence is exculpatory does not satisfy the constitutional materiality standard."  United States v. Fleming, 19 F.3d 1325, 1331 (10th Cir. 1994).  The Tenth Circuit has also stated that evidence is material if it "might meaningfully alter a defendant's choices before and during trial . . . including

whether the defendant should testify." Case v. Hatch, 731 F.3d 1015 (10th Cir. 2013)(quoting

United States v. Burke, 571 F.3d 1048, 1054 (10th Cir. 2009))(internal quotation marks omitted).

"To be material under Brady, undisclosed information or evidence acquired through that

information must be admissible." Banks v. Reynolds, 54 F.3d 1508, 1521 n.34 (10th Cir.

1995)(quoting United States v. Kennedy, 890 F.2d at 1059). The Supreme Court in Cone v. Bell,

556 U.S. 449 (2009), noted:

> Although the Due Process Clause of the Fourteenth Amendment, as interpreted by Brady, only mandates the disclosure of material evidence, the obligation to disclose evidence favorable to the defense may arise more broadly under a prosecutor's ethical or statutory obligations. See Kyles, 514 U.S. at 437 ("[T]he rule in Bagley (and, hence, in Brady) requires less of the prosecution than the ABA Standards for Criminal Justice Prosecution Function and Defense Function 3-3.11(a) (3d ed. 1993)"). See also ABA Model Rules of Professional Conduct 3.8(d) (2008)("The prosecutor in a criminal case shall" "make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal").

Cone v. Bell, 556 U.S. at 470 n.15.

The government bears the burden of producing exculpatory materials; the defendants

have no obligation to first note that such materials exist. See Kyles v. Whitley, 514 U.S. at 437

(stating that the prosecution has an affirmative duty to disclose evidence, because "the

prosecution, which alone can know what is undisclosed, must be assigned the consequent

responsibility to gauge the likely net effect of all such evidence and make disclosure when the

point of 'reasonable probability' is reached"); United States v. Deutsch, 475 F.2d 55, 57 (5th Cir.

1973)(granting a mistrial for failure to produce personnel files of government witnesses),

overruled on other grounds by United States v. Henry, 749 F.2d 203 (5th Cir. 1984); United

States v. Padilla, 2011 WL 1103876, at *6 (D.N.M. 2011)(Browning, J.). This obligation means

that the United States must "volunteer exculpatory evidence never requested, or requested only in a general way." Kyles v. Whitley, 514 U.S. at 433 (internal quotation marks omitted). Additionally, "[u]nder Brady, the good or bad faith of government agents is irrelevant." United States v. Quintana, 673 F.2d 296, 299 (10th Cir. 1982). "This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence." Kyles v. Whitley, 514 U.S. at 439.

 **2**. **Timing of the Disclosure Under** Brady.

 "The obligation of the prosecution to disclose evidence under Brady can vary depending on the phase of the criminal proceedings and the evidence at issue." United States v. Harmon, 871 F. Supp. 2d 1125, 1149 (D.N.M. 2012)(Browning, J.), aff'd, 742 F.3d 451 (10th Cir. 2014). As a general matter, "[s]ome limitation on disclosure delay is necessary to protect the principles articulated in Brady v. Maryland." United States v. Burke, 571 F.3d at 1054. The Tenth Circuit has recognized, however, that "[i]t would eviscerate the purpose of the Brady rule and encourage gamesmanship were we to allow the government to postpone disclosures to the last minute, during trial." United States v. Burke, 571 F.3d at 1054. "[T]he belated disclosure of impeachment or exculpatory information favorable to the accused violates due process when an 'earlier disclosure would have created a reasonable doubt of guilt.'" United States v. Burke, 571 F.3d at 1054. The Tenth Circuit has stated:

> Where the district court concludes that the government was dilatory in its compliance with Brady, to the prejudice of the defendant, the district court has discretion to determine an appropriate remedy, whether it be exclusion of the witness, limitations on the scope of permitted testimony, instructions to the jury, or even mistrial.

United States v. Burke, 571 F.3d at 1054. Notably, "not every delay in disclosure of Brady material is necessarily prejudicial to the defense." United States v. Burke, 571 F.3d at 1056.

"To justify imposition of a remedy, the defense must articulate to the district court the reasons why the delay should be regarded as materially prejudicial." United States v. Burke, 571 F.3d at 1056.

Once a prosecutor's obligations under Brady have been triggered, however, they "continue[] throughout the judicial process." Douglas v. Workman, 560 F.3d at 1173. For instance, the prosecutor's obligation to disclose Brady material can arise during trial. See United States v. Headman, 594 F.3d at 1183 (10th Cir. 2010)("Although Brady claims typically arise from nondisclosure of facts that occurred before trial, they can be based on nondisclosure of favorable evidence (such as impeachment evidence) that is unavailable to the government until trial is underway."). The disclosure obligation continues even while a case is on direct appeal. See United States v. Headman, 594 F.3d at 1183; Smith v. Roberts, 115 F.3d 818, 819, 820 (10th Cir. 1997)(applying Brady to a claim that the prosecutor failed to disclose evidence received after trial but while the case was on direct appeal).

The Supreme Court has held that Brady does not require "preguilty plea disclosure of impeachment information." United States v. Ruiz, 536 U.S. 622, 629 (2002)("We must decide whether the Constitution requires that preguilty plea disclosure of impeachment information. We conclude that it does not."). The Supreme Court recognized that "impeachment information is special in relation to the fairness of a trial, not in respect to whether a plea is voluntary." United States v. Ruiz, 536 U.S. at 632 (emphasis in original). The Supreme Court acknowledged that, "[o]f course, the more information the defendant has, the more aware he is of the likely consequences of a plea, waiver, or decision, and the wiser that decision will likely be," but concluded that "the Constitution does not require the prosecutor to share all useful information with the defendant." United States v. Ruiz, 536 U.S. at 632. The Supreme Court added:

[T]his Court has found that the Constitution, in respect to a defendant's awareness of relevant circumstances, does not require complete knowledge of the relevant circumstances, but permits a court to accept a guilty plea, with its accompanying waiver of various constitutional rights, despite various forms of misapprehension under which a defendant might labor.

United States v. Ruiz, 536 U.S. at 630. The Supreme Court explained that "a constitutional obligation to provide impeachment information during plea bargaining, prior to entry of a guilty plea, could seriously interfere with the Government's interest in securing those guilty pleas that are factually justified, desired by defendants, and help to secure the efficient administration of justice." United States v. Ruiz, 536 U.S. at 630. The Tenth Circuit has reiterated these principles from United States v. Ruiz:

Johnson asserts that his plea was not knowing and voluntary because he did not know that he was giving up a claim that the government failed to disclose impeachment evidence. The Supreme Court, however, foreclosed this exact argument in United States v. Ruiz, by holding that the government has no constitutional obligation to disclose impeachment information before a defendant enters into a plea agreement. Ruiz emphasized that "impeachment information is special in relation to the fairness of a trial, not in respect to whether a plea is voluntary." Rather, "a waiver [is] knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply in general in the circumstances -- even though the defendant may not know the specific detailed consequences of invoking it."

United States v. Johnson, 369 F. App'x 905, 906 (10th Cir. 2010)(unpublished)(quoting United States v. Ruiz, 546 U.S. at 630).[8]

---

[8]United States v. Johnson is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A)("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

The Tenth Circuit has held, however, that <u>United States v. Ruiz</u> does not apply to exculpatory evidence, but rather applies only to impeachment evidence:

> <u>Ruiz</u> is distinguishable in at least two significant respects. First, the evidence withheld by the prosecution in this case is alleged to be exculpatory, and not just impeachment, evidence. Second, Ohiri's plea agreement was executed the day jury selection was to begin, and not before indictment in conjunction with a "fast-track" plea. Thus, the government should have disclosed all known exculpatory information at least by that point in the proceedings. By holding in <u>Ruiz</u> that the government committed no due process violation by requiring a defendant to waive her right to impeachment evidence before indictment in order to accept a fast-track plea, the Supreme Court did not imply that the government may avoid the consequence of a <u>Brady</u> violation if the defendant accepts an eleventh-hour plea agreement while ignorant of withheld exculpatory evidence in the government's possession.

<u>United States v. Ohiri</u>, 133 F. App'x 555, 562 (10th Cir. 2005)(unpublished). The Tenth Circuit qualified its holding in <u>United States v. Ohiri</u>, however, stating that the case presented "unusual circumstances." 133 F. App'x at 562.

The United States Courts of Appeals "have split on the issue whether <u>Brady v. Maryland</u>'s restrictions apply to suppression hearings." <u>United States v. Harmon</u>, 871 F. Supp. 2d at 1151. In an unpublished opinion, the Tenth Circuit, without discussing whether <u>Brady</u> applies to a suppression hearing, rejected a defendant's argument that the prosecution violated <u>Brady</u> by failing to disclose impeachment evidence before a suppression hearing on the basis that the evidence was not impeachment evidence and not material. <u>See</u> <u>United States v. Johnson</u>, 117 F.3d 1429, 1997 WL 381926, at *3 (10th Cir. 1997)(unpublished table decision). Specifically, the Tenth Circuit found:

---

<u>United States v. Austin</u>, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted). The Court concludes that <u>United States v. Johnson</u>; <u>United States v. Hernandez-Mejia</u>, 406 F. App'x at 336; <u>McGee v. Hayes</u>, 43 F. App'x 214, 217 (10th Cir. 2002); and <u>United States v. Ohiri</u>, 133 F. App'x 555 (10th Cir. 2005), have persuasive value with respect to a material issue, and will assist the court in its disposition of this Memorandum Opinion and Order.

> [D]isclosure of the evidence existing at the time of the hearing, even if impeaching, would not establish a reasonable probability that the outcome of the suppression hearing would have been different. First, we question whether the evidence in question would have been admitted at the suppression hearing. Even if it had been admitted, however, in light of [the defendant's] lack of truthfulness, our confidence in the result of the hearing has not been undermined. Therefore, we hold that the evidence was not material, and that its nondisclosure by the prosecution does not constitute a <u>Brady</u> violation.

<u>United States v. Johnson</u>, 1997 WL 381926, at *3 (citation omitted).

The United States Court of Appeals for the District of Columbia Circuit has recognized that "it is hardly clear that the <u>Brady</u> line of Supreme Court cases applies to suppression hearings," because "[s]uppression hearings do not determine a defendant's guilt or punishment, yet <u>Brady</u> rests on the idea that due process is violated when the withheld evidence is 'material either to guilt or to punishment.'" <u>United States v. Bowie</u>, 198 F.3d 905, 912 (D.C. Cir. 1999)(citation omitted). Without deciding the issue and in an unpublished opinion, the United States Court of Appeals for the Sixth Circuit quoted with approval this language from <u>United States v. Bowie</u>. <u>See</u> <u>United States v. Bullock</u>, 130 F. App'x 706, 723 (6th Cir. 2005)(unpublished)("Whether the suppression hearing might have come out the other way, however, is of questionable relevance to the <u>Brady</u> issues at stake here."). The Seventh Circuit held that, under its precedent and the law from other Courts of Appeals, it was not "obvious" for clear-error purposes that "<u>Brady</u> disclosures are required prior to suppression hearings." <u>United States v. Stott</u>, 245 F.3d 890, 902 (7th Cir. 2001). The Second Circuit also noted that <u>Brady</u>'s applicability to suppression hearings was not "obvious" for plain error purposes. <u>United States v. Nelson</u>, 193 F. App'x 47, 50 (2d Cir. 2006).

Before the Supreme Court issued its <u>United States v. Ruiz</u> decision, the United States Court of Appeals for the Fifth Circuit and the United States Court of Appeals for the Ninth Circuit held that <u>Brady</u> applies to suppression hearings. <u>See</u> <u>United States v. Barton</u>, 995 F.2d

931, 935 (9th Cir. 1993)("[W]e hold that the due process principles announced in <u>Brady</u> and its progeny must be applied to a suppression hearing involving a challenge to the truthfulness of allegations in an affidavit for a search warrant."); <u>Smith v. Black</u>, 904 F.2d 950, 965-66 (5th Cir. 1990)("Timing is critical to proper <u>Brady</u> disclosure, and objections may be made under <u>Brady</u> to the state's failure to disclose material evidence prior to a suppression hearing."), <u>vacated on other grounds</u>, 503 U.S. 930 (1992).

Most recently, the Tenth Circuit has suggested that <u>Brady</u> does not apply to suppression hearings, because "*Brady* rests on the idea that due process is violated when the withheld evidence is material to either guilt or punishment," but "[s]uppression hearings do not determine a defendant's guilt or punishment." <u>United States v. Dahl</u>, 597 F. App'x 489, 491 n.2 (10th Cir. 2015)(quoting <u>United States v. Lee Vang Lor</u>, 706 F.3d 1252, 1256 n.2 (10th Cir. 2013)(acknowledging that "[w]hether *Brady's* disclosure requirements even apply at the motion to suppress stage is an open question")). Although the United States Courts of Appeals have split on whether <u>Brady</u> applies to suppression hearings, "it is not likely that a prosecutor must disclose impeachment evidence before a suppression hearing in light of the Supreme Court's conclusion in <u>United States v. Ruiz</u> that a prosecutor does not have to disclose impeachment evidence before the entry of a guilty plea." <u>United States v. Harmon</u>, 871 F. Supp. 2d at 1151. The Tenth Circuit affirmed <u>United States v. Harmon</u>, in which the Court concluded that the United States need not disclose impeachment information before a suppression hearing.

> Given that the Court has located no Tenth Circuit case deciding this issue, the Court believes that the Tenth Circuit would extend the holding of <u>United States v. Ruiz</u> to suppression hearings. The Supreme Court's rationale distinguishing the guilty-plea process from a trial applies equally to a comparison of the suppression-hearing process and a trial. The Court believes that both the Tenth Circuit and the Supreme Court would recognize that impeachment evidence need not be disclosed before a suppression hearing. In <u>United States v. Ruiz</u>, the Supreme Court recognized that "impeachment information is special in relation to

- 48 -

the *fairness of a trial*, not in respect to whether a plea is <u>voluntary</u>." <u>United States v. Ruiz</u>, 536 U.S. at 632 . . . (emphasis in original). It acknowledged that, "[o]f course, the more information the defendant has, the more aware he is of the likely consequences of a plea, waiver, or decision, and the wiser that decision will likely be," but concluded that "the Constitution does not require the prosecutor to share all useful information with the defendant." <u>United States v. Ruiz</u>, 536 U.S. at 632 . . . . Likewise, "the more information the defendant has, the more" likely he will be able to successfully suppress a particular piece of evidence, but "the Constitution does not require the prosecutor to share all useful information with the defendant." <u>United States v. Ruiz</u>, 536 U.S. at 632 . . . .

<u>United States v. Harmon</u>, 871 F. Supp. 2d at 1169 (emphasis in original). Accordingly, <u>Brady</u> does not require the United States to disclose impeachment evidence before suppression hearings. <u>See</u> <u>United States v. Harmon</u>, 871 F. Supp. 2d at 1165-67.

**3.** **<u>Evidence Must Be in the United States' Possession</u>.**

"It is well settled that there is no 'affirmative duty upon the government to take action to discover information which it does not possess.'" <u>United States v. Tierney</u>, 947 F.2d 854, 864 (8th Cir. 1991)(quoting <u>United States v. Beaver</u>, 524 F.2d 963, 966 (5th Cir. 1975)). <u>Accord</u> <u>United States v. Kraemer</u>, 810 F.2d 173, 178 (8th Cir. 1987)(explaining that the prosecution is not required "to search out exculpatory evidence for the defendant"); <u>United States v. Badonie</u>, 2005 WL 2312480, at *2. On the other hand, "a prosecutor's office cannot get around <u>Brady</u> by keeping itself in ignorance, or by compartmentalizing information about different aspects of a case." <u>Carey v. Duckworth</u>, 738 F.2d 875, 878 (7th Cir. 1984). Under <u>Brady</u>, "[a] prosecutor must disclose information of which it has knowledge and access." <u>United States v. Padilla</u>, 2011 WL 1103876, at *7 (citing <u>United States v. Bryan</u>, 868 F.2d 1032, 1037 (9th Cir. 1989)). "A prosecutor may have a duty to search files maintained by other 'governmental agencies closely aligned with the prosecution' when there is 'some reasonable prospect or notice of finding exculpatory evidence.'" <u>United States v. Padilla</u>, 2011 WL 1103876, at *7 (quoting <u>United States v. Brooks</u>, 966 F.2d 1500, 1503 (D.C. Cir. 1992)). A prosecutor does not have a duty,

however, to obtain evidence from third parties.  See United States v. Combs, 267 F.3d 1167, 1173 (10th Cir. 2001)(observing that Brady v. Maryland does not oblige the government to obtain evidence from third parties).

## LAW REGARDING THE JENCKS ACT

In Jencks v. United States, 353 U.S. at 667, the Supreme Court held that a "criminal action must be dismissed when the government, on the ground of privilege, elects not to comply with an order to produce, for the accused's inspection and for admission in evidence, relevant statements or reports in its possession of government witnesses touching the subject matter of their testimony at trial."  353 U.S. at 672.  In so holding, the Supreme Court recognized that the

> rationale of the criminal cases is that, since the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense.

353 U.S. at 671.  Congress later codified Jencks v. United States in 18 U.S.C. § 3500.  See United States v. Kimoto, 588 F.3d 464, 475 (7th Cir. 2009)(explaining that "the Jencks Act, 18 U.S.C. § 3500[,] . . . was enacted in response to the Supreme Court's holding in Jencks v. United States, 353 U.S. 657 . . . .").

Section 3500 of Title 18 of the United States Code provides:

**(a)**     In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

**(b)**     After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified.  If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the

court shall order it to be delivered directly to the defendant for his examination and use.

18 U.S.C. §§ 3500(a)-(b).  "The Jencks Act requires the government to disclose to criminal defendants any statement made by a government witness that is 'in the possession of the United States' once that witness has testified."  United States v. Lujan, 530 F. Supp. 2d 1224, 1232 (D.N.M. 2008)(Brack, J.)(quoting 18 U.S.C. §§ 3500(a) & (b)).  The Jencks Act "manifests the general statutory aim to restrict the use of such statements to impeachment."  Palermo v. United States, 360 U.S. 343, 349 (1959).  The Jencks Act's purpose is "not only to protect Government files from unwarranted disclosure but also to allow defendants materials usable for the purposes of impeachment."  United States v. Smaldone, 544 F.2d 456, 460 (10th Cir. 1976)(citing Palermo v. United States, 360 U.S. at 352).

The Jencks Act defines statements as:

**(1)**     a written statement made by said witness and signed or otherwise adopted or approved by him;

**(2)**     a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

**(3)**     a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

18 U.S.C. § 3500(e).

The Tenth Circuit has held: "Interview notes could be 'statements' under the [Jencks] Act if they are substantially verbatim."  United States v. Smith, 984 F.2d 1084, 1086 (10th Cir. 1993).  At least one district court within the Tenth circuit has distinguished interview notes from reports that "embody only the agent's epitomization, interpretation, or impression of an interview," finding that the latter are not producible under the Jencks Act.  United States v.

Jackson, 850 F. Supp. 1481, 1508 (D. Kan. 1994)(Crow, J.). In United States v. Lujan, the Honorable Robert C. Brack, United States District Judge for the District of New Mexico, explained that rough interview notes may be discoverable under the Jencks Act, when a defendant makes "at least . . . a colorable claim that an investigator's discarded rough notes contained exculpatory evidence not included in any formal interview report provided to the defense." 530 F. Supp. 2d at 1266. Judge Brack held that, "[b]ecause the contents of rough interview notes may in some cases be subject to disclosure and because the potential impeachment value of the notes may not become evident until trial," the United States must, under 18 U.S.C. § 3500, preserve its rough interview notes "made by law enforcement agents during interview of potential witnesses." 530 F. Supp. 2d at 1267. See United States v. Cooper, 283 F. Supp. 2d 1215, 1238 (D. Kan. 2003)(Crow, J.)(noting that rough interview notes may be discoverable under the Jencks Act); United States v. Jackson, 850 F. Supp. at 1508-09 (finding that interview notes may be producible under the Jencks Act).

The defendant bears the initial burden of showing that particular materials qualify under the Jencks Act, but the defendant's burden is not heavy. See United States v. Smaldone, 544 F.2d at 460 ("[T]he burden is on the defendant to show that particular materials qualify as 'Statements' and that they relate to the subject matter of the testimony of the witness."); United States v. Harry, 2013 WL 684671, at *10 (D.N.M. 2013)(Browning, J.). To satisfy this burden, the defendant need not prove that particular materials are within the scope of the Jencks Act, as the documents are not in the defendant's possession, but rather, "must plainly tender to the Court the question of the producibility of the document at a time when it is possible for the Court to order it produced, or to make an appropriate inquiry." United States v. Smith, 984 F.2d at 1086 (quoting Ogden v. United States, 303 F.2d 724, 733 (9th Cir. 1962)). See United States v.

Burton, 81 F. Supp. 3d 1229, 1250-51 (D.N.M. 2015)(Browning, J.).  The defendant's demand for documents under the Jencks Act must be sufficiently precise for a court to identify the requested statements.  See United States v. Smith, 984 F.2d at 1086.  For example, in United States v. Smith, the Tenth Circuit concluded that a defendant had met his burden and made a prima facie showing that a statement of a witness existed which may be producible under the Jencks Act when a government witness testified during the United States' case-in-chief that a government agent had interviewed her before she testified, and the defense counsel moved for production of the notes.  See 984 F.2d at 1085-86.  Once the defendant makes a prima facie showing that a witness statement exists that may be producible under the Jencks Act, the court should conduct a hearing or in camera review of the statement.  See 984 F.2d at 1086.

In United States v. Fred, No. CR 05-801 JB, the Court ordered the United States to produce "any personal notes or investigative materials that Federal Bureau of Investigation" agents "may have created regarding an interview" with the defendant.  No. CR 05-801 JB, Order at 1, filed November 8, 2006 (Doc. 86).  The Court required the United States to disclose the notes and investigative materials in a timely manner, so that the defendant could properly prepare for cross-examination at trial of the FBI agent who conducted the interview.  See No. CR 05-801 JB, Order at 1-2.  The Court has applied the Jencks Act to Drug Enforcement Agency agents' notes, generated from interviews with defendants, holding that the notes must be given to the defendants after the agents testify at trial.  See United States v. Goxcon-Chagal, 2012 WL 3249473, at **2, 6 (D.N.M. 2012)(Browning, J.).  In United States v. Tarango, 760 F. Supp. 2d 1163 (D.N.M. 2009)(Browning, J.), the Court, applying 18 U.S.C. § 3500, held that the United States must produce FBI agents' 302s, after the United States' witnesses testified at trial, to the

extent those reports contained statements from witnesses who testified at trial.  See 760 F. Supp. 2d at 1164, 1167.

## THE NEED FOR PRACTICAL AND EFFECTIVE CRIMINAL DISCOVERY

In 1990, a state jury convicted Debra Milke of murdering her four-year-old son, Christopher.  See Milke v. Ryan, 711 F.3d 998, 1000 (9th Cir. 2013).  The state judge sentenced her to death.  See Milke v. Ryan, 711 F.3d at 998.  The Honorable Alex Kozinski, Chief Judge for the Ninth Circuit, described the trial as "a swearing contest between Milke and Phoenix Police Detective Armando Saldate, Jr."  711 F.3d at 1000.  At the trial, Saldate testified that Milke confessed to the murder; Milke vehemently protested her innocence and denied confessing.  See 711 F.3d at 1000.  With no other witnesses, the state judge and jury believed Saldate.  See Milke v. Ryan, 711 F.3d 998.  They were unaware, however, of one fact that might have changed their minds: Saldate had a "long history of lying under oath and other misconduct."  711 F.3d at 1000-01.  Specifically, Saldate had lied to a grand jury or a judge in four cases, requiring state judges to throw out indictments or confessions.  See 711 F.3d at 1004. In another four cases, "judges threw out confessions or vacated convictions because Saldate had violated suspects' Miranda and other constitutional rights during interrogations, often egregiously."  Milke v. Ryan, 711 F.3d at 1004.  Finally, Saldate's personnel file documented a five-day suspension "for taking sexual liberties with a motorist he stopped and then lying to his supervisors about it."  711 F.3d at 1011.  The file revealed that his "supervisors had caught him in a lie and concluded that his credibility was compromised."  711 F.3d at 1006, 1012 (describing the report as showing that "Saldate has no compunction about lying during the course of his official duties" and that he has "a willingness to abuse his authority to get what he wants").  The information about Saldate's misconduct was in the hands of the party responsible for

ensuring that justice is achieved -- the state. Unfortunately, however, the state did not disclose this information, despite its requirements under Brady and Giglio. See Milke v. Ryan, 711 F.3d at 1005 (describing how the state did not mention the evidence, even though an important question in Milke's case was whether Saldate ignored Milke's request for an attorney). "This error resulted in a 'one-sided presentation of evidence' and 'impeded [the jury's] ability to fully and fairly assess the credibility of both [Milke] and Saldate." Milke v. Ryan, 711 F.3d at 1005 (alterations in the original). More than that problem, however, the error resulted in Milke's death sentence and imprisonment on death row for twenty-two years. See Milke v. Ryan, 711 F.3d at 1001.[9]

The disclosure problem is not confined to the context of overzealous police officers closing murder cases. It reaches to all corners of the criminal justice system. Judges and scholars are increasingly recognizing the problem with blatant Brady violations. See Daniel S. Medwed, Brady's Bunch of Flaws, 67 Wash. & Lee L. Rev. 1533 (2010); David Keenan et al., The Myth of Prosecutorial Accountability After Connick v. Thompson: Why Existing Professional Responsibility Measures Cannot Protect Against Prosecutorial Misconduct, 121 Yale L.J. Online 203 (2011). For example, in 2012, an investigation revealed that two Department of Justice prosecutors intentionally hid evidence in the 2008 political corruption case against Senator Ted Stevens, the longest serving Republican Senator in history. See United States v. Stevens, 2009 WL 6525926 (D.D.C. 2009)(Sullivan, J.). See Henry F. Schuelke III,

---

[9]After the Ninth Circuit vacated Milke's conviction and gave Arizona the chance to re-try Milke, the Arizona Court of Appeals barred any re-trial in a scathing opinion that garnered the New York Times' attention. See Arizona: No Retrial for Woman Freed from Death Row, N.Y. Times (Dec. 11, 2014), http://www.nytimes.com/2014/12/12/us/arizona-no-retrial-for-woman-freed-from-death-row.html?_r_1. The Arizona Court of Appeals described the "long course of Brady/Giglio violations" as a "flagrant denial of due process" and a "severe stain on the Arizona justice system." Milke v. Mroz, 339 P.3d 659, 665-66, 668 (Ariz. Ct. App. 2014).

Special Counsel, Report to Hon. Emmet G. Sullivan of Investigation Conducted Pursuant to the Court's Order (dated April 7, 2009), filed March 15, 2012 in In re Special Proceedings, No. 1:09-mc-00198-EGS (D.D.C. March 15, 2012)("Stevens Report").  Special prosecutor Henry F. Schuelke III's blistering report found that the United States team concealed documents that would have damaged the credibility of key United States witnesses and helped the late Stevens to defend himself against false-statements charges.  See Stevens Report at 12.  Stevens lost his Senate seat as the scandal unfolded, dying at age eighty-six in a plane crash two years later.  See Carrie Johnson, Report: Prosecutors Hid Evidence in Ted Stevens Case, NPR News (May 15, 2012), http://www.npr.org/2012/03/15/148687717/report-prosecutors-hid-evidence-in-ted-stevens-case.  Schuelke based his 500-page report on a review of 128,000 documents and interviews with prosecutors and FBI agents.  See Stevens Report at 12.  United States Attorney General Eric Holder moved to vacate Stevens' conviction.  See Jerry Seper, Inquiry Slams Prosecution of Stevens Corruption Case By Justice Department, The Washington Times (March 15, 2012).  The Department of Justice ("DOJ") subsequently "instituted a sweeping training curriculum for all federal prosecutors, and made annual discovery training mandatory."  Mark Memmott, Report Slams Sen. Stevens' Prosecutors, NPR News (March 15, 2012), http://www.npr.org/sections/thetwo-way/2012/03/15/148668283/report-slams-sen-stevens-prosecutors.

As Milke v. Ryan and the Stevens Report reveal, prosecutors hold a tremendous amount of power in criminal prosecutions, often more than the jury.  See Alex Kozinski, Criminal Law 2.0, 44 Geo. L.J. Ann. Rev. of Crim. Proc. iii, xxii (2015)(explaining that prosecutors often hold more power "than jurors because most cases don't go to trial").  They are the ones with access to the evidence, both inculpatory and exculpatory.  They can disclose it easier than anyone else can.

See Scott H. Greenfield, The Flood Gates Myth, Simple Justice (Feb. 16, 2015), http://blog.simplejustice.us/2015/02/16/the-flood-gates-myth/.  As one illustration, in Milke v. Ryan, Milke discovered the impeachment evidence detailing Saldate's misconduct "only after a team of approximately ten researchers in post-convictions proceedings spent nearly 7000 hours sifting through court records."  711 F.3d at 1018.  The team worked eight hours a day for three and a half months searching through the clerk of court's officers for Saldate's name in every criminal case file from 1982 to 1990.  See 711 F.3d at 1018.  It took another researcher another month to review motions and transcripts from each of those cases to find examples of Saldate's misconduct.  See 711 F.3d at 1018.  The Ninth Circuit concluded: "A reasonably diligent lawyer couldn't possibly have found these records in time to use them at Milke's trial."  711 F.3d at 1018.  The prosecutor was in the best position to give Milke the opportunity to effectively cross-examine Saldate and ensure that she had a fair trial.  Although Brady and Giglio require prosecutors to disclose exculpatory evidence to the defense, it is often extremely difficult for criminal defendants to know whether the prosecution is complying with this obligation.  Furthermore, prosecutors exert tremendous control over witnesses.

> They can offer incentives -- often highly compelling incentives -- for suspects to testify.  This includes providing sweetheart plea deals to alleged co-conspirators and engineering jail-house encounters between the defendant and known informants.  Sometimes they feed snitches non-public information about the crime so that the statements they attribute to the defendant will sound authentic.  And, of course, prosecutors can pile on charges so as to make it exceedingly risky for a defendant to go to trial.  There are countless ways in which prosecutors can prejudice the fact-finding process and undermine a defendant's right to a fair trial.

Kozinski, supra, at xxii (internal footnotes omitted).

To address this problem, Holder put together a working group of senior prosecutors, law enforcement representatives, and information technology professionals to improve the DOJ's discovery practices.  See Hearing on the Special Counsel's Report on the Prosecution of Senator

<u>Ted Stevens</u> at 3-4, Committee on the Judiciary United States Senate (March 28, 2012)("Hearing"). The DOJ then issued guidelines that federal prosecutors must follow in complying with their discovery obligations in criminal cases. <u>See</u> Memorandum for Department Prosecutors from David W. Ogden, Deputy Attorney General, Regarding Issuance of Guidance and Summary of Actions Taken in Response to the Report of the Department of Justice Criminal Discovery and Case Management Working Group (Jan. 4, 2010); Memorandum for Department Prosecutors from David W. Ogden, Deputy Attorney General, Regarding Requirement for Office Discovery Policies in Criminal Matters (Jan. 4, 2010); Memorandum for Department Prosecutors from David W. Ogden, Deputy Attorney General, Regarding Guidance for Prosecutors Regarding Criminal Discovery (Jan. 4, 2010), https://www.justice.gov/dag/memorandum-department-prosecutors. These memoranda are intended to establish a methodical approach to discovery obligations and to address inconsistent discovery practices among prosecutors within the same office. <u>See</u> Hearing at 4-5. Although these memoranda are "not intended to have the force of law or to create or confer any rights, privileges or benefits," DOJ attorneys will likely have to follow the guidance in the memoranda to argue that they have complied with their discovery obligations. Later in January, 2010, Deputy Attorney General David W. Ogden appointed a long-serving career prosecutor as the DOJ's first full-time National Criminal Discovery Coordinator to lead and oversee all DOJ efforts to impose disclosure practices. <u>See</u> Hearing at 4.

Many courts and scholars, however, have argued that training prosecutors is insufficient to fully combat discovery abuse. Instead of relying on prosecutors alone to disclose all potentially exculpatory evidence, they have suggested that judges take a more active role in preventing <u>Brady</u> and <u>Giglio</u> violations. <u>See</u> <u>United States v. Jones</u>, 686 F. Supp. 2d 147, 149

(D. Mass. 2010)(Wolf, J.)(expressing the district court's skepticism that prosecution-initiated training sessions, in the absence of strong judicial action, would effectively curb Brady violations).  Chief Judge Kozinski has asserted that "[t]here is an epidemic of *Brady* violations abroad in the land.  Only judges can put a stop to it."[10]  United States v. Olsen, 737 F.3d 625, 626 (9th Cir. 2013)(Kozinski, C.J., dissenting).  Two years after Chief Judge Kozinski described the "epidemic of *Brady* violations," he observed that his use of the phrase "caused much controversy but brought about little change in the way prosecutors operate."  Kozinski, supra, at viii (citing Center for Prosecutor Integrity, An Epidemic of Prosecutor Misconduct, White Paper (Dec. 2013), available at http://www.prosecutorintegrity.org/wp-content/uploads/EpidemicofProsecutor-Misconduct.pdf.  The reason that there was little action on his charge may have been that neither he nor anyone else has done what needs to be done to substantiate his claim with empirical data.  Nonetheless, he proposed some additional reforms, such as requiring open-file discovery.  See Kozinski, supra, at xxvi-vii.  North Carolina has adopted such a rule by statute that requires courts to order the "State to make available to the defendant the complete files of all law enforcement agencies, investigatory agencies, and prosecutors' offices involved in the investigation of the crimes committed or the prosecution of the defendant."  N.C. Gen. Stat. § 15A-903(a)(1) (2011).  The DOJ, however, has opposed such a law, instead advocating that prosecutors should remain in charge of deciding what evidence will be material to the defense.  See Video Recording: Ensuring that Federal Prosecutors Meet Discovery Obligations: Hearing on S. 2197 Before the S. Judiciary Comm., 112th Cong. (2012)(on file with S. Judiciary Comm.)(statement of James M. Cole, Deputy Att'y Gen., U.S.

---

[10]Neither Chief Judge Kozinski nor anyone else has empirically shown that an epidemic of Brady violations is occurring.  The Court does not see an epidemic of Brady violations.  The Assistant United States Attorneys appear to take their duties very seriously.

Dep't of Justice opposing the bill: "[I]n reacting to the *Stevens* case, we must not let ourselves forget . . . true improvements to discovery practices will come from prosecutors and agents . . . . In other words, new rules are unnecessary."); Eric Holder Jr., Preface, In the Digital Age, Ensuring that the Department Does Justice iii, 41 Geo. L.J. Ann. Rev. Crim. Proc. (2012). Chief Judge Kozinski contends that effectively deterring Brady and Giglio violations means that prosecutorial offices across the country must establish firm open-file policies to ensure compliance.[11]  See Kozinski, supra, at xxviii.

---

[11]In New Mexico, the New Mexico Legislature has not enacted an open-file policy for its state prosecutors, nor does the United States Attorney's Office -- according to an Assistant United States Attorney -- operate under an open-file policy. See United States v. Hykes, Tr. at 12:7-15 (Hurtado)("I want to affirm clearly in open Court and on the record that there is no open file policy that the U.S. Department of Justice or the United States Attorney's office follows either in this district or across the entire United States."). Despite the Assistant United States Attorney's contention in that case, however, the United States Attorney's Office has previously represented to the Court that the Albuquerque office operates under such a policy. See United States v. Rodella, 2015 WL 711931, at *39 n.12 (D.N.M. Feb. 2, 2015)(Browning, J.)(stating that the United States Attorney's Office for the District of New Mexico has "consistently represented that they maintain an 'open file policy'"). The Court recognized that, despite the United States' representations that it maintains an open-file policy, its "conduct before the Court suggests otherwise." United States v. Rodella, 2015 WL 711931, at *39 n.12.

These attorneys have at times shown that they are willing to disclose to criminal defendants only the bare minimum that the law requires and nothing more. In United States v. Roybal, 2014 WL 4748136 (D.N.M. 2014)(Browning, J.), the United States refused to produce certain raw wiretap data and progress reports they made concerning wiretaps. See 2014 WL 4748136, at *1. The United States did not give a reason for denying the defendants' request for the information, other than the law did not require it to produce the documents. See 2014 WL 4748136, at *4. Again in United States v. Folse, the United States refused to disclose reports related to a shooting between a co-defendant and a Federal Bureau of Investigation agent for a similar reason: the law did not require it to disclose the information. See United States v. Folse, No. CR 14-2354, Unsealed Memorandum Opinion and Order, filed January 26, 2015 (Doc. 75). . . . By its very name -- the Department of Justice -- the United States is also interested in the pursuit of justice. In refusing to disclose evidence, documents, and materials unless the law requires it to produce the items, the United States may be undermining the appearance of justice. Defendants are often left in the dark, not knowing what information the United States has in its possession. While Courts and Congress have placed requirements on what information the United States

While these reforms may indeed decrease the number of <u>Brady</u> and <u>Giglio</u> violations that occur, the Court cannot unilaterally impose those requirements upon attorneys. Judges have several other tools at their disposal, however, and the Court uses several of these tools to ensure compliance with <u>Brady</u> and <u>Giglio</u> in the District of New Mexico. First, while the Court must rely heavily on the prosecutors to do their job under <u>Brady</u> and <u>Giglio</u>, the Court does more than rely solely on the prosecutors to comply with their obligations. <u>See</u> Kozinski, <u>supra</u>, at xxxiii ("*Brady* is not self-enforcing; failure to comply with *Brady* does not expose the prosecutor to any

---

must disclose, these requirements are a bare minimum and not a recommendation. Criminal defendants are already at a disadvantage, because of the United States' resources and because the United States gets a head start in every case by being able to investigate before bringing an indictment. The United States need not compound this disadvantage by refusing to give over any evidence unless it is absolutely required. After the United States secures a conviction, the criminal defendant, and the public at large, should feel that the conviction was based on a fair trial in which there was nothing else the defendant could have done to obtain a different result -- *i.e.* the appearance of justice. The nation may not be well served when a defendant is left wondering whether things would have been different if the United States had disclosed all of the information that it possessed. By refusing to disclose all available information, the United States may create the perception that it obtained a conviction through gamesmanship and concealment, <u>i.e.</u>, through sharp practices, and not through the pursuit of truth and justice. This perception undermines the pillars of our criminal justice system. The Court will continue to faithfully follow the law and will not require the United States to disclose any information which the law does not require it to disclose. The Court, however, cautions the United States that, if it continues its pattern of refusing to disclose available information to criminal defendants, it is undermining the representation that it routinely makes that it has an open file policy and that the Court will take that purported policy with a grain of salt. That representation, which is not completely accurate, and the unclear practices of the Assistant United States Attorneys undermine the administration of justice and the public's perception of the justice system. It also puts its convictions unnecessarily at risk, if the Court is wrong that the United States did not have to produce the documents. The United States is a key player in the adversarial system; as the people's representative, it too plays a fundamental role in ensuring the appearance of justice.

<u>United States v. Rodella</u>, 2015 WL 711931, at *39. It appears that the United States has finally abandoned its representations that it has an open-file policy.

personal risk."); Imbler v. Pachtman, 424 U.S. 409, 430, 431 n.34 (1976)(noting that prosecutors are absolutely immune for "activities [that are] intimately associated with the judicial phase of the criminal process," including the willful suppression of exculpatory evidence). The District of New Mexico Magistrate Judges enter orders at the beginning of cases directing prosecutors to comply with those obligations by disclosing documents and objects, reports and tests, expert witness opinions, and all relevant material that Brady and Giglio require. If courts do not enter an order requiring prosecutors to comply with Brady and Giglio, the court lacks the power to sanction attorneys, because those attorneys will not have violated any court-imposed obligations. See Henry F. Schuelke III, supra, at 507-510. By entering such orders, the Court can hold prosecutors personally responsible for failures to disclose information.

Second, when prosecutors hide Brady and Giglio material, courts can name the offending prosecutors in their judicial opinions. One author terms this technique "public shaming." Adam M. Gershowitz, Prosecutorial Shaming: Naming Attorneys to Reduce Prosecutorial Misconduct, 42 U.C. Davis L. Rev. 1059 (2009). Naming prosecutors' names can serve as a unique tool to encourage compliance with a prosecutor's disclosure obligations. Prosecutors will know that non-compliance can expose them to embarrassment in front of their friends and colleagues. See Jenia Iontcheva Turner, Policing International Prosecutors, 45 N.Y.U. J. Int'l L. & Pol. 175, 229 (2012)("The court's judgment condemning particular actions of prosecutors as unlawful can serve as a potent deterrent for most prosecutors, who would not like to be called out publicly by a court for failing in their obligation."). While the Court is usually reluctant, in both civil and criminal cases, to name the attorneys it sanctions, prosecutors run the risk that the Court may, depending on the egregiousness of a violation, believe that more than a sanction is necessary.

Finally, several scholars have endorsed Professor Jason Kreag's proposal that judges engage in a formal colloquy with the prosecutor on the record during pretrial hearings.  See Jason Kreag, The Brady Colloquy, 67 Stan. L. Rev. Online 47 (2014); Kozinski, supra, at xxxiv (endorsing Kreag's colloquy); Adam M. Samaha & Lior Jacob Strahilevitz, Don't Ask, Must Tell -- And Other Combinations, 103 Cal. L. Rev. 919, 984 n.296 (2015).  Kreag suggests that trial judges routinely ask a series of questions such as:

1.  Have you reviewed your file, and the notes and file of any prosecutors who handled this case before you, to determine if these materials include information that is favorable to the defense?

2.  Have you requested and reviewed the information law enforcement possesses, including information that may not have been reduced to a formal written report, to determine if it contains information that is favorable to the defense?

3.  Have you identified information that is favorable to the defense, but nonetheless elected not to disclose this information because you believe that the defense is already aware of the information or the information is not material?

4.  Are you aware that this state's rules of professional conduct require you to disclose all information known to the prosecutor that tends to be favorable to the defense regardless of whether the material meets the *Brady* materiality standard?

5.  Now that you have heard the lines of cross-examination used by the defense and have a more complete understanding of the theory of defense, have you reviewed your file to determine if any additional information must be disclosed?

Kreag, supra, at 50-51 (internal footnotes omitted).  Kreag contends that the formality of facing a judge on the record impresses upon prosecutors the need to scrupulously comply with their disclosure obligations.  See Kreag, supra, at 49.  He further argues that the colloquy will require prosecutors to explain why they are not disclosing certain information at the time they decide not to disclose that information, instead of asking for an explanation years later when the non-disclosure comes to light.  See Kreag, supra, at 53-54.

The Court agrees that some form of pretrial questioning will increase compliance with Brady and Giglio. Despite this agreement, the Court believes that the formal colloquy that Kreag proposes is not only unnecessary, but also somewhat impractical for district judges that see hundreds of criminal cases a year. Because the District of New Mexico sees more felony cases than any other federal district in the country,[12] and more criminal cases than most courts in the country, the Court has developed professional relationships with the Assistant United States Attorneys who appear before it on a regular basis. See Criminal Cases Commenced, by Number of Felony Defendants, Excluding Reopens, During the 12-Month Period Ending March 31, 2015, JNET, Criminal Caseload Tables, http://jnet.ao.dcn/resources/statistics/caseload-tables/criminal-caseload-tables (listing New Mexico as having the highest number of criminal cases involving felony defendants in the nation). Asking Assistant United States Attorneys whether they intentionally refused to disclose exculpatory information can appear derogatory and insulting to attorneys who frequently appear before the Court. See Radley Balko, Judge Says Prosecutors Should Follow Law. Prosecutors Revolt., Wash. Post. (March 7, 2014), http://www.washingtonpost.com/news/the-watch/wp/2014/03/07/judge-says-prosecutors-should-follow-the-law-prosecutors-revolt (describing how a prosecutor opposed the Arizona Supreme Court's recommendation that Arizona adopt an ethical rule to ensure that prosecutors disclose

_____

[12]In addition to seeing more felony cases than other courts, the District of New Mexico consistently sees more criminal cases than most other courts in the country. See Criminal Cases Commenced, Terminated, and Pending (Including Transfers), During the 12-Month Periods Ending March 31, 2015 and 2016, JNET, Criminal Caseload Tables, http://jnet.ao.dcn/resources/statistics/caseload-tables/criminal-caseload-tables ("Criminal Filings"). In the 12-Month Period ending March 21, 2016, alone, 4,641 criminal cases were filed in the District of New Mexico. See Criminal Filings at 1. Only Arizona, with 5,349, and Texas' Southern and Western Districts, with 6,128 and 5,899, respectively, saw more criminal filings. See Criminal Filings at 1. In comparison, 115 criminal cases were filed in the District of Rhode Island, 170 were filed in Vermont, 135 were filed in the Northern District of Mississippi, 141 were filed in the Western District of Wisconsin, and 89 were filed in the Eastern District of Oklahoma. See Criminal Filings at 1.

new evidence of a potential wrongful conviction, in part because he was insulted by the suggestion that an ethical guideline was needed to encourage him to do what he said he would do as a matter of course). Kreag concedes that "some prosecutors might be insulted by having to answer these or similar questions from the court, believing that the questions themselves amount to an accusation." Kreag, supra, at 56. The Court agrees with this assessment. The Court has known many of these lawyers for years; there is no need to insult them with questions about whether they have complied with their ethical duties that it does not ask of defense lawyers or civil lawyers.

Moreover, the Court can accomplish the same goals that the colloquy seeks to accomplish by getting assurances at a pretrial hearing that the United States has complied with its duty. Merely holding a hearing or a pretrial conference where the United States Attorney knows that he or she must answer to the Court about discovery issues, and what has been produced, heightens the importance of disclosing Brady and Giglio material; the hearing impresses upon attorneys the seriousness of their representations to the Court.[13] The Court can therefore "signal to young prosecutors [] the importance the judge places on enforcing a prosecutor's ethical and *Brady* obligations" by holding a hearing or pretrial conference, and asking about discovery issues, without running through a standardized and potentially insulting checklist. Kreag, supra, at 54. Second, a hearing or pretrial conference does more than demonstrate the seriousness of the situation. Like the colloquy, it also personalizes the prosecutor's decision not to disclose. A

---

[13]Those professors and judges who have endorsed the formal colloquy do not hear criminal cases at the district court level, especially with the frequency that the Court does. See Kozinski, supra; Kreag, supra. The District of New Mexico sentences hundreds more criminal defendants than judges in most other districts. A formal colloquy is not always practical in this context.

hearing or pretrial conference requires prosecutors to acknowledge that they made the non-disclosure decision, and that they are responsible for providing an explanation for that non-disclosure. Furthermore, the hearing emphasizes -- without having to say it -- that they may be sanctioned for any misrepresentations they make about Brady and Giglio material. This accountability -- and threat of sanctions for making misrepresentations to the Court -- increases disclosure on the front-end without the need for "public shaming" on the back end if the Court later discovers a Brady or Giglio violation. The Court agrees that some of Kreag's suggested questions may be useful in some hearings or pretrial conferences. Other situations, however, call for more pointed and probing questions. Moving away from a checklist of questions gives judges the flexibility to get to the point more quickly and easily, to ask specific questions rather than general ones, and to avoid impairing its working relationship with United States Attorneys and the assistants in the meantime. Finally, holding a hearing or pretrial conference encourages prosecutors to review their notes and to effectively prepare a reason for non-disclosure early in the proceedings. Accordingly, while asking some of Kreag's questions may be helpful, the Court can more practically curb Brady and Giglio violations by asking questions tailored to the circumstance rather than going through a standardized formal checklist.

In sum, the Court is not comfortable with engaging in a colloquy with an Assistant United States Attorney like he or she is a defendant. While no one wants to admit this fact, the truth is that, if the DOJ prosecutors do not do their duties under Brady and Giglio, the system is in trouble. The Court, the defense bar, and the nation, to a great extent, trust them. They are, therefore, entitled to respect, not suspicion, mistrust, or hostility, until they conduct themselves in a manner that is unprofessional. Sometimes more vigilance is achieved in a respectful environment than one where the Court asks the lawyer: "Have you been ethical today?"

One additional check that the Court requires of prosecutors is to disclose officers' and investigators' notes as "statement[s]" within the meaning of the Jencks Act. United States v. Harry, 2013 WL 684671, at *1 (D.N.M. 2013)(Browning, J.). As explained above, some courts -- including the Court -- have concluded that an officer's interview notes are "statement[s]" that the Jencks Act requires the United States to disclose. 18 U.S.C. § 3500. See United States v. Harry, 2013 WL 684671, at *11-12 ("The United States must turn over to Harry, after the witness testifies at trial, any investigative notes containing statement from those witnesses . . . ."); United States v. Tarango, 760 F. Supp. 2d at 1164, 1167 (requiring the United States to produce FBI reports, which contain statements from prosecution witnesses after those witnesses testify at trial); United States v. Cooper, 283 F. Supp. 2d at 1238 (noting that rough interview notes may be discoverable under the Jencks Act); United States v. Smith, 984 F.2d at 1086 ("Interview notes could be 'statements' under the [Jencks] Act if they are substantially verbatim."); United States v. Jackson, 850 F. Supp. at 1508-09 (finding that interview notes may be producible under the Jencks Act). Officers then maintain these notes pursuant to various standards and protocols. See United States v. Harrison, 524 F.2d 421, 424 n.2 (D.C. Cir. 1975); United States v. Lujan, 530 F. Supp. 2d at 1267 (stating that, "[b]ecause the contents of rough interview notes may in some cases be subject to disclosure and because the potential impeachment value of the notes may not become evident until trial," the United States must preserve its rough interview notes "made by law enforcement agents during interview of potential witnesses" under 18 U.S.C. § 3500). Officers then use their notes as the basis for their reports. When officers write their reports, however, they may exclude certain information that does not help the prosecution. These reports are then placed in a prosecutor's file, but the notes are not. To ensure that any impeachment information is disclosed, the Court requires prosecutors

to disclose the investigating officer's notes as Jencks material after the United States' witness testifies at trial. This disclosure could reveal information that conflicts with the officer's report, serving as valuable impeachment evidence. The more often that district judges require prosecutors to disclose a testifying officer's notes, the more care officers will take to ensure that their reports reflect their notes and accurately summarize the events leading to an arrest. Even if some courts resist requiring such disclosure, see United States v. Lujan, 530 F. Supp. 2d at 1266, cases are randomly assigned to different judges. The threat of being assigned to a judge who requires disclosure may incentivize officers to include all exculpatory and impeachment evidence in their formal report. Additionally, even if a prosecutor's file omits the officer's notes, courts must require prosecutors to disclose exculpatory information in officers' notes under Brady. See Kyles v. Whitley, 514 U.S. at 437 (placing an affirmative obligation on prosecutors to learn of exculpatory evidence in others' possession); United States v. Padilla, 2011 WL 1103876, at *5 (D.N.M. 2011)(Browning, J.)("The Due Process Clause of the Constitution requires the United States to disclose information favorable to the accused that is material to either guilt or to punishment."); United States v. Burke, 571 F.3d at 1054 (holding that the "belated disclosure of impeachment or exculpatory information favorable to the accused violates due process when an earlier disclosure would have created a reasonable doubt of guilt").

The Court recently reiterated its approach to criminal discovery in United States v. Hykes, which concerned a defendant's motion filed pursuant to Giglio, requesting that the United States "disclose certain pertinent information pertaining to [police officers testifying at his suppression hearing] as the information is relevant to impeachment." United States v. Hykes, 2016 WL 1730125, at *2 (D.N.M. 2016)(Browning, J.)(internal quotation marks and citations

omitted).  See United States v. DeLeon, Sealed Memorandum Opinion and Order at 97-111, filed

January 3, 2017 (Doc. 809).  The Defendant in United States v. Hykes argued that

> the Supreme Court's Giglio decision requires the government to disclose evidence
> affecting a government witness' credibility.  [Hykes] states that he "has a good
> faith basis to believe that the internal personnel files of some o[r] all of these
> officers contain information that may potentially be properly used for
> impeachment."  Hykes asserts that "witnesses have revealed that the information
> relied upon by officers to arrest Mr. Hykes was false.  [Hykes] contends that this
> false information led the arresting officers to arrest him, beat him, and search him
> without warrants.  [Hykes] states that, because the Court will determine whether
> Hykes' Motion to Suppress is well-founded, the officers' credibility is "of critical
> import for this Court's ultimate decision Hykes reasons that the officers'
> personnel files will reveal whether the officers are trustworthy.  Hykes argues that
> credibility information is especially relevant in this case, where the only witnesses
> against him are police officers, so "anything that goes to their credibility is
> exculpatory and admissible."

2016 WL 1730125, at **2-3 (citations omitted).  The United States contested the discovery

request for the officers' personnel files in United States v. Hykes, because

> the government's review and determination is controlling unless the defense
> provides grounds to believe there is impeachment information in the items to
> which the defense seeks access. . . .  Hykes must "make a particularized showing
> of what information he was seeking or how it would be material" rather than
> making broad discovery demands.

2016 WL 1730125, at *4 (citations omitted).

> Accordingly, the Court held in United States v. Hykes that

> Hykes is not sending the United States on a fishing expedition.  Hykes
> demonstrates that the officers' personnel files may contain impeachment
> evidence.  As support, Hykes points to the officers' involvement in several
> excessive-force lawsuits, discrepancies between the officers' story and
> eyewitnesses' stories, and evidence that the officers had a personal feud with
> Hykes.

2016 WL 1730125, at *20.  Cf. United States v. Lafayette, 983 F.2d 1102 (D.C. Cir.

1993)(affirming the denial of the appellants' request for an officer's personnel file, because

"nothing in appellants' brief informs us why they have any reason to believe that the personnel

files would provide any useful evidence whatsoever"); United States v. Andrus, 775 F.2d 825,

843 (7th Cir. 1985)(noting that the defendant was "not entitled to the personnel files of the law enforcement witnesses without even a hint that impeaching material was contained therein"). The Court then reiterated that Hykes had requested specific information contained within the personnel files and that thus "the United States must search the personnel files of the testifying officers pursuant to the Court's order at the hearing, examining the list of documents that Hykes specifically requests in his Giglio Motion." 2016 WL 1730125, at *20.

United States v. Hykes did not deviate from the Court's general philosophy regarding the administration of discovery under Giglio, Brady, the Jencks Act, and rule 16. Instead, the Court in United States v. Hykes merely maintained that

> if the United States uncovers any such exculpatory material, it must produce any material evidence in time for its effective use at trial. See United States v. Coppa, 267 F.3d 132, 144 (2d Cir. 2001)("[W]e reiterate the longstanding constitutional principle that as long as a defendant possesses *Brady* evidence in time for its effective use, the government has not deprived the defendant of due process of law.").

United States v. Hykes, 2016 WL 1730125, at **19-20. Where the Defendant demonstrated that there was particular impeachment material in the officers' personnel files, the Court ordered the United States to review the files for the requested information in accordance with its continuing discovery and disclosure obligations. United States v. Hykes, 2016 WL 1730125, at **20-21. ). See United States v. DeLeon, Sealed Memorandum Opinion and Order at 97-111, filed January 3, 2017 (Doc. 809).

## LAW REGARDING THE DISCLOSURE OF AN INFORMANT'S IDENTITY

The Supreme Court, in 1957, held that the government has a privilege "to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law." Roviaro v. United States, 353 U.S. at 59. In that case, the Supreme Court considered whether the district court

committed reversible error when it allowed the Government to refuse to disclose the identity of an undercover employee who had taken a material part in bringing about the possession of certain drugs by the accused, had been present with the accused at the occurrence of the alleged crime, and might be a material witness as to whether the accused knowingly transported the drugs as charged.

Roviaro v. United States, 353 U.S. at 55. The defendant in Roviaro v. United States was charged with selling "heroin to one 'John Doe'" and "on the same date and in the same city he 'did then and there fraudulently and knowingly receive, conceal, buy and facilitate the transportation and concealment after importation of . . . heroin, knowing the same to be imported into the United States contrary to law . . . .'" 353 U.S. at 55.

At trial, "the Government relied on the testimony of two federal narcotics agents, Durham and Fields, and two Chicago police officers, Bryson and Sims, each of whom knew" the defendant, and who had "met at 75th Street and Prairie Avenue in Chicago with an informer described only as John Doe." Roviaro v. United States, 353 U.S. at 56. At this point, one of the officers -- Bryson -- hid in John Doe's vehicle's trunk as John Doe drove away, and, thereafter, overheard a conversation between the defendant and John Doe after John Doe stopped the vehicle and allowed the defendant to enter.

> He heard [the defendant] greet John Doe and direct him where to drive. At one point, [the defendant] admonished him to pull over to the curb, cut the motor, and turn out the lights so as to lose a "tail. "He then told him to continue "further down." [The defendant] asked about money Doe owed him. He advised Doe that he had brought him "three pieces this time." When Bryson heard Doe being ordered to stop the car, he raised the lid of the trunk slightly. After the car stopped, he saw [the defendant] walk to a tree, pick up a package, and return toward the car. He heard [the defendant] say, "Here it is," and "I'll call you in a couple of days."

353 U.S. at 57. Upon investigation, the officers discovered that the package the defendant left under the tree was heroin, and they then arrested the defendant at his home. See 353 U.S. at 57. The district court's decision that the Supreme Court reviewed progressed as follows: "Before

trial, petitioner moved for a bill of particulars requesting, among other things, the name, address and occupation of 'John Doe.'  The Government objected on the ground that John Doe was an informer and that his identity was privileged.  The motion was denied."  353 U.S. at 55.  Further, "[d]uring the trial John Doe's part in the charged transaction was described by government witnesses, and counsel for petitioner, in cross-examining them, sought repeatedly to learn John Doe's identity.  The court declined to permit this cross-examination and John Doe was not produced, identified, or otherwise made available."  353 U.S. at 55.  The testifying witnesses explained that John Doe was an informant and special employee.  See 353 U.S. at 55, 56 n.3.

The Supreme Court thus took up the issue -- "the propriety of the nondisclosure of the informer's identity," because, obviously, John Doe's identity went undisclosed -- and explained that "the purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement.  The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation."  353 U.S. at 59.  Yet, the Supreme Court explained, the privilege is not absolute, and, where "the disclosure of an informer's identity . . . is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way."  353 U.S. at 60-61.  Indeed, the Supreme Court also held:

> The scope of the privilege is limited by its underlying purpose.  Thus, where the disclosure of the contents of a communication will not tend to reveal the identity of an informer, the contents are not privileged.  Likewise, once the identity of the informer has been disclosed to those who would have cause to resent the communication, the privilege is no longer applicable.

Roviaro v. United States, 353 U.S. at 60-61.  The Supreme Court then further indicated that the desirability of calling the informant as a witness, or at least interviewing the informant in

advance of trial, is a matter for the accused, rather than the government, to decide.  See 353 U.S. at 64.  Accordingly, when an informant is a "participant in and a material witness to" the alleged criminal transaction, the disclosure of his or her identity is sometimes required.  353 U.S. at 65. The standard the Supreme Court thus announced for disclosure of CIs who play an active, as opposed to a passive, role in the investigation is "not fixed"; rather, the court must consider: "(1) the crime charged, (2) the possible defenses, (3) the possible significance of the informer's testimony, and (4) other relevant factors."  353 U.S. at 62.  In the specific context of Roviaro v. United States, the Supreme Court was concerned with the scenario where the informant "helped to set up the criminal occurrence and had played a prominent part in it.  [And h]is testimony might have disclosed an entrapment."  353 U.S. at 64.  The Supreme Court thus concluded that the district court's failure to order disclosure of the informant's identity, who did not testify at trial, "in the face of repeated demands by the accused for his disclosure," was prejudicial error. 353 U.S. at 64-65.

The Supreme Court has, recently, added a gloss to its holding in Roviaro v. United States by distinguishing Roviaro v. United States in a case where the state did not disclose the status of a testifying witness as a CI to the defendant before trial, because, the State argued, "disclosure [of an informant's identity] is not automatic," and, "[c]onsequently, it was [defendant's] duty to move for disclosure of otherwise privileged material," pursuant to the standard in Roviaro v. United States.  Banks v. Dretke, 540 U.S. 668, 697-98 (2004).  In Banks v. Dretke, a postconviction proceeding, the Supreme Court was considering a murder where "Bowie County Deputy Sheriff Willie Huff, lead investigator of the death, learned from two witnesses that [the victim] had been in the company of petitioner, 21-year-old Delma Banks, Jr."  540 U.S. at 676. Apparently, "Huff received a call from a confidential informant reporting that 'Banks was

coming to Dallas to meet an individual and get a weapon.'" 540 U.S. at 676. Banks was then

apprehended, interrogated, and charged with the murder. See 540 U.S. at 676. Banks, at a

pretrial hearing, thus sought information concerning that "confidential informant" who had

tipped Huff about Banks' trip to Dallas, to which the State explained it "will, without necessity

of motions provide you with all discovery to which you are entitled." 540 U.S. at 676. At trial, a

man named "Robert Farr was a key witness for the prosecution," the paid informant who tipped

Huff about Banks' movements, and accompanied Banks to Dallas. 540 U.S. at 678. Farr

testified, however, that he had not served as a paid confidential informant. See 540 U.S. at 678.

In sum, Banks was convicted, and over the course of his postconviction appeals, maintained that

Farr's status as a confidential informant was material pursuant to Brady. The Supreme Court, in

dicta after already having overturned the conviction, held:

> We need not linger over this argument. The issue of evidentiary law in *Roviaro*
> was whether (or when) the Government is obliged to reveal the identity of an
> undercover informer the Government does not call as a trial witness. . . . The
> Court there stated that no privilege obtains "[w]here the disclosure of an
> informer's identity, or of the contents of his communication, is relevant and
> helpful to the defense of an accused." . . . . Accordingly, even though the
> informer in *Roviaro* did not testify, we held that disclosure of his identity was
> necessary because he could have "amplif[ied] or contradict[ed] the testimony of
> government witnesses.

Banks v. Dretke, 540 U.S. at 697-98. Thus, according to the Supreme Court:

> Here, the State elected to call Farr as a witness. Indeed, he was a key witness at
> both guilt and punishment phases of Banks's capital trial. Farr's status as a paid
> informant was unquestionably "relevant"; similarly beyond doubt, disclosure of
> Farr's status would have been "helpful to [Banks's] defense." . . . Nothing in
> *Roviaro*, or any other decision of this Court, suggests that the State can examine
> an informant at trial, withholding acknowledgment of his informant status in the
> hope that defendant will not catch on, so will make no disclosure motion.

Banks v. Dretke, 540 U.S. at 698. The Supreme Court continued:

> In summary, Banks's prosecutors represented at trial and in state postconviction
> proceedings that the State had held nothing back. Moreover, in state

> postconviction court, the State's pleading denied that Farr was an informant. . . .
> It was not incumbent on Banks to prove these representations false; rather, Banks
> was entitled to treat the prosecutor's submissions as truthful. Accordingly, Banks
> has shown cause for failing to present evidence in state court capable of
> substantiating his Farr *Brady* claim.

Banks v. Dretke, 540 U.S. at 698. In light of Banks v. Dretke, then, courts are left to wonder

whether, if at all, Roviaro v. United States applies in the case of disclosure of testifying

witnesses. See Banks v. Dretke, 540 U.S. at 697-98 ("The issue of evidentiary law in *Roviaro*

was whether (or when) the Government is obliged to reveal the identity of an undercover

informer the Government does not call as a trial witness.").

As for an answer to that specific question of timing, the Court first looks to the specific

principles originally articulated by the Supreme Court in Roviaro v. United States. In that

regard, at least as to non-testifying witnesses, "[t]he Tenth Circuit's take on this analysis is well-

known." United States v. Padilla, 2010 WL 4337819, at *7 (D.N.M. 2010)(Browning, J.).

"Anonymity of informants encourages communications to law enforcement officers." Usery v.

Local Union 720, Laborers' Int'l Union of N. Am., AFL-CIO, 547 F.2d 525, 527 (10th Cir.

1977). Cf. United States v. Brantley, 986 F.2d 379, 383 (10th Cir. 1993)("Nor must the

government supply the defendant with information about an informer when the individual

introduces suspected traffickers to narcotics agents."); United States v. Ortiz, 804 F.2d 1161,

1166 (10th Cir. 1986)("We have ruled previously that the government is not required to supply

information about an informer to a defendant when the informer merely provides the initial

introduction."). The Tenth Circuit's take on the analysis thus places the burden on the defendant

to show that the informant's possible aid to the defendant outweighs the public's interest in

protecting the flow of information, which the confidentiality of the informant's identity

facilitates:

The disclosure of a confidential informant's identity involves balancing the public interest in protecting the flow of information in a manner necessary for effective law enforcement against an individual's right to prepare his defense. In making the determination as to whether disclosure is necessary, the court must consider the particular circumstances of the case, including the crime charged, the possible defenses, and the significance of the informer's testimony. Where it is clear that the informant cannot aid the defense, the government's interest in keeping secret his identity must prevail over the defendant's asserted right of disclosure. A defendant seeking disclosure has the burden of proof, and we review the district court's decision for an abuse of discretion.

United States v. Sinclair, 109 F.3d at 1538 (internal citations and quotation marks omitted). See United States v. McKenzie, 2010 WL 597971, at **3-4 (D.N.M. 2010)(Browning, J.)(citing United States v. Sinclair, 109 F.3d at 1538). "[T]he defendant must present more than mere speculation about the possible usefulness of an informant's testimony." United States v. Moralez, 908 F.2d at 567. In sum,

[a] defendant may obtain the identity and whereabouts of an informer if his testimony might be relevant to the defendant's case and justice would be best served by disclosure[, but d]isclosure of an informant is not required . . . where the information sought from the informer would be merely cumulative, or where the informant did not participate in the transaction in question.

United States v. Reardon, 787 F.2d 512, 517 (10th Cir. 1986)(internal citations omitted). See United States v. Moralez, 908 F.2d at 567. Disclosure of a CI, therefore, involves a balancing act of many competing interests.

The Court has required the United States to disclose a CI's identity where the CI "was integrally involved in the criminal transaction[,] . . . observed the criminal transaction[,] and was not a mere bystander." United States v. Aguilar, 2010 WL 2977708, at *5 (D.N.M. 2010)(Browning, J.). In United States v. Aguilar, the defendant, Aguilar, was one of three defendants charged with a conspiracy to traffic in cocaine, stemming from a transaction between his two co-defendants and a government CI. See 2010 WL 2977708, at *1. In relation to the first factor that the Supreme Court identified in Roviaro v. United States -- the crime charged --

the Court noted that "the crimes charged in this case are relatively egregious -- conspiracy, possession with intent to distribute cocaine, and possessing a gun while committing the other crimes." 2010 WL 2977708, at *6. As to the second and third Roviaro v. United States factors -- the possible defenses and the possible significance of the informer's testimony -- it appeared that the defendant intended to argue that he did not know his alleged co-conspirator possessed cocaine or that the drug transaction was going to occur, and the Court found that, given the CI was present during the crime, the CI's testimony "could be highly significant" to the defenses:

> The [CI] was present in the car with Mirabal, Aguilar, and Garner, and would be in a unique position to testify to what conversations, if any, occurred in the car and whether Aguilar took part in them. After the four individuals arrived at the [CI]'s residence, again, the [CI] would be in a unique position to testify whether it appeared that Aguilar had any idea that the bag Mirabal retrieved from the car contained cocaine. Once the three Defendants and the [CI] were inside the [CI]'s residence, the [CI] was able to observe Aguilar's demeanor and whether he actively participated in the drug transaction. The [CI] could testify as to where Aguilar was and what he did while the [CI] made the alleged drug transaction with Mirabal.

2010 WL 2977708, at *6. Additionally, the Court noted that the CI might provide relevant information which no other witness could, because Aguilar's "alleged co-conspirators might try to push blame away from themselves and on to Aguilar, and Villegas, a law-enforcement officer, might tend to be biased toward the United States." 2010 WL 2977708, at *6. The Court thus granted Aguilar's motion and ordered the United States to disclose the CI's identity. See 2010 WL 2977708, at *6. The Court also incorporated the following protective order in its decision:

> Ms. Johnson[, Aguilar's attorney,] is ordered that she will not disclose the identity of the CI to anyone -- except the defense investigator she retains in this case -- unless and until she seeks further leave of the Court. Any information that the United States provides to Ms. Johnson regarding the CI may be discussed only with the investigator and the Assistant United States Attorneys who disclosed it. Finally, any information the United States provides must be returned once this case is closed. These requirements should minimize the danger, if any, to the CI and perhaps permit law-enforcement to use him in a covert capacity again in the future, if they so desire.

2010 WL 2977708, at *6.  <u>See also</u> <u>United States v. Rivas</u>, 26 F. Supp. 3d 1082 (D.N.M. 2014)(Browning, J.).

As to the issue of timing for the disclosure of the identity of CIs who plan to testify at trial, one district court has explained:

> With respect to [testifying] informants, several circuits have adopted the rule that pretrial disclosure of informants' identities is not necessary where they will testify at trial.  *E.g., United States v. Perkins,* 994 F.2d 1184, 1190 (6th Cir. 1993).  That rule is gaining ground in this circuit.  *See DiBlasio v. Keane,* 932 F.2d 1038, 1043 (2d Cir. 1991); *United States v. Leonard,* 817 F. Supp. 286, 302 (E.D.N.Y. 1992). <u>This court agrees with these authorities, that when no more particularized need for disclosure is averred by defendants, the testimony of a confidential informant at trial obviates the need for pretrial disclosure.</u>  The Jencks Act, 18 U.S.C. § 3500, prescribes the time the government must provide relevant information about testifying witnesses. *See United States v. Valerio*, 737 F. Supp. 844, 846 (S.D.N.Y. 1990).

<u>United States v. Murgas</u>, 967 F. Supp. 695, 712 (N.D.N.Y. 1997)(Munson, S.J.)(emphasis added)(discussing informant who did not testify, but whose identity was not disclosed and was relevant to the defendant's entrapment defense).  <u>See, e.g.</u>, <u>United States v. Ford</u>, 2016 WL 483871, at *4-5 (D.D.C. 2016)(Friedman, J.)(discussing different standards for non-testifying witnesses -- where <u>Roviaro v. United States</u> governs -- and testifying witnesses -- where the district court, without expressly disavowing the potential import of <u>Roviaro v. United States</u>, explained are generally governed by <u>Brady</u>, <u>Giglio</u>, rule 16, and the Jencks Act).  The Court agrees that there is a difference between testifying CIs and non-testifying CIs.  It is clear that the <u>Roviaro v. United States</u> analysis applies to non-testifying CIs.  The issues are whether <u>Roviaro v. United States</u> also applies to testifying CIs, whether the United States has an absolute right not to disclose a CI's identity when they testify at trial, or whether some combination of <u>Brady</u>, <u>Giglio</u>, and rule 16 covers testifying CIs.

The law regarding the application of <u>Roviaro v. United States</u> in the Tenth Circuit,

specifically regarding the timing of the disclosure of a testifying CI, is unsettled. In United States v. Pennick, the issue was broader, however, than the disclosure of CIs; instead, the issue involved the trial court's denial of a request "[p]rior to trial . . . to compel the Government to identify the persons it intended to call as witnesses. In this regard Pennick's counsel particularly requested that the Government identify and [sic] informer who was to be called as a Government witness." United States v. Pennick, 500 F.2d at 185. Pennick was convicted and appealed, explaining:

> The Government's evidence showed that a Government drug agent, and his informer, went to Pennick's home in Junction City, Kansas, on two separate occasions in September 1972. On each occasion the informer was searched and, after being given money by the agent, the informer proceeded to gain admission to Pennick's house, the informer and Pennick being friends. The informer was called as a Government witness and his testimony was that on each occasion he bought heroin from Pennick which he later turned over to the Government agent.

500 F.2d at 186. Pennick, accordingly, argued that "the judgment should be reversed because of the refusal of the trial court to compel the Government to identify its witnesses by way of pre-trial discovery, particularly as concerns any witness who was also an informer." United States v. Pennick, 500 F.2d at 186. Further, Pennick argued that, "while Pennick may have no right to such disclosure prior to trial, the trial court in the exercise of its discretion could nonetheless order, and under the circumstances should have ordered, such disclosure, particularly when we are dealing with an informant." 500 F.2d at 186. The Tenth Circuit, first, indicated that

> Section 3432, 18 U.S.C., provides that a person charged with treason or other capital offense shall be furnished at least three days prior to trial with a list of the witnesses to be produced at the trial for proving the indictment. The statute has been construed as meaning that in a noncapital case a defendant is not entitled as a matter of right to a list of the Government's witnesses in advance of trial. . . . In the instant case the informer was a Government witness and did appear and testify upon trial, submitting himself to examination and cross-examination, a fact which we deem to be significant. In other words, we are not here concerned with an informer who does not appear on trial as a Government witness, and who conceivably could be helpful to the defendant in his defense. So, the informer in

the instant case being himself a Government witness, under the general rule cited above Pennick was not entitled to learn the identity of the informer, or any other Government witness, prior to trial.

United States v. Pennick, 500 F.2d at 186.  The Tenth Circuit ultimately, then, disagreed with

Pennick that he was entitled to the informant's identity, stating:

> We do not agree with such reasoning and in our view the fact that one of the Government's witnesses was an informer weakens, rather than strengthens, Pennick's argument that he was entitled in advance of trial to a list of the Government's witnesses.  As the trial court noted, informers whose identity is revealed prior to trial are often among the missing when the trial date rolls around.

500 F.2d at 186.  The Tenth Circuit then explained, however:

> In the instant case the trial court applied the "balancing test" referred to in *Roviaro* and took into consideration the various factors mentioned in that case, and then in the exercise of its discretion refused to require the Government to reveal the identity of its informer who all knew was to testify upon trial.  In so doing the trial court did not err.

500 F.2d at 187.  Accordingly, the Tenth Circuit concluded that "[t]he significant difference

between *Roviaro* and the instant case is that in the former the informer did not testify at trial, and

in our case he did.  Such ruled out a possibility that the informer's testimony could somehow be

helpful to Pennick."  500 F.2d at 187.

Thus, despite silence with respect to the timing of the disclosure of a testifying CI, in

United States v. Pennick, the Tenth Circuit -- at the least -- gave district courts guidance that they

may be able to apply Roviaro v. United States in the case of a testifying CI.  See United States v.

Pennick, 500 F.2d at 187.  Given this discussion of the application of the Roviaro v. United

States analysis to a testifying CI, and the conclusion that it was not in error, district courts are left

to conclude that, at the least, Roviaro v. United States does not preclude a district court from

ordering disclosure of a testifying CI, upon a satisfactory showing by a defendant under Roviaro

v. United States before the time that the United States is generally required to disclose the

identity of its witness list.  See United States v. Pennick, 500 F.2d at 187 ("In the instant case the trial court applied the 'balancing test' referred to in *Roviaro* and took into consideration the various factors mentioned in that case, and then in the exercise of its discretion refused to require the Government to reveal the identity of its informer who all knew was to testify upon trial.  In so doing the trial court did not err.").

In the same year, but a couple of months before United States v. Pennick, the Tenth Circuit decided United States v. Baca, 494 F.2d 424 (10th Cir. 1974).  The Tenth Circuit there considered a trial court's denial of a defendant's motion to disclose the identity of a CI to "permit him to prepare adequately for trial."  494 F.2d at 427.  The trial court denied the motion upon the United States' argument that "in view of the fact that no search warrants were involved and no arrests were effected prior to indictment, that the United States was not obligated to reveal its 'witnesses' at that time."  494 F.2d at 427.  The Tenth Circuit found no error in the trial court's decision, where the CI had testified as to her involvement in controlled narcotic buys, summarily explaining that "[i]t is settled law in this circuit that, in the absence of a statutory or constitutional requirement, the government is not required to endorse the names of its witnesses on the information or indictment, nor is there a requirement that the government disclose its witnesses in any manner, except in a case where trial is for treason or other capital offense." United States v. Baca, 494 F.2d at 427 (emphasis added).

More recently, the Tenth Circuit considered the pretrial disclosure of a witness' identity in United States v. Nevels, 490 F.3d 800, 803 (10th Cir. 2007), where it stated: "We review the admission of testimony from an unlisted government witness for abuse of discretion."  490 F.3d at 803.  In that case, the United States had learned of the existence of an undisclosed witness three days before trial, notified the defendant about the witness three days before trial, and filed a

formal notice with the court on the eve of trial as to the witness' likelihood to testify. See 490 F.3d at 803. The defendant objected to the witness' testimony at trial, but the district court ordered that the United States needed to make the witness available to the defendant on that first day of trial and ultimately allowed her testimony two days later. See 490 F.3d at 803. In considering this issue, then, the Tenth Circuit concluded there was no error by the trial court in allowing this surprise-witness, because, as was the case in United States v. Baca, "in the absence of a statutory or constitutional requirement, . . . there [is no] requirement that the government disclose its witnesses in any manner, except in a case where trial is for treason or other capital offense." U.S. v. Nevels, 490 F.3d at 803.

Roviaro v. United States' plain language, however, suggests that the desirability of calling a CI as a witness, or at least interviewing the informant in advance of trial, is a matter for the accused, rather than the government, to decide. See 353 U.S. at 64. Indeed, in United States v. Pennick, the Tenth Circuit indicated that the defendant's satisfactory showing in that case, under Roviaro v. United States, may have entitled the defendant to the CI's identity, despite the "general rule . . . [that a defendant is] not entitled to learn the identity of the informer, or any other Government witness, prior to trial." United States v. Pennick, 500 F.2d at 186 ("In the instant case the trial court applied the 'balancing test' referred to in Roviaro and took into consideration the various factors mentioned in that case, and then in the exercise of its discretion refused to require the Government to reveal the identity of its informer who all knew was to testify upon trial. In so doing the trial court did not err."). Although the Supreme Court in Banks v. Dretke explains that, factually, the CI at issue in Roviaro v. United States was a non-testifying witness, making that factual scenario distinct from that which was at issue in Banks v. Dretke, the Supreme Court in Roviaro v. United States did not otherwise restrict its guidance to a

non-testifying witness.  Nor did the Supreme Court in <u>Banks v. Dretke</u> explicitly restrict its holding to non-testifying witnesses when it summarily dismissed <u>Roviaro v. United States</u>' import, because <u>Roviaro v. United States</u> had dealt with a non-testifying witness.  <u>See</u> <u>Banks v. Dretke</u>, 540 U.S. at 697-98.  <u>Roviaro v. United States</u>' plain language does not preclude the Court from instructing the United States to disclose a CI's identity upon the proper showing, regardless of future potential for testimony.  <u>See</u> 353 U.S. at 60-61 (holding that the privilege to withhold a CI's identity is not absolute, and, where "the disclosure of an informer's identity . . . is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way").

Other courts, in addition to the Tenth Circuit in <u>United States v. Pennick</u>, have indicated that there might be a significant difference between testifying and non-testifying CIs.  Indeed, the Courts of Appeals, which are generally in the position of reviewing a CI's untimely disclosure or nondisclosure, tend to rely on that dichotomy in reaching a conclusion that the trial court below did not error.  <u>See</u> <u>United States v. Casseus</u>, 282 F.3d 253, 257 (3d Cir. 2002); <u>United States v. Tejada</u>, 974 F.2d 210, 217 (1st Cir. 1992); <u>United States v. Norton</u>, 504 F.2d at 343 n.1.  For the most part, those Courts of Appeals have concluded that, where a CI ultimately testifies, a district court's failure to order early disclosure of the CI's identity does not constitute error.  <u>See</u> <u>United States v. Casseus</u>, 282 F.3d 253, 257 (3d Cir. 2002); <u>United States v. Tejada</u>, 974 F.2d 210, 217 (1st Cir. 1992); <u>United States v. Norton</u>, 504 F.2d at 343 n.1.

The United States Court of Appeals for the Third Circuit, in <u>United States v. Casseus</u>, although not specifically dealing with CIs, dealt with joint defendants who, on appeal, argued that "the District Court erred by refusing to order the prosecution, within a reasonable time before trial, to disclose and allow the defense to interview the only available eyewitnesses, who

were in the prosecution's custody." 282 F.3d at 257. Dispelling the appellants' arguments, the Third Circuit explained that "a criminal defendant does not have the right to full discovery of the government's case," and that here the witnesses the appellants wished to have interviewed did not have Brady information, as "the record is clear that the witnesses had no exculpatory information to offer." United States v. Casseus, 282 F.3d at 257. Further, the Third Circuit summarily rejected the appellants' reliance on Roviaro v. United States, as that case regards "the duty of the prosecution to disclose the identity of confidential informants who will not testify. Here, all witnesses did testify, and appellants were actually allowed to interview these witnesses before trial. We conclude that the Court did not abuse its discretion by denying discovery." United States v. Casseus, 282 F.3d at 257.

The Sixth Circuit, in United States v. Perkins, 994 F.2d 1184 (6th Cir. 1994), addressed the United States' failure to disclose a testifying confidential informant's identity, where that informant ultimately testified against the defendants' interests, and the defense argued that the "district court erred in denying his motion for a bill of particulars. . . . ask[ing] for particulars of the overt acts of the conspirators, the date and places where they were performed, the names of any unindicted coconspirators, and the names and addresses of any informants." 994 F.2d at 1191. The Sixth Circuit found "no persuasive reason to depart from the . . . general rule" that the government does not have to disclose its witnesses, because the circumstances involved a testifying informant whom the defendant can cross-examine. 994 F.2d at 1191. In such cases, the Sixth Circuit concluded that, as government witnesses, CIs' testimony would not be helpful to the defendant. 994 F.2d at 1191. There was no discussion whether the district court, in making its decision, considered the Roviaro v. United States factors as to the disclosure of testifying CIs.

The Sixth Circuit has also considered the following language in Roviaro v. United States:

"[O]nce the identity of the informer has been disclosed to those who would have cause to resent the communication, the privilege is no longer applicable." Roviaro v. United States, 353 U.S. at 60. In United States v. Sierra-Villegas, the Sixth Circuit stated:

> The dictum in Roviaro that Sierra-Villegas relies on -- "once the identity of the informer has been disclosed to those who would have cause to resent the communication, the privilege is no longer applicable" -- must be understood in light of the purpose of the informant privilege: "The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials, and, by preserving their anonymity, encourages them to perform that obligation." . . . . Disclosure to those who might resent the informant's cooperation with law enforcement eliminates the privilege because such disclosure exposes the informant to potential harm, and the privilege is designed to shield the informant from harm that might arise from his or her cooperation. But so long as some potential harm from further disclosure or publication remains, the government retains an interest in non-disclosure and the privilege may still apply.

United States v. Sierra-Villegas, 774 F.3d 1093, 1098 (6th Cir. 2014). Where the Court orders CI disclosures under a protective-disclosure agreement, as the United States has already used here in this cased in its disclosure to an individual Defendant, the Court will follow the Sixth Circuit's directions and guidance regarding this language in Roviaro v. United States, when that case -- or its principles -- are applicable.

The United States Court of Appeals for the Eighth Circuit, to the contrary, in United States v. Norton, explained in a footnote that

> these cases do not stand for the proposition that the government may withhold names of participating informants so long as it intends to call them at trial. Nor do they stand as an invitation to trial courts to routinely deny defendants access to the names and addresses of informants prior to trial on the theory that the error may be cured by making the informant available at trial. A finding of no prejudice in a particular case ought never be construed as an invitation to deliberate error in the future.

504 F.2d at 343 n.1. United States v. Norton did not focus, however, on an argument that the

failure to disclose a testifying CI harmed a defendant, but instead focused on an argument that the defendant "was injured by the failure of the government to arrest him promptly, a failure which he claims deprived him of the opportunity to interview the informant, thereby discovering and preserving any exculpatory evidence." 504 F.2d at 343. In United States v. Gullickson, 982 F.2d 1231, 1234 (8th Cir. 1993), the Eighth Circuit also provided that "[t]he reasoning [under Roviaro v. United States] hinges on the fact that the informant was not produced before trial and did not appear at trial." 982 F.2d at 1234

District courts, nonetheless, take the cases case-by-case, considering that approach to be the most appropriate analytical approach to adequately balance the differing interests under Roviaro v. United States, Brady, Giglio, rule 16, and the Jencks Act. Cf. United States v. Nance, 168 F. Supp. 3d 541, 552 (W.D.N.Y. 2016)(Arcara, J.). In United States v. Nance, the trial court, without discussion of whether a number of requested CIs were going to testify, stated:

> a conclusory statement is inadequate to meet Nance's burden of showing that an "informant's testimony is . . . material to the defense." United States v. Saa, 859 F.2d 1067, 1073 (2d Cir. 1988). Nance must demonstrate that an informant would do more than "merely . . . cast doubt on the general credibility of one of the Government's witnesses."

United States v. Nance, 168 F. Supp. 3d at 552. This observation accords with the Eighth Circuit's guidance in United States v. Norton. Indeed, in the Court's review, no court has suggested that merely because a CI testifies, the failure to disclose that CI's identity to a requesting defendant, who makes an ample showing under Brady, Giglio, rule 16, and Roviaro v. United States as to that defendant's entitlement to the CI's identity, is somehow a cure for not disclosing that CI's identity early enough in the pretrial proceedings for the defendant to interview that CI. See United States v. Norton, 504 F.2d at 343 n.1.

Again, the issues here are whether <u>Roviaro v. United States</u> applies to testifying CIs, whether the United States has an absolute right not to disclose a CI's identity when they testify at trial, or whether some combination of <u>Brady</u>, <u>Giglio</u>, and rule 16 covers testifying CIs. The Court rejects the second notion that the United States has an absolute right not to disclose testifying CI's identities. The general rule is certainly that the United States does not have to disclose witnesses before trial. The United States cannot, however, refuse to disclose potentially material, exculpatory information. The United States' witnesses often have nothing helpful to say for a defendant. Rarely does the United States prepare a witness who is testifying favorably to a defendant. Some witnesses are just a mixed bag. The United States cannot keep the defendant from finding out about exculpatory evidence just because the United States intends to call the witness. The favorable evidence that a United States' testifying witness may have still might constitute <u>Brady</u>, <u>Giglio</u>, and rule 16 information, and the Court will apply those doctrines accordingly.

It is true that the Court, in making this observation and conclusion, cannot undercut the Jencks Act's restrictions, and the general rule that the United States does not have to disclose its witnesses until trial. The Court thinks its rule is consistent with the Jencks Act and the general non-disclosure rule. The Jencks Act and the non-disclosure rule remain the rules -- no disclosure until trial, when applicable. But nothing in the United States Constitution protects the United States. The Jencks Act and the non-disclosure rule are legislative and judicially created rules; they are not protections like, and certainly do not supersede, the Constitution. <u>Brady</u>, <u>Giglio</u>, and, to a certain extent, rule 16, are grounded in the Constitution's protections of defendants. Thus, as with most things in the law, when judge-made and legislative rules conflict with the Constitution, the Constitution trumps.

When Roviaro v. United States uses words indicating that disclosure must be had where: "the disclosure of an informer's identity . . . is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, [because] the privilege must give way," 353 U.S. at 60-61, academics and appellate judges may be able to draw distinctions between these phrases and tests, but on the street-level, district-court level -- like this case -- these finer distinctions may be hard to apply. In a case like this one, where there may be as many as 350 CIs, the Court has to make quick and decisive rulings regarding the disclosure and necessity of their identities, and, all the while, ensuring CI safety; the Court has to make this case work, and it has to make rulings almost as quickly as evidentiary rulings. It cannot get bogged down in appellate-level consideration of the fine distinctions underlying various disclosure and discovery obligations in criminal cases; it has to enter orders and make rulings while balancing every interest of the parties in a case. In the end, too, the Court has to ensure a trial that protects the defendant's constitutional rights.

Thus, the Court concludes that Roviaro v. United States does not apply to testifying witnesses. It also concludes, however, that the distinction does not really make a difference. The Court concludes that Brady, Giglio, and, to an extent, rule 16, still apply to testifying witnesses and the testimony that they will give, even if the United States will call that witness and, normally, does not have to disclose that witness until trial. A benefit of this rule is that the Court can be creative and flexible in creating disclosure orders. It can order disclosure for attorney's eyes only. It can deny the production to protect the CI. In other words, rather than a blanket, fixed rule, the Court can fashion a disclosure order that gets the defendant and/or counsel anything they need, and still try to protect the CI's safety as much as possible.

In sum, the Court is not requiring the United States to disclose its trial witnesses, but is ordering the United States to disclose a particular person with knowledge that the defendant has shown that person is likely to have material, exculpatory information under Brady.  The Court cannot soundly conclude that, just because the United States has a person on its witness list, the United States does not need to disclose that person's identity pretrial.  If the witness does not have Brady information, then the United States does not have to disclose the witness, even if it intends to call the witness at trial.  The United States can completely protect CIs having nothing favorable to say about the Defendants, but if the CI has exculpatory evidence, it will need to disclose that witness' identity, just like it does all other Brady material.  If the rule were otherwise, the United States could shield a lot of Brady, Giglio, and rule 16 information from disclosure just by putting a CI on an undisclosed witness list.  Such would not be consistent with due process and Brady.

Given the aforementioned principles underlying a defendant's ability to overcome the United States' privilege to withhold a non-testifying CI's identity upon a factual showing consistent with Roviaro v. United States, Brady, Giglio, and rule 16,  and that the Supreme Court in Roviaro v. United States did not explicitly restrict its holding to the case of a non-testifying CI, the Court sees no sound reason why, upon a sufficient showing, disclosure of a testifying CI's identity should not occur pretrial.  The Court has accurately concluded, in another case, that "there is a difference between a confidential informant, whose identity the government often never wants to reveal, and a confidential witness, whose identity will ultimately be revealed to facilitate the witness' testimony at trial and the defendant's opportunity to cross examine that witness."  United States v. Tarango, 760 F. Supp. 2d 1163, 1168 (D.N.M. 2009)(Browning, J.).  And, in United States v. Tarango, the Court reached its conclusion to not automatically order

disclosure of a testifying CI, in part, because the defendant "will know these witnesses' identities if they become witnesses; the issue is one of timing, not disclosure."  760 F. Supp. 2d at 1168. The Court, however, did not reach the timing issue in that case, because:

> The United States has offered to give Tarango more than what is required. Specifically, the United States has agreed to allow Tarango's attorney, Mr. Fisher, to access certain witnesses on the weekend before trial, after the United States has been able to secret those witnesses.  The United States also tentatively offered to turn over the identities of witnesses and other information for attorney's-eyes only review.  This arrangement[] would be suitable if both parties can come to an agreement on the details.

760 F. Supp. 2d at 1170.  The Court reached a similar agreement in United States v. Padilla, where it held:

> In this case, there is a strong inference -- based on the information confidential sources provided in the search-warrant affidavit -- that the identities of confidential informants who will be called as witnesses may aid the Defendants.  The Court believes that, to adequately investigate information which may be valuable for impeachment purposes, the Defendants' attorneys and investigator should have sufficient time to conduct an investigation, attempt to interview the witnesses, and request necessary information -- which the United States may not have in its possession -- from the proper sources.  Thus, the Court is requiring the United States to provide a list of its witnesses thirty days before trial.
>
> The Court, however, incorporates a protective order.  Mr. Twohig and Mr. Gorence are ordered that they will not disclose the identities of the confidential informants whom the United States intends to call as witnesses and other sensitive witnesses to anyone -- except the defense investigator they retain in this case -- unless and until Mr. Twohig and Mr. Gorence seek further leave of the Court or until fourteen days before the trial, when the United States must make its witness list publicly available.  Any information that the United States provides to Mr. Twohig and Mr. Gorence regarding the confidential informants whom the United States intends to call as witnesses and other sensitive witnesses may be discussed only with the investigator and the Assistant United States Attorneys who disclosed it.

2010 WL 4337819, at *8.  Because of these agreements, the defendants in those cases did not raise further argument as to the precise timing of the disclosure of the relevant testifying CIs in those cases.  Other courts have reached similar disclosure agreements amongst the parties.

> Based upon the record, the court finds that it is appropriate for the government to reveal the identities of informants numbers 4, 6, 7 and 11 ten days before trial. This ruling is based upon the court's concern for the safety of these and other informants. Disclosure of the identities of these informants ten days before trial will provide the defendants an adequate opportunity to prepare their defenses.

United States v. Avalos, 753 F. Supp. 871, 872 (D. Or. 1991)(Frye, J.).

The United States' Brady obligations bolster the lawfulness of disclosure of CIs' identities, testifying or not, upon a satisfactory showing under Brady, Giglio, rule 16, or Roviaro v. United States. "The Constitution, as interpreted in Brady, does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant." Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d at 823. Brady requires disclosure only of evidence that is both favorable to the accused, and "material either to guilt or to punishment." Brady, 373 U.S. at 87. "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. at 682. See United States v. Allen, 603 F.3d 1202, 1215 (10th Cir. 2010). A "reasonable probability," in turn, is a "probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. at 682 (internal quotation marks omitted). Where the Court is making an in depth and detailed analysis under Brady, Giglio, rule 16, or Roviaro v. United States, and concludes that the United States must disclose a testifying CI's identity, the obligations the United States has under Brady counsel against the United States' refusal to order disclosure until, for instance, the United States' obligations under the Jencks Act arise. Such an individual case-by-case inquiry, it appears, must occur in the Tenth Circuit, and disclosure must be had -- pretrial -- where the Court concludes that the principles at stake in Brady and the other criminal discovery obligations, and potentially in Roviaro v. United States, so demand.

## LAW REGARDING THE CONSTITUTIONAL BASIS FOR <u>ROVIARO V. UNITED STATES</u>

The Supreme Court has held that the principles underlying its holding in <u>Roviaro v. United States</u> are rooted in the Due Process Clause and Confrontation Clause. In <u>Roviaro v. United States</u> the Supreme Court concluded that there was error in the failure to disclose a non-testifying CI, but that case was "not decided on the basis of constitutional claims." <u>United States v. Valenzuela-Bernal</u>, 458 U.S. 858, 870 (1982). The Supreme Court, in <u>McCray v. Illinois</u>, 386 U.S. 300 (1967), considered both Due Process and Confrontation Clause claims in its <u>Roviaro v. United States</u> analysis, albeit in the context of a hearing to determine probable cause for an arrest where testifying officers attested to their CIs' veracity. See <u>McCray v. Illinois</u>, 386 U.S. at 309-14. The Supreme Court in <u>McCray v. Illinois</u> ultimately held, in the context of a probable-cause hearing, that "nothing in the Due Process Clause of the Fourteenth Amendment requires a state court judge in every such hearing to assume the arresting officers are committing perjury" and that the Sixth Amendment was similarly not implicated. 386 U.S. at 313-14 (referencing the Sixth Amendment, which states "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence," U.S. Const. amend. VI). In so holding, the Supreme Court stated that it is generally understood that <u>Roviaro v. United States</u> has a constitutional basis, because

> [w]hile *Roviaro* was not decided on the basis of constitutional claims, its subsequent affirmation in *McCray v. Illinois*, 386 U.S. 300[], where both due process and confrontation claims were considered by the Court, suggests that *Roviaro* would not have been decided differently if those claims had actually been called to the Court's attention.

United States v. Valenzuela-Bernal, 458 U.S. at 870.

The Tenth Circuit noted that Roviaro v. United States protects constitutional rights in

Gaines v. Hess, 662 F.2d 1364, 1368 (10th Cir. 1981). There, the Tenth Circuit stated:

> The Court in *Roviaro* declared that "fundamental requirements of fairness" require restrictions on the Government's privilege to refuse disclosure of an informant's identity. . . . This strongly indicates that the Court was referring to a constitutional limitation on the privilege, for few phrases are more closely associated to a constitutional guarantee than is the term fundamental fairness. The very "touchstone of due process is fundamental fairness."

Gaines v. Hess, 662 F.2d at 1368. The Tenth Circuit further concluded:

> We do not see how the Court's usage of the term could be otherwise construed. The public's interest in effective law enforcement is an important one. But at some point, withholding the identity of an informant who may be critical to the conduct of the defense infringes the defendant's constitutional right to a fair trial, which obviously includes the right to adequately prepare and present that defense. *Roviaro* clearly establishes that a blanket disclosure rule is not required. <u>Only under circumstances in which nondisclosure would deprive the defendant of his due process right to a fundamentally fair trial is disclosure constitutionally mandated</u>.

Gaines v. Hess, 662 F.2d at 1368 (emphasis added). Cf. McCray v. Illinois, 386 U.S. at 311

("What *Roviaro* makes clear is that this Court was unwilling to impose any absolute rule

requiring disclosure of an informer's identity even in formulating evidentiary rules for federal

criminal trials."). In that case, the Tenth Circuit considered a drug-buy scenario where the

"informant in question set up the transaction and was the only witness to the sale," and, "[t]hus,

the informant could testify directly to the critical issue in the case: whether [defendant] was the

seller." Gaines v. Hess, 662 F.2d at 1368. At trial, "[t]he informant's existence was revealed by

[a witness'] testimony, and the informant was the only one mentioned in the record, other than

[the defendant] himself, who could corroborate or discredit [that witness'] testimony." 662 F.2d

at 1368. The Tenth Circuit thus held that, "[o]n these facts, it would violate [the defendant's]

due process rights to deny disclosure if in fact the informant could provide potentially significant exculpatory testimony." Gaines v. Hess, 662 F.2d at 1368.

Thus, the Due Process Clause does not require the United States to disclose the identity of CIs in every case, see McCray v. Illinois, 386 U.S. at 309-14, but, to justify compelled disclosure under Roviaro v. United States and the Due Process Clause, a defendant can show that his right to the information outweighs the traditional privilege to withhold CIs' identities, as the Supreme Court explained in Roviaro v. United States, 353 U.S. at 59-62 ("Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way."). That showing, accordingly, entails demonstrating that disclosure is material to the defense or to the fair determination of the cause. See United States v. Rovario at 60-61.

## RELEVANT LAW REGARDING CIVIL DISCOVERY

Rule 34 of the Federal Rules of Civil Procedure governs discovery requests for documents. See Fed. R. Civ. P. 34. Rule 34(a) states:

A party may serve on any other party a request within the scope of Rule 26(b):

**(1)** to produce and permit the requesting party or its representative to inspect, copy, test, or sample the following items in the responding party's possession, custody, or control:

**(A)** any designated documents or electronically stored information -- including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations -- stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form; or

**(B)** any designated tangible things; or

      **(2)**     to permit entry onto designated land or other property possessed or controlled by the responding party, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

Fed. R. Civ. P. 34(a). Rule 26(b)(1) explains that the proper scope of discovery is "any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). Information sought is relevant "if the discovery appears reasonably calculated to lead to discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). Federal courts have held that the scope of discovery under rule 26 is broad. See Gomez v. Martin Marrietta Corp., 50 F.3d 1511, 1520 (10th Cir. 1995); Sanchez v. Matta, 229 F.R.D. 649, 654 (D.N.M. 2004)(Browning, J.)("The federal courts have held that the scope of discovery should be broadly and liberally construed to achieve the full disclosure of all potentially relevant information."). The federal discovery rules reflect the courts' and Congress' recognition that "mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation." Hickman v. Taylor, 329 U.S. 495, 507 (1947). As a result of this policy, rule 26 "contemplates discovery into any matter that bears on or that reasonably could lead to other matter that could bear on any issue that is or may be raised in a case." Anaya v. CBS Broad., Inc., 251 F.R.D. 645, 649-50 (D.N.M. 2007)(Browning, J.)(internal quotations marks omitted).

    A district court is not, however, "required to permit plaintiff to engage in a 'fishing expedition' in the hope of supporting his claim." McGee v. Hayes, 43 F. App'x at 217. "'Discovery . . . is not intended to be a fishing expedition, but rather is meant to allow the parties to flesh out allegations for which they initially have at least a modicum of objective support.'" Rivera v. DJO, LLC, 2012 WL 3860744, at *1 (D.N.M. 2012)(Browning, J.)(quoting Tottenham v. Trans World Gaming Corp., 2002 WL 1967023, at *2 (S.D.N.Y. 2002)(Knapp, J.)). See Hardrick v. Legal Servs. Corp., 96 F.R.D. 617, 618 (D.D.C. 1983)(noting that courts do, and

should, remain concerned about "fishing expeditions, discovery abuse and inordinate expense involved in overbroad and far-ranging discovery requests")(internal quotation marks omitted). "[B]road discovery is not without limits and the trial court is given wide discretion in balancing the needs and rights of both plaintiff and defendant." Gomez v. Martin Marietta Corp., 50 F.3d at 1520 (internal quotation marks omitted).

Courts have recognized that, while it is true that relevancy in discovery is broader than that required for admissibility at trial, "the object of inquiry must have some evidentiary value before an order to compel disclosure of otherwise inadmissible material will issue." Zenith Elecs. Corp. v. Exzec, Inc., 1998 WL 9181, at *2 (N.D. Ill. 1998). Courts have also recognized that "[t]he legal tenet that relevancy in the discovery context is broader than in the context of admissibility should not be misapplied so as to allow fishing expeditions in discovery." Zenith Elecs. Corp. v. Exzec, Inc., 1998 WL 9181, at *2 (internal quotation marks omitted).

Rule 26(b)(1) was amended in 2000. Before the 2000 amendments, rule 26(b)(1) defined the scope of discovery as follows:

> Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending actions, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. The information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(1)(1996). The 2000 amendments made the following changes, shown here in redline form with the deleted language stricken and the added material underlined:

> Parties may obtain discovery regarding any matter, not privileged, that which is relevant to the subject matter involved in the pending actions, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity

and location of persons having knowledge of any discoverable matter.  <u>For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action.  Relevant</u> <s>The</s> information <s>sought</s> need not be admissible at the trial if discovery the <s>information sought</s> appears reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(1).  Putting aside the changes to the last sentence -- which the advisory committee's notes make clear was a housekeeping amendment to clarify that inadmissible evidence must still be relevant to be discoverable -- the 2000 amendments have two effects: (i) they narrow the substantive scope of discovery in the first sentence; and (ii) they inject courts into the process in the entirely new second sentence.

In 1978, the Committee published for comment a proposed amendment, suggested by the Section of Litigation of the American Bar Association, to refine the scope of discovery by deleting the "subject matter" language.  This proposal was withdrawn, and the Committee has since then made other changes in the discovery rules to address concerns about overbroad discovery.  Concerns about costs and delay of discovery have persisted nonetheless, and other bar groups have repeatedly renewed similar proposals for amendment to this subdivision to delete the "subject matter" language.  Nearly one-third of the lawyers surveyed in 1997 by the Federal Judicial Center endorsed narrowing the scope of discovery as a means of reducing litigation expense without interfering with fair case resolutions.  <u>Discovery and Disclosure Practice</u>, <u>supra</u>, at 44-45 (1997).  The Committee has heard that in some instances, particularly cases involving large quantities of discovery, parties seek to justify discovery requests that sweep far beyond the claims and defenses of the parties on the ground that they nevertheless have a bearing on the "subject matter" involved in the action.

The amendments proposed for subdivision (b)(1) include one element of these earlier proposals but also differ from these proposals in significant ways.  The similarity is that the amendments describe the scope of party-controlled discovery in terms of matter relevant to the claim or defense of any party.  The court, however, retains authority to order discovery of any matter relevant to the subject matter involved in the action for good cause.  The amendment is designed to involve the court more actively in regulating the breadth of sweeping or contentious discovery.  The Committee has been informed repeatedly by lawyers that involvement of the court in managing discovery is an important method of controlling problems of inappropriately broad discovery.  Increasing the availability of judicial officers to resolve discovery disputes and increasing court management of discovery were both strongly endorsed by the attorneys surveyed by the Federal Judicial Center.  <u>See</u> <u>Discovery and Disclosure Practice</u>, <u>supra</u>, at 44. Under the amended provisions, if there is an objection that discovery goes

beyond material relevant to the parties' claims or defenses, the court would become involved to determine whether the discovery is relevant to the claims or defenses and, if not, whether good cause exists for authorizing it so long as it is relevant to the subject matter of the action. The good-cause standard warranting broader discovery is meant to be flexible.

**The Committee intends that the parties and the court focus on the actual claims and defenses involved in the action. The dividing line between information relevant to the claims and defenses and that relevant only to the subject matter of the action cannot be defined with precision. A variety of types of information not directly pertinent to the incident in suit could be relevant to the claims or defenses raised in a given action. For example, other incidents of the same type, or involving the same product, could be properly discoverable under the revised standard. Information about organizational arrangements or filing systems of a party could be discoverable if likely to yield or lead to the discovery of admissible information. Similarly, information that could be used to impeach a likely witness, although not otherwise relevant to the claims or defenses, might be properly discoverable. In each instance, the determination whether such information is discoverable because it is relevant to the claims or defenses depends on the circumstances of the pending action.**

The rule change signals to the court that it has the authority to confine discovery to the claims and defenses asserted in the pleadings, and signals to the parties that they have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings. In general, it is hoped that reasonable lawyers can cooperate to manage discovery without the need for judicial intervention. When judicial intervention is invoked, the actual scope of discovery should be determined according to the reasonable needs of the action. The court may permit broader discovery in a particular case depending on the circumstances of the case, the nature of the claims and defenses, and the scope of the discovery requested.

The amendments also modify the provision regarding discovery of information not admissible in evidence. As added in 1946, this sentence was designed to make clear that otherwise relevant material could not be withheld because it was hearsay or otherwise inadmissible. The Committee was concerned that the "reasonably calculated to lead to the discovery of admissible evidence" standard set forth in this sentence might swallow any other limitation on the scope of discovery. Accordingly, this sentence has been amended to clarify that information must be relevant to be discoverable, even though inadmissible, and that discovery of such material is permitted if reasonably calculated to lead to the discovery of admissible evidence. As used here, "relevant" means within the scope of discovery as defined in this subdivision, and it would include information relevant to the subject matter involved in the action if the court has ordered discovery to that limit based on a showing of good cause.

Finally, a sentence has been added calling attention to the limitations of subdivision (b)(2)(i), (ii), and (iii). These limitations apply to discovery that is otherwise within the scope of subdivision (b)(1). The Committee has been told repeatedly that courts have not implemented these limitations with the vigor that was contemplated. See 8 Federal Practice & Procedure § 2008.1 at 121. This otherwise redundant cross-reference has been added to emphasize the need for active judicial use of subdivision (b)(2) to control excessive discovery. Cf. Crawford-El v. Britton, 118 S. Ct. 1584, 1597 (1998)(quoting Rule 26(b)(2)(iii) and stating that "Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly").

Fed. R. Civ. P. 26 advisory committee's notes (emphasis added).

One gets the impression from reading the advisory committee's notes that the amendment was not intended to exclude a delineable swath of material so much as it is intended to send a signal to district judges to become more hands-on in the process of regulating -- mostly limiting -- discovery on relevance grounds alone. The "two effects" of the 2000 amendments might, thus, be only one effect: directing district judges to roll up their sleeves and manage discovery, and to do so on the basis of relevance. The change in substantive scope from "subject matter," to "claim or defense," would, therefore, seem to exist more to "add teeth" to the relevance standard than to effectuate a substantive narrowing. It is not surprising that Congress would want to increase judicial presence: "relevance" is a wide-open concept even in the context of trial, see Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."), and it is often said that relevance for discovery is an even broader concept. One might then say that old rule 26(b)(1)'s relevant discovery provision was toothless. It is likewise unsurprising that the rulemakers are unable to articulate precise language narrowing the substantive scope of discovery: no single general rule can adequately take into account the infinite number of possible permutations of different claims, defenses, parties, attorneys,

resources of parties and attorneys, information asymmetries, amounts in controversy, availabilities of information by other means, etc. The determination requires the individualized judgment of someone on the scene, and that presence is what the rulemakers wanted when they: (i) encouraged district judges to take a firmer grasp on the scope of discovery; and (ii) put their thumbs on the scale in favor of narrower discovery in the rule's definition of the scope of discovery.

Of course, courts should also seek to give substantive content to amendments. Read literally, the rule does not permit parties to discover information relevant only to the claim or defense of another party; they must use discovery only to investigate their own claims and defenses. More problematically, however, the rule may prevent using the Federal Rules' compulsory discovery process to obtain "background" information not specifically relevant to any one claim or defense -- e.g., a plaintiff naming a pharmaceutical company as a defendant and then using discovery to educate itself generally about medicine, biochemistry, and the drug industry by using the defendant's expertise.

In In re Cooper Tire & Rubber Co., 568 F.3d 1180 (10th Cir. 2009), the Tenth Circuit clarified that the 2000 Amendments to rule 26 "implemented a two-tiered discovery process; the first tier being attorney-managed discovery of information relevant to any claim or defense of a party, and the second being court-managed discovery that can include information relevant to the subject matter of the action." 568 F.3d at 1188. The Tenth Circuit further stated that,

> when a party objects that discovery goes beyond that relevant to the claims or defenses, "the court would become involved to determine whether the discovery is relevant to the claims or defenses and, if not, whether good cause exists for authorizing it so long as it is relevant to the subject matter of the action." This good-cause standard is intended to be flexible. When the district court does intervene in discovery, it has discretion in determining what the scope of discovery should be. "[T]he actual scope of discovery should be determined according to the reasonable needs of the action. The court may permit

broader discovery in a particular case depending on the circumstances of the case, the nature of the claims and defenses, and the scope of the discovery requested."

568 F.3d at 1188-89 (quoting the advisory committee's notes to the 2000 amendments to Fed. R. Civ. P. 26(b)(1))(citations omitted)(footnote omitted)(alteration in original).

## ANALYSIS

The CI Motion and the Motion to Compel present the Court with various categories of disclosure and discovery requests at varying levels of compliance and assent on the United States' part. By the time of the hearing, the parties had resolved many of the issues that the CI Motion and Motion to Compel raised. The Court, then, helped the parties resolve their objections, or else eliminated the confusion between the parties about the disclosure and discovery requests. The Court is mindful that the Protective Order requires that Garcia receive discovery on a tablet -- by way of a discovery coordinator -- and that the discovery comes to Garcia in combination with discovery for the indictments in United States v. DeLeon and United States v. Baca. Below are the Court's orders and analysis regarding the items and categories of disclosure that Garcia requests -- and that have not subsequently been mooted -- within the CI Motion and the Motion to Compel.

## I.     THE COURT WILL GRANT IN PART AND DENY IN PART THE CI MOTION.

The CI Motion asks the Court for an order directing the United States to "furnish counsel for the accused with the following information concerning the use of informants, confidential informants, witnesses, informers, confidential sources, sources of information, infiltrators, cooperating individuals, security informers or intelligence assets who participated in any way or who are material witnesses to any of the events charged in the indictment." CI Motion at 1. According to Garcia, the individuals about whom he seeks information are:

(A) Any person or entity furnishing information to the government on a confidential basis, where such information has been obtained as a result of legitimate employment or access to records and is provided consistent with applicable law;

(B) Any other person or entity furnishing information to the government on a confidential basis;

(C) Any other person or entity providing information or substantial operation assistance with some degree of regularity, which may be as infrequent as a few times per year, or as frequent as several times per week.

(D) It is further requested that the information requested be provided specifically as it may relate or pertain to the following individuals:

> (1) All confidential sources as described in any affidavits which have been filed in support of requests for electronic surveillance whether such have been revealed or not;

> (2) Any individual who has or is expected to furnish information, cooperation, testimony at the grand jury or at trial, or assistance to the government;

> (3) All confidential sources referred to in the affidavits in support of the various search warrants which have been or will be provided in discovery;

> (4) Individuals whose names were redacted in discovery referencing individuals believed to be inmates or cooperating defendants and co-defendants; and,

> (5) Any other person identified in any document which has been or will be provided in this case.

CI Motion at 1-2. For those persons, Garcia then makes thirty-nine requests, with sub-parts, for specific information to which, he argues, he is entitled. See CI Motion at 2-10. At the hearing, Garcia narrowed his request's scope, as it became apparent that there were only four CIs and one undercover officer involved with this standalone drug case. Indeed, even before the hearing, the United States had agreed to produce all Giglio related information for two of the CIs, and at the hearing agreed to produce the identities and all Giglio information for the other two CIs.

The Court, in United States v. DeLeon, has already held that it will not stray from the principles it has used to manage criminal discovery in the past as it oversees the SNM cases, as it had recently memorialized those principles in its opinion in United States v. Hykes, 2016 WL 1730125, at *2. The Court administers criminal discovery, first, in accordance with rule 16, under which at

> a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and: (i) the item is material to preparing the defense; (ii) the government intends to use the item in its case-in-chief at trial; or (iii) the item was obtained from or belongs to the defendant.

Fed. R. Crim. P. 16(a)(1)(E). The United States must also disclose to the Defendants any evidence that "is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution," Brady, 373 U.S. at 87, and that disclosure obligation includes evidence that is useful to the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory, see Giglio, 405 U.S. at 153. See also United States v. Roybal, 46 F. Supp. 3d 1127, 1166 (D.N.M. 2014)(Browning, J.)(stating that the United States must put itself in the shoes of Defendant's counsel, and be certain that items it does not wish to disclose "do not contain exculpatory or impeachment material," because "[i]n the end, the burden remains on the United States to know its case and comply scrupulously with Brady"). The Jencks Act requires the United States to disclose to criminal defendants any statement that a United States witness made and which is "in the possession of the United States" once that witness has testified. 18 U.S.C. § 3500.

Indeed, the Court has also already, in the context of these SNM cases, provided guidance regarding the proper legal standard it uses when analyzing CIs' disclosure both where the Court

has concluded that the United States must disclose a testifying CI's identity pursuant to <u>Brady</u> -- requiring that the Defendant has shown that the CI likely has material, exculpatory evidence, where, should it not be disclosed, "there is a reasonable probability that . . . the result of the proceeding would [be] different," <u>Kyles v. Whitley</u>, 514 U.S. at 433 (discussing <u>Brady</u> standards), and also where the CI is a nontestifying witness. The disclosure of both testifying and non-testifying CIs' identities -- under <u>Roviaro v. United States</u>, <u>Brady</u>, <u>Giglio</u>, rule 16, or the Jencks Act -- is, under some circumstances, and at some point, appropriate. The primary dispute is generally only over the timing of that disclosure after the Court has concluded that disclosure is appropriate. Regarding CIs in particular, the United States has a privilege "to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law." <u>Roviaro v. United States</u>, 353 U.S. at 59. "The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation." <u>Roviaro v. United States</u>, 353 U.S. at 59. "Anonymity of informants encourages communications to law enforcement officers." <u>Usery v. Local Union 720, Laborers' Int'l Union of N. Am., AFL-CIO</u>, 547 F.2d at 527.

The privilege is not absolute, however, and where "the disclosure of an informer's identity . . . is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." <u>Roviaro v. United States</u>, 353 U.S. at 60-61. The Supreme Court in <u>Roviaro v. United States</u> stated that the desirability of calling the CI as a witness, or at least interviewing the informant in advance of trial, is a matter for the accused, rather than the government, to decide. <u>See</u> 353 U.S. at 64. When a CI is a "participant

in and a material witness to" the alleged criminal transaction, the disclosure of his or her identity is sometimes required. Roviaro v. United States, 353 U.S. at 65. The standard for disclosure of CIs who play an active, as opposed to a passive, role in the investigation is not fixed; rather, the court must consider: "(1) the crime charged, (2) the possible defenses, (3) the possible significance of the informer's testimony, and (4) other relevant factors." Roviaro v. United States, 353 U.S. at 62. In Roviaro v. United States, for example, the CI "helped to set up the criminal occurrence and had played a prominent part in it. His testimony might have disclosed an entrapment." 353 U.S. at 64. The Supreme Court found that the district court's failure to order disclosure of the CI's identity "in the face of repeated demands by the accused for his disclosure" was prejudicial error. 353 U.S. at 64-65.

In this case, at the hearing, the United States recognized the writing on the wall with respect to the Court's tendencies concerning CI disclosure, as well as the appurtenant discovery of information relating to law enforcement's use of CIs in their investigations and how criminal discovery rules apply in those contexts. Specifically, the United States represented to the Court that it had had already immediately produced the Giglio information for the CI it was going to call at trial earlier at the hearing. See 3 Tr. at 43:24-44:11 (Armijo). The Court reiterated:

> Okay. So if I understand you correctly you will make certain that all law enforcement reports written by or on these five [CI]s will be produced either as Jencks material, Giglio material, or if it's Brady [it] will be produced immediately, but all of it will be produced by Wednesday before trial?

3 Tr. at 44:17-23 (Court). The United States responded that the Court was mistaken -- "because we're not calling all those other people. So I think that's where the Roviaro is going to come in. Is the Court going to require us to provide" that information, even though they are not to be testifying witnesses? 3 Tr. at 44:23-45:1 (Armijo). The United States has provided all of the requested law enforcement reports for the CI whom it is calling to testify and for the undercover

agent, but the remaining three CIs are non-testifying witnesses for the United States' case, so the analysis has to be different regarding Garcia's requests pertaining to them. See 3 Tr. at 47:17-24 (Armijo, Court). Regarding the three non-testifying CIs, however, the United States nonetheless indicated that it believed that "given the Court's previously ruling in the DeLeon case," Garcia was entitled to the identity of the three CIs, and that it was thus in the process of helping Garcia by providing him "the identities of the reports for those CHSs to whose identity they're entitled. So now I hope I've confused you enough to tell you that we're going to disclose these people's identity to them, and also disclose which reports they have from these people." 3 Tr. at 48:25-49:5 (Beck).

Regarding what Garcia would be getting from the United States relating to these CIs, the United States clarified that the disclosure would be expansive, because the Court had held that "the Department of Justice, U.S. Attorney's office can pretty much get w[hat it] wants given [the Secretary of the Department of Corrections] being an alleged target of [SNM,] they pretty much can pick up the phone and get this information [from the state Department of Corrections]." Tr. at 25:15-20 (Court). The United States explained that it did not object to disclosing -- as Giglio information and also as Jencks information -- "everything that's in the Government's possession," Tr. at 25:25-26:1 (Beck), which includes the information it can get from the New Mexico Department of Corrections, and "if . . . for example he's had contact with the FBI or DEA or somebody related to the federal Government, [it] would also give everything in the [federal] department files," Tr. at 26:1-4 (Court).

The Court then posited: "So what you're saying you're not going to do is folks, go search state police, local, county, local DA's that sort of stuff for his criminal history. Is that basically the dividing line[?]" Tr. at 26:13-17 (Court). The United States responded that the Court was

correct, and that, absent those entities such as the New Mexico Department of Corrections which were part of the joint SNM investigation, the United States did not have the whole world of the information that all unrelated entities might have regarding its CIs.  See Tr. at 26:18-25 (Beck). The United States noted: "[I]f [the United States] know[s] about it or [has it] the[n it will] produce it but [it is] not going to go out and start doing an investigation trying to find out whether there is something there."  Tr. at 27:1-5 (Court, Beck).  At the hearing, the Court confirmed with Garcia that it had adequately disposed of the CI Motion as a result of the United States' representations, saying: "It seems to me we've gotten pretty close to what I think you're entitled to[,] Mr. Adams.  Where do you see the remaining issues[?]"  Tr. at 30:15-17 (Court). Garcia urged the Court only to have the United States disclose the information as soon as possible: "Judge, if they're prepared to produce it ASAP then I think that's right.  I mean, this is apparently material separate from Jencks."  Tr. at 30:18-20 (Adams).  It needs to be disclosed as soon as possible, Garcia argued, because his counsel has "a duty to investigate it."  Tr. at 31:4 (Adams).  The United States did not raise objection to prompt disclosure of the Giglio information, causing the Court to again inquire whether the United States' agreements and intentions to disclose much of the requested Giglio information pertaining to the CIs involved in the standalone drug case -- as soon as possible -- satisfied Garcia's requests in the CI Motion, and Garcia agreed.  See Tr. at 34:5-9 (Court, Adams).  Garcia further maintained that the United States should need to run searches of state files for the names of persons that Garcia might later suspect are "cooperators whose names are not confirmed," because it was not possible for Garcia to make those searches.  Tr. at 31:12-17 (Adams).  The United States agreed to run and disclose summaries of the reports for names of persons that Garcia suspects and, obviously, for the CIs

about which the Court had already ordered it needed to disclose information.  See Tr. at 33:23-34:4 (Beck).

Accordingly, the Court concludes that it will grant in part and deny in part the CI Motion. The CI Motion was admittedly overbroad, but the Court -- over the course of the hearing -- narrowed Garcia's CI Motion to the requests for information to which he was entitled success. Before the hearing, the United States conceded that there were two CIs whom "[we]re witnesses to these transactions: they set up the drug deals and were material participants in the drug sales. So *Roviaro* entitles Garcia to their identities."   CI Motion Response at 3.   The Court, nonetheless, concludes that Garcia has made a sufficient showing under Roviaro v. United States that, with the identities of all three nontestifying CIs whom have information related to this case, Garcia might be able to obtain relevant and helpful information for his defense.  See 353 U.S. at 60-61.  Further, because the United States has represented that all three nontestifying CIs played active roles in the drug stings which implicated Garcia in these drug crimes, see 3 Tr. at 48:25-49:5 (Beck); Roviaro v. United States, 353 U.S. at 64, and that it has law enforcement reports and certain information in its possession, custody, and control which may contain impeachment evidence regarding those CIs' roles in this matter; the United States will disclose that information as soon as possible, bearing in mind the proximity of trial, see Giglio, 405 U.S. at 153.  The United States further confirmed that, for the one CI it plans to call to testify at trial, Garcia had correctly guessed that CI's identity at the hearing, and that it would be disclosing all of the law enforcement reports and Giglio information it had in its possession, custody, and control, as soon as possible.  See 3 Tr. at 43:6-7; 43:24-44:11 (Beck, Armijo).  The Court will not require the United States to provide any other information than was established at the hearing for the other CIs that it is not calling as witnesses, however, because Garcia has not made a

showing that most of that information is <u>Brady</u>, <u>Giglio</u>, or rule 16 information; in other words, Garcia is doing a lot of fishing for information to which he is not entitled, and the Court will not order such disclosure. As to all <u>Brady</u>, <u>Giglio</u>, or rule 16 information, though, the United States must produce that as soon as possible, whether for a testifying CI or a nontestifying CI.

## II.     THE COURT WILL GRANT IN PART AND DENY IN PART THE MOTION TO COMPEL.

The Court first notes that much of the CI Motion's requests are also found, in one way or the other, in the Motion to Compel. At the outset, the Court's orders and the United States' agreements to promptly disclose the identities of the three nontestifying CIs, as well as all <u>Giglio</u> information regarding those CIs, that is in the United States possession, custody, and control, moots many of Garcia's requests in the Motion to Compel. Similarly, the United States' agreement to disclose the <u>Giglio</u> information and ultimately Jencks information for the United States' testifying witness and the undercover officer -- in a prompt manner before trial -- also moots some of Garcia's requests. Indeed, as the hearing proceeded, simply figuring out how many CIs the United States used in these transactions, and how many they intended to call to testify at trial, also appeared to moot some of Garcia's requests. Much of the United States' disclosures regarding the four CIs at issue in this case addressed the Motion to Compel's content. To the extent that it was not, the Court now addresses the Motion to Compel.

The Court starts by summarizing the relevant law it has decided in these SNM-related cases. If the CI is not going to testify, <u>Roviaro v. United States</u> controls, but it only controls disclosure of that CI's identity. Even if the CI's identity must be disclosed, that does not mean that the defendant gets all the information about the CI that the defendant wants. <u>Brady</u>, <u>Giglio</u>, and rule 16, not <u>Roviaro v. United States</u>, governs discovery of all other information. Second, if

the CI is going to testify, <u>Brady</u>, <u>Giglio</u>, and rule 16 govern the timing of disclosure of any additional information about the CI.

Again, Garcia's requests in the Motion to Compel fall roughly into eleven general categories, with the first category seeking "items relating to specific incident dates," with those items from each incident entailing, for the most part, "incident reports, search warrants, affidavits, records, reports, video/audio recordings, witness statements, photographs, evidence inventories and chain of custody reports, laboratory or forensic reports [and] any other investigative materials, documents, or data." Motion to Compel at 3, 9. Those specific incidents are: (i) a May 6, 2014 -- or 2015 -- incident; (ii) a July 13, 2015, incident; (iii) an August 7, 2015, incident (distribution of heroin and cocaine, Count 1 and 2, <u>see</u> Redacted Superseding Indictment at 1-2); (iv) an August 11, 2015, incident (distribution of heroin, Count 3, <u>see</u> Redacted Superseding Indictment at 2); (v) a September 10, 2015, incident (distribution of heroin, Count 4, <u>see</u> Redacted Superseding Indictment at 2); a November 18, 2015, incident; (vi) a December 3, 2015, incident (intent to distribute heroin and possession of marijuana, Count 5 and 6, <u>see</u> Redacted Superseding Indictment at 2-3); and (vii) thirty other dates which generally relate to certain overt acts alleged in <u>United States v. DeLeon</u> and <u>United States v. Baca</u>. <u>See</u> Motion to Compel at 3-11.

Garcia next requests: (i) category two -- "scientific reports and related items"; (ii) category three -- "telephone records used by all confidential human sources"; (iii) category four -- "witness information and miscellaneous items," such as "a list of lay and expert witnesses that the Government intends to call at trial in each case," and "any and all law enforcement agency Reports of Investigation . . . regarding allegations in the indictments"; (iv) category five -- a viewing of "drug evidence, and all laboratories that conducted the drug testing, and independent

testing of all the drug evidence"; (v) category six -- a viewing of "NM DOC Level VI cell where Eric Duran allegedly made phone calls to Mr. Garcia"; (vi) category seven -- "redacted pages of all discovery and immediate identification of all CHSs, cooperating informants, [and] cooperating defendants"; (vii) category eight -- "NM D[epartment of Corrections ('NM DOC')] policies, procedures and documentation in effect at the time Mr. Garcia was housed at NM DOC"; (viii) category nine -- "Syndicato De Nuevo Mexico[] alleged enterprise evidence"; (ix) category ten -- "prior law enforcement contacts with Christopher Garcia"; and (x) category eleven -- "transcripts of audio recordings" of CI conversations. Motion to Compel at 12-22. As the reader can tell, much of Garcia's remaining requests are simply the same requests he already made in his Motion to Compel, but devoid of relevance to a specific incident charged in the Indictment -- making the Motion to Compel less onerous than it originally seems. The United States also addressed many of Garcia's requests by either disclosing the requested items, or explaining to Garcia how he may obtain the requested items. In particular, regarding witness lists and witness information -- the fourth category of Garcia's requested discovery -- the United States indicates that it has already filed its witness list in this case and that it will continue to supplement that list according to the Court's schedule. See Response at 6. Regarding Garcia's fifth category of requests, to view drug evidence and all laboratories, can be fulfilled, in part, by making an appointment to view the drug evidence with the Assistant United States Attorneys. See Response at 6-7. Regarding viewing the laboratories, however, the United States cautions that the Drug Enforcement Administration and the New Mexico State Police will oppose Garcia's request. See Response at 7. Further, the United States also does not object to Garcia's sixth category of requests -- viewing Duran's "NM DOC Level VI cell" -- and provides that Garcia's counsel need only go through the normal process to visit the Penitentiary of New

Mexico ("PNM"). Response at 7. The Court is left, then, with only the first category of requests -- pertaining to specific incident dates -- and Garcia's second, third, seventh, eighth, ninth, tenth, and eleventh categories of requests.

At the hearing, Garcia focused his argument on the discovery requests which corresponded with significant incident dates. The Court will take the requests as Garcia presented at the hearing, because the Court is not in a position to know precisely what the United States produced subsequent to the Motion to Compel and relied on Garcia at the hearing to narrow his requests. Garcia was first interested in "requested items [that] relate . . . to the August 7, 2015 incident," primarily law enforcement investigatory reports by "deputy Matt Chance . . . one of the key investigative officers that day." 3 Tr. at 22:10-18 (Sirignano). The United States responded that "if she hasn't received a report from [Matt Chance] then there isn't a report." 3 Tr. at 23:6-8 (Armijo). The United States explained that it had "asked for the complete file from BCSO and if there is not one in the discovery, then there is not one, if she says she has not received one." 3 Tr. at 23:11-14 (Armijo). Apparently, however, Garcia had a report -- or outside knowledge that there was a report -- from Chance, and was now looking for the whole file related to his report, causing the Court to order the United States to "talk to [BCSO Deputy Chance and] find out what report or reports he did, and then let's track those down, I think I'd feel more comfortable if the Government produced any report or reports rather than relying upon whatever sources the defendant is getting, has to get it." 3 Tr. at 25:7-12 (Court).

Garcia next requested, regarding BCSO laboratory reports, "chains of custody," because he has "received a number of the chains of custody and . . . did review the evidence here in Court which had partial chains of custody but I know for sure I don't have all the chains of custody I need." 3 Tr. at 25:15-19 (Sirignano). Garcia further clarified that he had the chains of custody

from everything going into the BCSO lab, but not everything "coming out of the lab," and that

he was thus looking for whether "there is anybody else other than FBI and BCSO . . . involved in

chain of custody." 3 Tr. at 26:6-15 (Sirignano, Court). The United States then indicated that it

had

> contacted each of the labs because we have three labs . . . [W]e have southern
> state lab[,] we have the APD lab[,] and we have the DEA lab. I contacted all of
> the analysts and I asked them for all of the . . . data that they had, all their notes,
> extensive stems and we received those items and we [dis]closed those items. I
> also asked for the chain of custodies from the FBI, from BCSO. If there is not a
> lot of chain of custody on the stuff from BCSO because it hasn't really gone . . .
> anywhere.

3 Tr. at 27:9-16 (Armijo). The Court recognized that Garcia was entitled to that information

under Brady and rule 16, if it was available to the United States, and also that there has been a lot

of discovery produced in the SNM cases and that Garcia has had to sift through a lot of it to

prepare for the standalone drug case, so the Court ordered the United States to double and triple

check that it had disclosed all of the chain-of-custody information Garcia sought. See 3 Tr. at

16-17 (Court).

Garcia turned to his requests for law enforcement investigative reports next, providing

that

> I've got one surveillance report, which was Bates number 6 on this incident. I
> don't have any other investigative report, and I don't know if it's because the FBI
> has failed to abide by their 5 day policy or rule to write reports, if reports were
> written or wasn't written, but when I was in the FBI everybody wrote reports
> within the five days for the most part. Not every single time and I can't imagine
> on an undercover drug purchase that all I have is one surveillance FBI report. I
> don't have any photographs . . . . I don't have any photographs or . . .
> investigative reports on that.

3 Tr. at 20:21-31:8 (Sirignano). Regarding these FBI investigative reports, the United States

stated that it had produced all existing reports, but that it would sit with the FBI and ensure that it

had indeed made those disclosures. See 3 Tr. at 31:13-18 (Armijo). The Court concluded: "All

right I'm going to take that as a representation that complete FBI investigative reports on this incident have been produced. If you find that it [has not been] you need to produce it immediately. But I'm going to take that as a representation in case something shows up." 3 Tr. at 31:19-25 (Court).

That argument regarding the law enforcement reports, and the Court's relevant orders, invited argument at the hearing that was also applicable to Garcia's CI Motion. Indeed, as the Court has explained, the parties came to the agreement at the hearing that there are four CIs and an undercover officer with information pertaining to the relevant drug transactions. More specifically, there were two CIs whom were participating actively in the drug deals Garcia made, and two CIs who were on telephones making the introductions necessary for the drug deals to proceed. See 3 Tr. at 33:14-17 (Sirignano). The United States intends to call the undercover officer and one CI, and Garcia -- for the time being -- seems keen to call the remaining three CIs, or at the least to investigate their identities and decipher which law enforcement reports related to those three CIs. Regarding whether the United States had "produced all law enforcement reports on" the four CIs and the undercover agent who might relate to the August 7, 2015, incident, 3 Tr. at 43:10-23 (Court), the United States represented to the Court that it had produced all such law enforcement reports, and that, for the one CI it intended to call, it had already -- the prior day -- produced the Giglio information for that testifying CI. See 3 Tr. at 43:24-44:11 (Armijo). The Court reiterated:

> Okay. So if I understand you correctly you will make certain that all law enforcement reports written by or on these five [CI]s will be produced either as Jencks material, Giglio material, or if it's Brady [it] will be produced immediately, but all of it will be produced by Wednesday before trial?

3 Tr. at 44:17-23 (Court). The United States affirmed the Court's attempt to frame the issue, indicating that it had provided all of the requested law enforcement reports for the CI it is calling

to testify and for the undercover agent; that, regarding the three non-testifying CIs, the United States believes that, "given the Court's previously ruling in the DeLeon case," Garcia is entitled to the three CIs' identity; and that it was thus in the process of helping Garcia by providing him "the identities of the reports for those CHSs to whose identity they're entitled. [W]e're going to disclose these people's identity to them, and also disclose which reports they have from these people." 3 Tr. at 47:17-24, 48:25-49:5 (Armijo, Beck). Further, regarding Giglio information for the undercover officer that is going to be called to testify, Garcia had worked out a timetable with the United States to get that information, mooting the requests related to that undercover officer. See 3 Tr. at 79:17-19 (Sirignano).

Next, Garcia addressed his request for transcripts of the recordings from the August 7, 2015, incident, regarding which the United States agreed to "produce all time transcripts all recordings from August 7 that you have, and if there is a doubt about the date, you'll go ahead and just produce it." 3 Tr. at 51:18-21 (Court, Armijo). More specifically, the Court ordered that the United States will give Garcia its "exhibit list [and the relevant transcripts] . . . but they're giving you a little bit more, probably some transcripts they're not going to use," too. 3 Tr. at 52:16-19 (Court). For the transcript's substance, the Court ordered that, "when you maybe send a letter over, could you just tell her that this transcript has CHS-1, CHS 2, CHS 3 and then we use the . . . chart Mr. Beck made," which depicts the relevant CIs and their roles. 3 Tr. at 54:1-4 (Court). This directive ensures that every party understands exactly the role each CI played in this investigation and the information those CIs may have which could be relevant to Garcia's defense. Accordingly, for the transcripts and CI information requests, the Court concluded: "Well I think that unless you tell me otherwise . . . we've probably gone through everything and with the law enforcement reports . . . the CHSs, so you're probably not entitled to

all [other] law enforcement reports unless it falls into <u>Brady</u>, <u>Giglio</u>, [or the] Rule 16 standard." 3 Tr. at 55:23-56:4 (Court, Sirignano).

Garcia then moved to his requests relating to the August 11, 2015, incident, to which the Court applied its orders for the August 7, 2015, incident -- to the extent they might be relevant, instructive, or applicable -- to all of the specific incident requests. <u>See</u> 3 Tr. at 58:9-61:2 (Court). That application caused Garcia to make argument only about his request regarding the home surveillance equipment which was at his home during the arrest for these drug charges. <u>See</u> 3 Tr. at 61:7-8 (Sirignano). According to Garcia,

> we believe that it contains <u>Brady</u> material or impeachment [material] and this equipment was taken, I believe by the Government during the search warrant. And we'd like to -- I'm asking if a copy or an original to be returned to the defense of that as it's relevant to these alleged drug transactions.

3 Tr. at 61:9-14 (Sirignano). The United States represented that the equipment was not seized, prompting the Court to order the United States to talk to the FBI agent who executed the search and arrest warrant to "confirm whether it's on the list or not that there was no surveillance equipment attention and if there is not let Ms. Sirignano know send her an email or letter and tell her you've talked to the agent it's not on the [log] doesn't look like it's in FBI possession." 3 Tr. at 64:8-13 (Court). The Court further ordered the United States to ask the FBI agent about the other items from his home for which Garcia wants an accounting, specifically cellular telephones, tablets, and computers. <u>See</u> 3 Tr. at 19-21 (Court). Garcia indicated, however, that he wanted the original cellular telephones, tablets, and computers, because

> in my experience, when a search warrant happens, a computer search warrant also is part of that. . . The evidence is downloaded if it's relevant to their investigation. Some kind of a report is done of the cellphone evidence. And in other cases . . . I've done with the AUSA[,] we've discussed either returning an original or a mirror images of the evidence that was seized, the computer evidence or the cellphone evidence, the tablet evidence so the defense isn't being deprived

of that evidence. And I'd like to have the . . . forensic . . . report . . . regarding all
this technology evidence.

3 Tr. at 66:2-16 (Sirignano). Garcia argued further, however, that "I need the original. [T]here

is no evidentiary value to the Government on the original, or a mirror image of the data from

those devices, and also the . . . forensic science center report regarding what was found on those

devices." 3 Tr. at 66:21-67:2 (Sirignano). The Court ordered that the United States allow

Garcia's counsel to come view the cellular telephones, tablets, and computers if the data mirror

images would not accomplish Garcia's same goals, satisfying this request for Garcia. See 3 Tr.

at 67:25-1 (Armijo).

The next incident Garcia argued regarding was the September 10, 2015, incident. See 3

Tr. at 70:3-7 (Armijo). For this incident, as for the others, the United States reiterated that it

would comply with the Court's order regarding law enforcement reports and will "make the

same request that we did on the other ones for BCSO, FBI, we will actually this will be like

triple checking again and we will certainly do that, Your Honor." 3 Tr. at 70:3-7 (Armijo).

Garcia added a gloss to his request on this matter, however, stating that one problem he was

having was that the BCSO reports, and their poor numbering, made it hard to determine about

what the reports discussed, and that he was going to argue at trial that this poor recordkeeping

could render the reports inappropriate for use at trial; the Court thus ordered the United States:

> When you do this triple review, if there [are] any signed copies, produce those, if
> there are any unsigned copies, produce those, if there is a stray page, produce
> those. I know you can't be sponges [of] what occurred over at BCSO. But just
> give her everything and then Ms. Sirignano, you can have fun on cross-
> examination making your point. But I don't think that probably I can do much
> more than that.

3 Tr. at 77:23-78:7 (Court).

The next issue that Garcia asked the Court to address was disclosure of law enforcement reports pertaining to the September 10, 2015, incident, wherein Garcia maintained his request "for all records or payments made by and benefits from law enforcement including but not limited to all payments made to this CHS," 3 Tr. at 81:16-19 (Sirignano), and the Court agreed that a CIs payment is something that should be in Garcia's hands, see 3 Tr. at 82:5-7 (Court), for any of these incidents. The United States argued to the Court, however, that it was not going to be calling a CI for this incident -- it was only calling an undercover officer, meaning it did not need to disclose any payments for the CI with whom the undercover officer worked. See 3 Tr. at 82:8-17 (Armijo). Garcia posited:

> I'm kind of astounded that the Government thinks that they're going to come in and prove their case without the beginning or how this case commenced and the cellphone records and the paid snitch with the cellphone in the jail . . . . You know, obviously they're just going to try and say, oh, on September 10th, you know an alleged drug deal occurred between this undercover officer and my client. Well, the story doesn't start there, Your Honor the story starts in the Department of Corrections.

3 Tr. at 83:9-24 (Sirignano). The Court was hesitant, inquiring why payments the testifying undercover officer may have made leading to his purchase of drugs from Garcia would help Garcia and his defense, to which Garcia explained:

> Well, this is something that I really don't think that we need to disclose to the Government or the Court at this time. You know, this is Kyles v. Whitley. This impeaches the integrity of their investigation. Your Honor, it starts from the beginning[] their investigation was tainted from the very beginning, and they want to start in the middle because they know that there was some dirty nonsense going on in the beginning of this case. And they don't want these snitches to testify.

3 Tr. at 84:7-19 (Sirignano). The United States then explained that this argument pertains to CIs whom they were not planning to call to prove their case, and that Garcia -- for the three CIs he was intending to call -- is

just planning on calling them [to im]peach them[.] I don't think that's allowed to call a witness just to impeach a witness unless it provides something. They won't have anything really exculpatory as far as this case goes. It's just like I keep saying this is a simple drug case. You have a search warrant and a lot of times have intros or a search warrants we start the case from on this date we served a search warrant. We don't go into the background of it. Or a lot of times we have in[tros] from CIs, for instance this count we're not getting into the int[r]o. We're trying to keep it clean Your Honor and exactly like she said she may be astounded but that's how we do dr[ug] cases, which is . . . on this date, this person bought th[ese] drugs from this person[] and . . . that's what we're doing. As to these CHSs, again I think they're using this case to try and get information ahead of time that they're not entitled to for the other cases. And so as to the witnesses that we call, we have no problem providing.

3 Tr. at 86:22-87:17 (Armijo). The Court indicated that it was inclined to conclude that Garcia is

not entitled to information regarding payments that the testifying undercover officer may have

made to persons in the lead up to the September 10, 2015, drug buy from Garcia without making

a showing that

these witnesses you're calling are going to provide some . . . evidence, and if you're calling them and then you're wanting to impeach your own witness that's fine, but I guess I'm wondering if you need to make a showing before you get that evidence from the Government that it [is not just a] fishing expedition and that in fact it's going to be [getting] Giglio or Brady information.

3 Tr. at 87:18-88:4 (Court). Garcia explained, however, that the purpose of these disclosures,

with respect to building his defense, is:

I don't think anyone would dispute that would be an area that we could [impeach] law enforcement[]'s lack of efforts to provide the best evidence in Court. I don't think anybody would dispute that we could ask about that. I think we are allowed to go further under Kyles v. Whitley and that was a 1995 Supreme Court case it's a Brady case and I've always thought it was really interesting because it was right [around the time of the] O.J. [trial], so and a lot of [people] where I lived were up[set] that O.J. got [aquitt]ed and . . . they thought it was unfair and right around that same time Kyles came out Supreme Court . . . said you know attacking the credibility of the police investigation is a time honored and legitimate defense strategy. . . . [W]e're allowed to talk about all the other things in their investigation that they did not do and the choices that they did do to try to develop a case against Chris Garcia and I think part of that is going to be the bank rol[l] that they put into . . . custody [and to the] person with the telephone and to other people. I mean we get, if they're going to put . . . agents on the stand we . . .

- 119 -

attack the lack of full investigation as we see it to the extent the Court finds it [permissible] at this point we want discovery on it so we can make those tactical choices. But we certainly anticipate challenging them on what . . . choices they did make in the investigation and choices they did not make in the investigation. And I think this falls squarely under <u>Kyles v. Whitley</u>, whether or not the Government chooses to call the witness and in <u>Kyles v. Whitley</u> the key witness was a guy named Bingaman [and] he was never called as a witness in the case but there was whole bunch of information that was never turned over to the defense that the defense could have used to further investigate and that could have led to admissible lines questioning of the law enforcement officer.

3 Tr. at 88:10-90:22 (Adams). The Court understood this defense theory, but nonetheless posited

that,

well, I guess my problem here is that these are witnesses . . . you're calling, [and] the Government is not calling. It seems to me that once that occurs I've got to run it through . . . <u>Brady</u> and <u>Giglio</u>, and it's getting pretty attenuated to get out there and start talking about payments to CIs they're not calling in this case. I'm not restricting your ability to question them on the stand about that.

3 Tr. at 90:22-91:4 (Court). The Court then concluded that it would

just warn the Government that if they've made payments and I'm going to allow these questions to be asked, which I am, you better have the material somewhat ready or have the officers ready to [speak about it] because I do think that I'll allow the question, but I'm not necessarily going to order the Government to produce all of it right at the moment. Because I'm not seeing the <u>Brady</u>, <u>Giglio</u> or other, it seems, it's a fact, and assuming that the Government's witnesses say accurately what occurred, . . . but have it ready. If you don't want to produce it now [fine,] but it may all of a sudden become relevant because the Government doesn't want to be in a position where its got witnesses up here that are not being accurate. So have it ready to go but I won't order its production now[,] I think probably we know what happened so it's probably not a secret.

3 Tr. at 91:11-92:3 (Court). Upon the United States' proffer that it was going to disclose the

balance of information which Garcia requests regarding the "cellular phone information" relating

to Duran's use of a cell phone in custody at PNM, 3 Tr. at 92:7-18 (Armijo), Garcia chose to

withdraw the rest of the Motion to Compel's requests regarding the September 10, 2015,

incident, ending argument on that request, 3 Tr. at 93:12-15; 93:19-21 (Sirignano). Regarding

the cellular phone information generally, for the CIs, the United States had already conceded that

it "has provided information on the cellular telephones used by the CHSs involved in the charged incidents in this case, and [that it] will provide Court orders pertaining to those telephones to the Defense." Response at 6.

Garcia then chose to turn argument to the Motion to Compel's category of requests regarding scientific reports and related items, ostensibly satisfied that the global disclosure orders he had received from the Court pertaining to specific incidents had fulfilled his requests in that regard. See 3 Tr. at 94:5-95:2 (Sirignano). In support of his scientific reports and related items request, Garcia relied on Arvizu's testimony; Arvizu is a "chemist who works as a laboratory auditor," and

> for clients who use laboratory test results to make very important decisions and they need to understand whether or not a given result or given set of results was generated in accordance with the laboratory's own pro[cedures] and then whether those procedures meet national and international standards for that type of work,

3 Tr. at 95:16-17; 96:9-15 (Arvizu). According to Arvizu, the issue Garcia faced -- and the purpose for this request -- was because:

> The records that have been received to date from the Albuquerque police department laboratory and from the New Mexico Department of Public Safety laboratory appear to both be good faith effort to provide all the available items of discovery that were listed in your request. I can't obviously ask the[m to] produce a record that doesn't exist. But it appears that they have made a good faith effort to produce all the requested materials. The records that have been provided to date from the DEA laboratory are wholly insufficient for this kind of an independent assessment. They are very, very limited. And the, I believe the only records to date []received from the FBI laboratory relate to their written procedures for doing latent print testing. So I don't actually have any case specific records just their latent print procedure.

3 Tr. at 99:6-22 (Arvizu). Arvizu stated that she needs the FBI laboratory data "to make an assessment as to whether or not the reported results can be considered scientifically reliable for an important forensic use in court." 3 Tr. at 99:24-100:2 (Arvizu). Arvizu clarified that "fingerprint work" was a component of the FBI data. See 3 Tr. at 100:8 (Arvizu). The United

States explained to the Court, at this point, that it had made a request from the FBI laboratory for the data that Arvizu may need and that the DEA has denied further requests for information.  See 3 Tr. at 100:10-25; 110:2-4 (Castellano).  Accordingly, the United States argued that it had given Arvizu what it had regarding the FBI laboratory data, and that, "if there is a specific request then DEA is going to take issue with that, and . . . because DEA's position is . . . that the criminal discovery rules do not require it; . . . [and] the [DEA] denied several requests made [by the United States] saying that what the defense wanted was civil discovery."  3 Tr. at 124:6-16 (Armijo).  The Court indicated that it was

> not inclined to grant the motion.  It seems to me that unless the defendant can point to some problem that it's a fishing expedition and it goes beyond what Brady and Giglio and Rule 16 require.  So I'm not inclined to order anything further.  I do think that if your expert, Ms. Arvizu, wants to look at the new [data she had not seen in the United States' disclosures] and make a more refined request, Ms. Armijo is not shutting the door of sending that to the DEA.  But my reaction or initial impression is that most of this is just fishing to see if they can find a problem rather than there being something that gives the Court some concern that we need to go that direction.

3 Tr. at 129:20-130:7 (Court).

At the hearing, Garcia chose not to specifically argue regarding his seventh, eighth, ninth, tenth, and eleventh categories of requests.  For clarity, those requests were for "redacted pages of all discovery and immediate identification of all CHSs, cooperating informants, [and] cooperating defendants"; "NM DOC policies, procedures and documentation in effect at the time Mr. Garcia was housed at NM DOC"; "Syndicato De Nuevo Mexico[] alleged enterprise evidence"; "prior law enforcement contacts with Christopher Garcia"; and "transcripts of audio recordings" from CHS conversations.  Motion to Compel at 20-21.  At the outset, the United States, regarding Garcia's request for information about prior law enforcement contacts, argues that Garcia's requests for production of prior law enforcement contacts with Garcia is

"overbroad and burdensome," but that -- nonetheless -- where the United States has information regarding Garcia's contacts with law enforcement which are relevant to this case, it represents that it has already provided those discovery materials. Response at 8. The United States has also made the representation that it will be triple checking other categories of productions which it has represented to the Court that it has produced, so the Court will order the United States, in this respect, to make a similar check for the production it argues it has produced. Cf. 3 Tr. at 70:3-7 (Armijo). This United States' concession, and Garcia's decision not to argue this request at the hearing, suggests to the Court that the United States' representation about which items of discovery it had produced for that matter satisfied Garcia. Regardless, the Court considers Garcia's request -- as it does not relate to this case -- to be overbroad under Brady, and Giglio, and rule 16, representing a fishing expedition for information to which he is not entitled -- particularly where he has made no explanation in the Motion to Compel why he makes such a broad request.

Further, the Court's global rulings address and resolve Garcia's request for transcripts of audio recordings of CI conversations, as the Court ordered that the United States give Garcia its "exhibit list [and the relevant transcripts] . . . but they're giving you a little bit more, probably some transcripts they're not going to use," too. 3 Tr. at 52:16-19 (Court). That order came on the heels of the United States' representation that, for the transcripts of the CI conversations which Garcia requests, it had already disclosed those materials. See Response at 8. The Court will, once more, similarly require the United States to triple check its disclosures regarding these transcripts of audio recordings under Brady, Giglio, and rule 16; otherwise, Garcia's requests have been satisfied.

The Court will now address the balance of Garcia's three other categories of requests which he chose not to address at the hearing.  First, regarding Garcia's request for "redacted pages of all discovery and immediate identification of all CHSs, cooperating informants, [and] cooperating defendants," the United States has already satisfied the request in part by its disclosure of the identities of the CIs involved in this case, and all <u>Brady</u> and <u>Giglio</u> information pertaining to those CIs, leaving only the issue of redactions.  The United States objects only to providing the relevant unredacted sets of discovery, at this time, because it argues such a request is an attempt to receive Jencks Act material early, which rule 15 does not allow.  <u>See</u> Response at 7.  The United States, however, also agreed at the hearing to -- after it has disclosed the CIs' identities -- alert Garcia to which reports relate to which CI, thus alleviating some of the need for unredacted discovery regarding these CIs.  <u>See</u> 3 Tr. at 48:25-49:5 (Beck).  Further, at the hearing, when discussing redactions of certain BCSO reports in a context unrelated to CI discovery, the Court stated:

> I'm not sure what I can do with the redaction do you[.  C]an you think of anything I can really do with the redactions[?]  I read lots of redacted material too, so I'm sympathetic how hard it is to read[.  T]hat was what I was talking about the CIs a moment ago[.  I]t's hard to keep all those [straight] as well, but can you think of anything I can really do to help you out on the redactions[?]

Tr. at 73:11-18 (Court).  Indeed, the Court got Garcia to concede that -- even with the redactions -- he had been able to discover who most "of the players in [the] case" were.  Tr. at 73:21-74:3 (Court, Sirignano).  The Court, accordingly, is not concerned that the redactions have impeded Garcia's investigation of his case, and that Garcia has not shown why, under <u>Brady</u>, <u>Giglio</u>, or rule 16, the Court should order early production of information the United States has indicated it will disclose with its Jencks productions before trial.  <u>See</u> Response at 7.  The Court will thus deny that component of Garcia's request at this time.

Next, Garcia requests:

> All NM DOC policies, procedures and documentation in effect at the time Mr. Garcia was housed at NM DOC, including, but not limited to, the STIU and RIP Program policies, all movement logs, movement in the pods Mr. Garcia was housed at, and work orders in all pods, that Christopher Garcia was housed in while at the NM DOC.

Motion to Compel at 21. Garcia, however, has not made any attempt -- in briefing or in oral argument -- to substantiate why he is entitled to that broad category of information under Brady, Giglio, or rule 16. See Motion to Compel at 21. In a Memorandum Opinion and Order the Court issues in a related case, United States v. DeLeon, the Court considered a similar request by the Defendants for all of the procedures, log books, and master roster from Southern New Mexico Correctional Facility, and STIU information for all inmates housed in unit 1A for the six months before and one month after March 7, 2014, which it concluded was too broad, and that it would not order such production without a more substantive showing. See United States v. DeLeon, Memorandum Opinion and Order at 106, filed February 8, 2017 (Doc. 907). The Court required a showing by the Defendants that a homicide victim in that case may have had "ongoing disputes" with other inmates in his unit, and that thus the log books could help to "potentially develop other motives . . . and potentially other suspects," before it ordered that the United States produce the log books for three weeks before and three days after the incident, thus denying the rest of the request "without prejudice" in case the produced log books consequently necessitate further production. United States v. DeLeon, Memorandum Opinion and Order at 106, filed February 8, 2017 (Doc. 907). The Court also ordered production of the New Mexico Corrections Department procedures, i.e., the procedures regarding how the log books are put together, for that same time period, because the Defendants had made an adequate showing under Brady. United States v. DeLeon, Memorandum Opinion and Order at 106, filed February 8, 2017 (Doc.

907).  The Court will adhere to this standard.  Garcia has made no similar showing here; instead, in its current one-sentence form, Garcia's request resembles a fishing expedition, by which he seeks information which he has not demonstrated will help him in his defense.  The Court will thus deny Garcia's request for this broad swath of information at this time.

Last, regarding Garcia's request for all "Syndicato De Nuevo Mexico[] alleged enterprise evidence," the United States has argued to the Court in the past that this is simply a prosecution of Garcia for certain drug crimes.  See United States v. Garcia, 2016 WL 7257190, at **3-4.  The Court will not label this case simple or not simple, but will state that it is a drug case and not the more complex case of United States v. DeLeon or United States v. Baca.  Garcia is not, in this prosecution, charged with SNM association or crimes in furtherance of the alleged SNM enterprise.  Accordingly, under either of Brady, Giglio, or rule 16 the Court is not persuaded that all "Syndicato De Nuevo Mexico[] alleged enterprise evidence" is a category of production which the Court must order under the law and on this showing.

**IT IS ORDERED** that: (i) the Defendant's Motion to Compel Disclosure of Discoverable Materials, filed February 25, 2017 (Doc. 163), is granted in part and denied in part; and (ii) the Defendant's Motion for Discovery and Inspection Concerning Government's Use of Informants and Cooperating Individual; Disclosure and Notice of Exculpatory Evidence Requested Concerning Government's Use of Informants and Cooperating Individuals, filed February 28, 2017 (Doc. 181), is granted in part and denied in part.  Regarding the CI Motion, the Court's orders, and the United States agrees, to promptly disclose the identities of the three nontestifying CIs, as well as all Giglio information regarding those CIs, that is in the United States possession, custody, and control.  Similarly, the Court notes the United States' agreement to disclose the Giglio information, and ultimately Jencks information, for the United States'

testifying witness and the undercover officer, in a prompt manner before trial. As to all <u>Brady</u>, <u>Giglio</u>, or rule 16 information, the United States must produce that as soon as possible, whether for a testifying CI or a nontestifying CI. Regarding the Motion to Compel, which the Court grants in part and denies in part for the reasons stated on the record at the hearing and detailed here in this Memorandum Opinion and Order, the Court notes that its rulings which pertain to a specific incident date apply to the other specific incident dates, where appropriate. The Court notes that the United States has agreed to disclose Garcia's request for telephone records used by all confidential human sources, transcripts of audio recordings of CI conversations, and that it will also disclose as appropriate the requested witness information. The Court also notes that the United States does not object to Garcia's viewing of the drug evidence or Eric Duran's cell at the New Mexico State Penitentiary. The Court also grants in part the disclosure of information regarding CIs and the CHS, for the reasons stated in relation to the CI Motion. The Court denies, however, Garcia's request for all prior law enforcement contacts with Garcia -- beyond those involving the investigation of the present case, which the United States agrees it will disclose -- Garcia's request for all SNM alleged enterprise evidence, and all New Mexico Department of Corrections policies, procedures, and documentation in effect at the time he was in the New Mexico Department of Corrections (absent a more substantial showing as to how such information constitutes, for example, <u>Brady</u> information that should have already been disclosed). Last, regarding Garcia's request for scientific reports and related items, the Court notes that it has ordered the United States to double and triple check its disclosures to ensure it has disclosed the information it represents to the Court it has disclosed.

UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon P. Martinez
  United States Attorney
Maria Y. Armijo
Randy M. Castellano
Matthew M. Beck
  Assistant United States Attorneys
Las Cruces, New Mexico

     *Attorneys for the Plaintiff*

Christopher W. Adams
Law Offices of Christopher W. Adams, P.C.
Charleston, South Carolina

--and--

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

     *Attorneys for the Defendant*